## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

LAVERNA SIMMS,

                Plaintiff,

    v.

DISTRICT OF COLUMBIA, *et. al.,*      Case No. 06-02178 (RCL)

          Defendants.

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants District of Columbia and D.C. Department of Corrections ("DOC"), by and through undersigned counsel, hereby move that this Honorable Court dismiss the plaintiffs' Amended Complaint. Such relief is requested pursuant to Fed. R. Civ. P. 12(b)(6) and 56. As grounds for this Motion, the defendants state as follows:

1. Plaintiff's Amended Complaint fails to state a claim for municipal liability under 42 U.S.C. § 1983 and the doctrine of *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978) (Counts I, II, III and IV);

2. The wrongdoing alleged in the Amended Complaint does not rise to the level of a constitutional violation (Counts I, II, III and IV);

3. Plaintiff's claims must be dismissed because they are barred by the applicable statute of limitations (Counts I, II, III, IV, V and VI);

4. Plaintiff's common law claims must be dismissed (Counts V and VI);

5. Plaintiff has failed to file any notice consistent with D.C. Code, § 12-309; and

6. DOC is *non sui juris* (Counts I, II, III, IV, V and VI).

A Memorandum of Points and Authorities and two proposed Orders are attached hereto. Because this is a dispositive motion, the District is not required to seek consent pursuant to LCvR 7.1(m).

Dated: June 4, 2007.                    Respectfully Submitted,

                                        LINDA SINGER
                                        Attorney General for the
                                        District of Columbia

                                        GEORGE C. VALENTINE
                                        Deputy Attorney General
                                        Civil Litigation Division

                                        _____/s/Nicole Lynch_____
                                        NICOLE L. LYNCH [471953]
                                        Section Chief
                                        General Litigation § II

                                        ____/s/Toni Michelle Jackson___
                                        TONI M. JACKSON (453765)
                                        Assistant Attorney General
                                        441 4th Street, NW, 6th Floor South
                                        Washington, DC 20001
                                        (202) 724-6602
                                        Fax:  (202) 727-3625
                                        E-Mail:  toni.jackson@dc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of June, 2007, I caused the foregoing DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

**Jo Ann Myles, Esquire**
**LAW OFFICES OF JO ANN MYLES**
**1300 Mercantile Lane, Suite 139-S**
**Largo, MD 20774**

                                        _____/s/Toni Michelle Jackson_____
                                        TONI MICHELLE JACKSON
                                        Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAVERNA SIMMS,

      Plaintiff,

  v.

DISTRICT OF COLUMBIA, *et. al.,*    Case No. 06-02178 (RCL)

     Defendants.

**DEFENDANTS' MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

This Court should dismiss the plaintiff's Amended Complaint against the defendants for the following reasons:

1. Plaintiff's Amended Complaint fails to state a claim for municipal liability under 42 U.S.C. § 1983 and the doctrine of *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978) (Counts I, II, III and IV);

2. The wrongdoing alleged in the Amended Complaint does not rise to the level of a constitutional violation (Counts I, II, III and IV);

3. Plaintiff's claim must be dismissed because they are barred by the applicable statute of limitations (Counts I, II, III, IV, V and VI);

4. Plaintiff's common law claims must be dismissed (Counts V and VI);

5. Plaintiff has failed to file any notice consistent with D.C. Code, § 12-309; and

6. DOC is *non sui juris* (Counts I, II, III, IV, V and VI).

## I. FACTUAL BACKGROUND:

Plaintiff filed suit on December 21, 2006, alleging that she was sexually harassed and subjected to a hostile work environment at the D.C. Jail.  (*See* Complaint, *et. seq.*). Specifically, the plaintiff alleges that a DOC employee, Harcourt Masi, sexually

harassed her and created, among other things, a hostile work environment. (*Id.*).  On May 4, 2007, plaintiff filed her Amended Complaint alleging violations of 42 U.S.C. §1983, §1988, and the Fifth and Eighth Amendments of the U.S. Constitution. (*See* Amended Complaint, *et. seq.*).[1]

In the Amended Complaint, plaintiff alleges that she "was at all times relevant herein, was (sic) an employee and part owner and/or incorporator of the Center for Correctional Health and Policy Studies ("CCHPS")." (*Id.*, at ¶¶ 3, 24, and 26.).  Plaintiff began working with CCHPS on or about April 2001.  (*Id.*, at ¶24.).  Plaintiff has named CCHPS as a defendant in this lawsuit. (*Id.*).  Plaintiff also states later in her Amended Complaint that CCHPS employed her and owed a duty of care to her and all its employees to "ensure their health, safety and a work environment free of sexual harassment and hostility and discrimination." (*Id.*, at ¶ 5.).

As to the District of Columbia and DOC, plaintiff alleges that she was an "employee, agent, and/or contractor, "who provided medical and mental health services to DOC." (*Id.*, at ¶ 3.).  Plaintiff further alleges that the District of Columbia and DOC are responsible for "ensuring the health, safety and a work environment free of sexual harassment and hostility and discrimination for all its employees and contractors." (*Id.*, at ¶ 4.).

On January 23, 2004, plaintiff gave a sworn statement to the D.C. Department of Corrections Office of the Special Inspector ("OSI"). (*See* Interview of Laverna Simms, attached hereto as Exh. A.).  In that statement, plaintiff indicated that Corporal Masi

---

[1] Defendants note that plaintiff claims a violation of §1988, but fails to make any allegations to support the claim.  In fact, plaintiff does not include a §1988 count in her Complaint and Amended Complaint. Therefore, defendants respectfully request that the Court find that plaintiff's failure to properly plead any

began making unwelcomed comments to her when she started at DOC in 1997, and continued to make unwelcomed comments for approximately two years. (*Id*., at p. 6.). Plaintiff stated that Masi never touched her, and that his comments were more annoying than sexual in nature. (*Id.*, at p. 7-8.). Plaintiff also stated that Masi stopped making comments to her about two years after he started and did not resume until sometime in 2003. (*Id*., at p. 9.).

Sometime in 2003, plaintiff alleged that Masi began making unwelcomed comments to her again, and eventually Masi touched her arm on two occasions in December 2003. (*Id*., at p. 12-14.). Plaintiff complained to a DOC official and asked that Masi be counseled for his behavior. (*Id*.). Plaintiff refused to file a formal complaint. (*Id*.). Plaintiff stated that Lt. McCormack counseled Masi, but after the counseling session Masi grabbed her arm for a third time. (*Id*., at p. 13.). After the third unwelcomed touch, plaintiff complained to Major Corbett, who contacted OSI and filed a formal complaint. (*Id.*, at p. 15.).

In September 2004, OSI found probable cause of sexual harassment, and proposed Masi's termination. (*See* Notice of Termination Letter, attached hereto as Exh. B.). Masi appealed the termination, and the hearing officer proposed that Masi be suspended for 180 days without pay. (*See* Notice of Final Decision Letter, attached hereto as Exh. C.). Masi was suspended for five months, from March 14, 2005 through July 11, 2005. (*Id*.).

Plaintiff filed her Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination on May 12, 2006. (*See* EEOC Charge, attached hereto as Exh. D.).

---

§1988 count in her Amended Complaint is sufficient to grant the defendants' motion to dismiss on that claim.

Plaintiff alleges sexual harassment, hostile work environment and retaliation starting in October 2001. (*Id*.). In her Charge of Discrimination, plaintiff states that she began working with CCHPS in October 2001. (*Id*.). The EEOC issued plaintiff her Right to Sue Letter on May 17, 2007. (*See* EEOC Letter, attached hereto as Exh. E.).

Plaintiff alleges that she complied with D.C. Code §12-309 by sending letters to the District on March 18, 2005, May 28, 2005 and August 10, 2006. (Amended Complaint, at ¶ 6.). However, the Office of Risk Management has no record of any Notice of Claim Letters from plaintiff or her attorney. (*See* Affidavit of Mia Powell Liley, attached hereto as Exh. F.).

The District received the Amended Complaint on May 4, 2007, which was entered on the docket on May 8, 2007. Defendants' response to the Amended Complaint was due on May 21, 2007. On May 21, 2007, defendants timely filed a Motion for an Extension of Time to File a Responsive Pleading until June 4, 2007. (*See* Docket #11.).

## II.  STANDARD OF REVIEW

A motion to dismiss for failure to state a claim upon which relief can be granted is appropriate where it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. <u>Aronoff v. Lenkin Co.</u>, 618 A.2d 669, 684 (D.C. 1992); <u>McBryde v. Amoco Oil Col.</u>, 404 A.2d 200, 202 (D.C. 1979); SCR - Civil 12(b)(6). Under Rule 12(b)(6), all allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff. <u>Atkins v. Industrial Telecommunications Assn.</u>, 660 A.2d 885, 887 (1995).

Alternatively, summary judgment should be granted if "there is no genuine issue as to any material fact and  . . . the moving party is entitled to judgment as a matter of law."  SCR - Civil 56(c).  "A moving party is entitled to judgment as a matter of law "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  I.J.G., Inc. v. Penn-America Ins. Co., 830 A.2d 430, 437 n.4 (D.C. 2002), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Applying either standard, this Court should grant DOC's motion to dismiss or, in the alternative, its motion for summary judgment.

### III.  ARGUMENT

### A. ALL CONSTITUTIONAL CLAIMS AGAINST THE DISTRICT SHOULD BE DISMISSED BECAUSE THE PLAINTIFF HAS FAILED TO STATE A CLAIM FOR MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983 (COUNTS I, II, III & IV)

The plaintiff alleges that the District violated her Eighth Amendment and Fifth Amendment rights under the U.S. Constitution, and demands relief for these violations pursuant to 42 U.S.C. § 1983. (See Amended Complaint, Counts I, II, III and IV).  As explained in Monell v. Dep't of Social Servs. of the City of New York, the District can be held liable for the plaintiff's constitutional claims only if the plaintiff alleges facts that indicate her injury was caused by a policy or custom of the District.  436 U.S. 658, 694 (1978); see also City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985).  According to the Supreme Court decision in Monell:

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under § 1983."

436 U.S. at 694.

The Supreme Court further held in *Oklahoma City* that, "at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City*, 471 U.S. at 824. The *Oklahoma City* decision interpreted *Monell* as holding that "municipal liability should not be imposed *when the municipality was not itself at fault.*" *Id*. at 818 (emphasis added).

Here, even with all reasonable inferences taken in favor of the plaintiff, the facts alleged in the Amended Complaint cannot permit a finding of a District of Columbia policy or custom of failure to ensure "the health, safety and a work environment free of sexual harassment and hostility and discrimination for all its employees and contractors." (*See* Amended Complaint, at ¶4). In fact, contrary to plaintiff's allegations, her statements to the OSI investigator indicate that once she made her allegations known to DOC personnel in 2004, DOC moved promptly to investigate and discipline Masi. (*See* Exhs. B and C.). Furthermore, even if such an inference could be made, there are no facts alleged in the Amended Complaint to suggest that the plaintiff's allegations of sexual harassment were the result of any such policy. [2]

## B. PLAINTIFF'S FIFTH AMENDMENT CLAIMS DO NOT STATE A CONSTITUTIONAL VIOLATION

The Fifth Amendment of the U.S. Constitution guarantees each individual equal protection under the laws, including federal, state, and municipal statutes and ordinances.[3] A law can be a facial violation of equal protection, or a facially valid law

---

[2] In addition, the District is not liable for Masi's actions under the doctrine of Respondeat Superior.

[3] The Fourteenth Amendment expands the protections of the Fifth Amendment to apply to the states. Because the District is not a state, the Fourteenth Amendment does not apply to the District of Columbia. However, the equal protection doctrines arising out of the Fourteenth Amendment are equally applicable to the District under the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

can be unconstitutionally applied in a manner that violates an individual's equal protection rights.

Here, the plaintiff alleges that the District is liable for her alleged injuries because it failed to ensure "the health, safety and a work environment free of sexual harassment and hostility and discrimination for all its employees and contractors." (*See* Amended Complaint, at ¶4). Nowhere in the plaintiff's Amended Complaint does she allege either a *per se* violation of equal protection, or that her equal protection rights were violated by a District of Columbia policy.

### 1. Due Process Clause

The Supreme Court has ruled that "the Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimum levels of safety and security in the workplace." *Collins v. City of Harker Heights*, 503 U.S. 115, 130 (1992). Nor was the Court "persuaded that the city's alleged failure to train its employees . . . was an omission that can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *Id*. at 128. It explained:

> Our refusal to characterize the city's alleged omission . . . as arbitrary in a constitutional sense rests on the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces. . . . The Due Process Clause "is not a guarantee against incorrect or ill-advised personnel decisions." . . . *Nor does it guarantee municipal employees a workplace that is free of unreasonable risks of harm.*

*Id.* at 128-29 (emphasis added). Finally, the Court ruled that plaintiff had "not alleged that the deprivation of this liberty interest was arbitrary in the constitutional sense." *Id.* at 129.

As applied here, the plaintiff's allegation that the District failed to ensure "the health, safety and a work environment free of sexual harassment and hostility and discrimination for all its employees and contractors," does not violate the plaintiff's constitutional rights. "The Due Process Clause" does not "guarantee municipal employees a workplace that is free of unreasonable risks of harm." *Collins*, 503 U.S. at 129.

Here, the plaintiff's claims are even more tenuous if she intends to allege that the DOC policies and procedures on which her constitutional claims depend have the status of District law. As the District of Columbia Court of Appeals has ruled, an agency protocol "is not itself a regulation whose violation by itself may support a finding of negligence, let alone gross negligence." *District of Columbia v. Henderson*, 710 A.2d 874, 877 (D.C. 1998). As the *Henderson* court also recognized, a rule that a deviation from an internal protocol constitutes negligence "would create the perverse incentive for the District to write its internal operating procedures in such a manner as to impose minimal duties upon itself . . . rather than imposing safety requirements . . . that may far exceed those followed by comparable institutions." *Clark v. District of Columbia*, 708 A.2d 632, 636 (D.C. 1998). These rulings apply with even greater force when plaintiff seeks to convert a deviation from internal operating procedures into a tort of constitutional dimensions.

2.  Equal Protection Clause

The plaintiff also bases her lawsuit on the equal protection clause of the 5th Amendment of the U.S. Constitution. (*See* Amended Complaint, Count IV.) Specifically, the plaintiff alleges that the District failed "to prevent and remedy the racial

discrimination and sexual harassment of" the plaintiff. (Amended Complaint, Count IV, ¶ 67.)  This claim must be dismissed, because, as a matter of law, the plaintiff cannot articulate a set of facts that establish discriminatory intent on the part of the District.

The plaintiff's claim arises directly out of the equal protection clause of the 5th Amendment.  Constitutional claims such as these are made actionable by the individual right of action set forth under 42 U.S.C. § 1983.  Because the plaintiff has brought her claim directly under the equal protection clause, her ability to survive a motion to dismiss or summary judgment challenge must be analyzed under equal protection guidelines.   It is well-settled that, in order for the plaintiff to prove that she was discriminated against in violation of the equal protection clause of the Fifth Amendment, she must set forth facts to show that the District's actions were based on discriminatory intent.

The Supreme Court has "made clear that 'proof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977) and citing *Washington v. Davis*, 426 U.S. 229 (1976)); *see also Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352 (1918)) ("the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.").

Here, plaintiff has not set forth sufficient facts to survive the District's motion to dismiss on her equal protection claim. Plaintiff simply cannot show through, the facts set forth in her Amended Complaint, the most critical element of her harassment claim––she cannot raise a factually supported inference of intent to harass. *Cuyahoga Falls*, 538 U.S. at 194; *Arlington Heights*, 429 U.S. at 265. The District, therefore, is entitled to judgment as a matter of law.

## C. PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE THEY ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.

The plaintiff brings claims against the District under the theories of negligence, deprivation of civil rights under 42 U.S.C. 1983, and violations of the Fifth and Eighth Amendments of the U.S. Constitution. (*See* Amended Complaint, *et. seq*.). All of these claims are time-barred under § 12-301(8), and therefore must be dismissed.

### 1. Plaintiff's Common Law Claims, prior to October 2004, should be Dismissed Because They are Barred by D.C. Code 12-301(8).

The plaintiff's common law claims of intentional infliction of emotional distress and negligent supervision and training should be dismissed because they are barred by the statute of limitations. According to D.C. Code 12-301(8), a three year statute of limitations is applied to all actions "for which a limitation is not otherwise specially prescribed," which includes claims for negligence and intentional infliction of emotional distress. *See Prouty v. Nat'l Railroad Passenger Corp.*, 572 F. Supp. 200, 206 (D.D.C. 1983) (holding there is a three year statute of limitations for negligence claims). The statute of limitations period begins to run at the moment the plaintiff "suffers injury." *Prouty*, 572 F. Supp. at 206. Also, a "one-action rule applies . . . : the plaintiff must bring a single suit for all present and future damages flowing from a discrete [tortious]

act . . . as soon as he or she becomes aware of some injury on which to base the suit."
*Beard v. Edmondson*, 790 A.2d 541, 546 (D.C. 2002) (quoting *Keefe Co. v. Americable Int'l, Inc.,* 755 A.2d 469, 476 (D.C. 2000).

The plaintiff was aware of her alleged injuries starting in 1997 and continuing for approximately two years until sometime in 1999. (*See* Exh. A, at p. 6-9.).  Therefore, plaintiff's statute of limitations period for the common law claims began to run in 1997.

### 2.  Plaintiff's Claim should be Dismissed Because Her Constitutional Claims Under Section 1983 and the U.S. Constitution Are Barred by the Statute of Limitations.

The plaintiff's 42 U.S.C. 1983 claim for deprivation of civil rights and the Fifth and Eighth Amendments of the U.S. Constitution are also barred by the applicable statute of limitations. According to the Supreme Court of the United States, a court should borrow the general or residual statute for personal injury actions when addressing a §1983 claim.  *Owens v. Okure*, 488 U.S. 235, 249-250 (1989).  The purpose of adopting the residual statute of limitations is to make it predictable and easy for a plaintiff to determine the appropriate statute of limitations before filing a §1983 claim.  *Id.* at 248.

A plaintiff does not have a "carte blanche to defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm." *Hendell v. World Plan Executive Council*, 705 A.2d 656, 661 (D.C. 1997).  Here, plaintiff left employment with the District of Columbia on or around October 2001. The plaintiff clearly had sufficient notice of the District's alleged misconduct in October of 2001. It is irrelevant that the plaintiff has since suffered any further injury since that date, since "a right of action may accrue before the plaintiff becomes aware of all of the relevant facts."  *Id.*  The plaintiff failed to file her lawsuit until

13

December 21, 2006, five years after she left the District and joined CCHPS as an owner-operator. Therefore, her constitutional claims are barred by the three year statute of limitations. *See Hall,* 285 F.3d at 82.

Simply put, all allegations of wrongdoing against the District of Columbia prior to October 2004, are barred by the applicable statute of limitations.

### D. PLAINTIFF'S COMMON LAW CLAIMS AGAINST THE DISTRICT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AND SUBJECT MATTER JURISDICTION

The plaintiff's Amended Complaint alleges common law claims for intentional infliction of emotional distress and negligent supervision and retention against the defendants. (Amended Complaint, Counts V and VI). Plaintiff's claims must be dismissed because she fails to state a claim upon which relief can be granted and this court lacks subject matter jurisdiction.

#### 1. Plaintiff's Amended Complaint fails to State a Claim— Intentional Infliction of Emotional Distress (Count IV)

Even making all reasonable inferences in the plaintiff's favor, the Amended Complaint has not alleged conduct that is severe enough to state a claim for intentional infliction of emotional distress. The D.C. Court of Appeals has held that "[e]stablishing a prima facie case of intentional infliction of emotional distress requires a showing of '(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Futrell v. Department of Labor Federal Credit Union*, 816 A.2d 793, 808 (D.C. 2003) (quoting *Paul v. Howard Univ.*, 754 A.2d 297, 307 (D.C. 2000)).

While the standard for proving and intentional infliction of emotional distress claim generally is rigid, it is even more stringent in the context of employment disputes.

The D.C. Court of Appeals explained, "We have been exacting as to the proof required to sustain such claims 'in an employment context.'  The conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'"  *Futrell*, 816 A.2d at 808 (quoting *Paul*, 754 A.2d at 307-08); *see also Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997) (quoting *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991) and Restatement (Second) of Torts § 46 cmt. d (1965)).  Thus, in the employment context, such a standard has been extremely difficult to meet.  In fact, the D.C. Court of Appeals has noted, that "generally, employer-employee conflicts do not rise to the level of outrageous conduct." *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211-12  (D.C. 1997).

The  D.C. courts  have  followed  this  standard  by  dismissing  all  but  the  most egregious intentional infliction of emotional distress claims brought against employers. In *Cowley v. North American Telecommunications Assn.*, 691 A.2d 1169, 1171 (D.C. 1997), the plaintiff employee brought an intentional infliction of emotional distress claim against his employer, alleging that his supervisor had thwarted his attempts to increase his organization's membership, which was directly related to the plaintiff's commissions. He alleged that his supervisor refused to meet with him or include him in meetings, ignored his presence, and treated him in a hostile and unprofessional manner.  At the end of 90 days, the plaintiff's supervisor gave him a poor performance evaluation, then terminated the plaintiff's employment for his refusal to sign the unfair evaluation. *Id.*

The D.C. Court of Appeals affirmed the trial court's dismissal of the case, holding that  the  aforementioned  circumstances  "are  not  the  type  for  which  liability  may  be imposed for this particular tort." *Id.*  The court further noted that "[m]ere discharge of an

employee is not 'conduct that goes beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community.'"  *Id.* at 1172 (quoting *Elliott v. Healthcare Corp.*, 629 A.2d 6, 9 (D.C. 1993).  The court wrote:

> Essentially, Crowley alleges only that he was subjected to contempt, scorn and other indignities in the workplace by his supervisor and an unwarranted evaluation and discharge. While offensive and unfair, such conduct is not in itself of the type actionable on this tort theory. *See Elliott, 629 A.2d at 9; Smith, 620 A.2d at 270.* Therefore, the trial court properly dismissed count IV (intentional infliction of emotional distress) for failure to state a claim.

*Id.*; *see also Kerrigan*, 705 A.2d at 628 (finding conduct not extreme and outrageous when plaintiff's employer allegedly manufactured evidence to establish a claim of sexual harassment against plaintiff and then demoted him and leaked information to other employees); *King*, 640 A.2d at 670-74 (finding conduct not extreme and outrageous when supervisor repeatedly failed to respond to employee's sexual harassment complaints, although noting that other retaliatory conduct was sufficient to send case to jury); *Hoffman v. Hill & Knowlton, Inc.*, 777 F. Supp. 1003, 1005 (D.D.C. 1991) (finding conduct not outrageous when employer intentionally interfered with employee's ability to do job, stated false, pretextual reasons for dismissing an employee knowing it would be communicated to others, and dismissed employee).

Here, the only timely allegations made by the plaintiff simply are incapable of supporting an intentional infliction of emotional distress claim against the District. Intentional infliction of emotional distress claims fall under the residual statute of limitations, which is three years.    D.C. Code § 12-301(8).    The District does not recognize a "continuing violation" doctrine.    *Beard v. Edmonson*, 790 A.2d 541 (D.C. 2002); *Hendel v. World Plan Executive Council*, 705 A.2d 656, 667 (D.C. 1997).

The plaintiff's intentional infliction of emotional distress claim therefore is limited to those allegations that occurred after December 21, 2003. Plaintiff alleges that Masi touched her arm on three occasions between December 2003 and January 2004. (*See* Exh. A, at p. 12-13.).  Even if, as the plaintiff alleges, Masi's motivation in such conduct was based on her sex, the alleged actions simply do not rise to the level of outrage required to sustain an intentional infliction of emotional distress claim.  If the plaintiffs in *Kerrigan*—whose employer manufactured evidence of sexual harassment against plaintiff, demoted him, and leaked information to other employees—could not state a claim for intentional infliction of emotional distress, it is clear that the plaintiff's allegations in this case cannot support such an action.

### 2. This Court does not have Subject Matter Jurisdiction over Plaintiff's Common Law Claims (Counts IV and V)

In the alternative, even if the plaintiff had properly alleged intentional infliction of emotional distress and negligent supervision and retention, these common law claims should be dismissed for lack of subject matter jurisdiction.  Absent any constitutional or federal statutory claims, this Court may decline to exercise supplemental jurisdiction over the common law claims asserted by the plaintiff.  *See* 28 U.S.C. § 1368(c)(3). Furthermore, the Supreme Court has held that, once federal claims have been dismissed, a District Court *should* dismiss pendent state law claims.

In *Gaubert v. Gray*, the D.C. District Court dismissed the plaintiff's constitutional claims on the grounds of qualified immunity. 747 F. Supp. 40, 50 (D.C. Cir. 1990). Noting that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right," the court also dismissed the plaintiff's four common law claims.  *Id.*  Citing the Supreme

Court's decision in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966),

the District Court wrote:

> Needless decisions of state law should be avoided both as a matter of comity
> and to promote justice between the parties, by procuring for them a surer-footed
> reading of applicable law.  Certainly, if the federal claims are dismissed before
> trial, even though not insubstantial in a jurisdictional sense, the state claims
> should be dismissed as well.  *Gaubert*, 747 F. Supp. at 50.

Here, the plaintiff's constitutional claims are barred under the *Monell* doctrine.

*Monell*, 436 U.S. at 694.  Furthermore, her constitutional claims do not rise to the level

of a constitutional violation or a violation of Title VII.  As such, the plaintiff will not be

prejudiced by dismissal of her common law claims.

### E.  PLAINTIFF SIMMS DID NOT COMPLY WITH D.C. CODE § 12-309

The District is entitled to either a dismissal of plaintiff Simms' common law

claims, or an Order granting it summary judgment on those claims because the plaintiff

has failed to satisfy the mandatory notice requirement of D.C. Code § 12-309.  Section

12-309 states in pertinent part:

> An action may not be maintained against the District of Columbia
> for unliquidated damages to person or property unless, <u>within six
> months</u> after the injury or damage was sustained, the claimant, his
> agent, or attorney has given notice in writing to the Mayor of the
> District of Columbia of the approximate time, place, cause and
> circumstances of the injury or damage.

D.C. Code § 12-309 (2001) (emphasis added).

It is well-settled that compliance with the notice requirement of Section 12-309 is

"a mandatory prerequisite to filing a lawsuit against the District."  *McRae v. Olive*, 368

F. Supp. 2d 91, 95 (D.D.C. 2005); *see also District of Columbia v. Dunsmore,* 662 A.2d

1356, 1359 (D.C. 1995).  "The rationale underlying the Section 12-309 notice

requirement is to (1) protect the District of Columbia against unreasonable claims and

(2) to give reasonable notice to the District of Columbia so that the facts may be ascertained and, if possible, deserving claims adjusted and meritless claims resisted." *Pitts v. District of Columbia*, 391 A.2d 803, 807 (D.C. 1978).

To protect this purpose, courts have construed strictly the plain language of § 12-309. *See, e.g., District of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995). Courts interpreting the statute have held that the District must <u>receive</u> notice within six months of the events that allegedly have caused a claimant's injury. *DeKine v. District of Columbia*, 422 A.2d 981, 984 (1980). Notice received even one day past due is considered untimely and completely bars recovery against the District. *Id.* at 986; *see also Williams v. District of Columbia*, 676 F. Supp. 329, 333 (D.D.C. 1987) (relying on *DeKine*, 422 A.2d 985, and explaining that the date of receipt is crucial in determining compliance with Section 12-309).

In this case, plaintiff has failed to satisfy the statutory requirements because she failed to notify the Mayor of her intent to file a claim against the District within six months of her last day of employment with CCHPS, September 30, 2006. In fact, to this day, the District has not received a notice from plaintiff. (*See* Exh. F.).

Any notice plaintiff may have given to the D.C. Department of Corrections is insufficient to satisfy the requirements of §12-309. *See McRae*, 368 F. Supp. 2d at 95 ("Notice to officials subordinate to the Mayor is not sufficient."); *McFarlane*, No. 04-CA-8506, at 14 (holding that giving notice to agency's general counsel was insufficient to meet the requirements of Section 12-309).

Because satisfaction of the notice requirement of §12-309 is a prerequisite to filing suit against the District, and because plaintiff cannot now cure this defect, the

19

District is entitled to either a dismissal of plaintiff's common law claims, or an Order granting it summary judgment on those claims.

### F.  THE DEPARTMENT OF CORRECTIONS IS *NON SUI JURIS*

As an agency within the District of Columbia Government, the Department of Corrections is *non sui juris* and cannot be a party to this lawsuit.   The law is clear that "agencies and departments within the District of Columbia government are not suable as separate entities."  *Does I through III v. District of Columbia,* 238 F.Supp.2d 212, 222 (D.D.C. 2002) (quoting  *Gales v. District of Columbia*, 47 F.Supp.2d 43, 48 (D.D.C. 1999) (in turn citing *Fields v. District of Columbia Dep't of Corr.,* 789 F.Supp.2d 20, 22 (D.D.C. 1992)); *see also Arnold v. Moore,* F. upp.28, 33 (D.D.C. 1997) ("governmental agencies of the District of Columbia are not suable entities") (citing *Robertson v. District of Columbia Bd. of Higher Educ.,* 359 A.2d 28, 31, n.4 (D.C. 1976); *Miller v. Spencer*, 330 A.2d 250, 251, n.1 (D.C. 1974).

The statutory powers and duties of the Department of Corrections, set forth in D.C. Code § 24-211 (2006), *et seq.*, contain no provision for the Department of Corrections to be sued in its own name. Accordingly, the Department of Corrections is not a proper party to this action; therefore, all claims against DOC must be dismissed.

### IV.  <u>CONCLUSION</u>

WHEREFORE, defendants respectfully request that this Court grant their motion to dismiss, or the motion for summary judgment on all claims.

Dated: June 4, 2007.                            Respectfully Submitted,

LINDA SINGER
Attorney General for the
District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


_____/s/Nicole Lynch_____
NICOLE L. LYNCH [471953]
Section Chief
General Litigation § II


____/s/Toni Michelle Jackson____
TONI M. JACKSON (453765)
Assistant Attorney General
441 4th Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6602
Fax:  (202) 727-3625
E-Mail:  toni.jackson@dc.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LAVERNA SIMMS,
                          Plaintiff,

       v.

DISTRICT OF COLUMBIA, *et. al.*     Case No. 06-02178 (RCL)

                     Defendants.

## ORDER

      Upon consideration of the defendants Motion to Dismiss, or in the alternative for Summary Judgment, the Memorandum of Points and Authorities attached in support thereof, any opposition thereto, and the entire record herein, it is on this _____ day of _____, 2007, that the Court hereby:

      ORDERS that the Motion to Dismiss is GRANTED; and it further,

      ORDERS that the plaintiff's case against defendants is hereby DISMISSED, with prejudice.

                        _____
                        JUDGE ROYCE C. LAMBERTH
                        U.S. District Court for the District of Columbia

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAVERNA SIMMS,
                Plaintiff,

     v.

DISTRICT OF COLUMBIA, *et. al.*     Case No. 06-02178 (RCL)

            Defendants.

## <u>ORDER</u>

Upon consideration of the defendants Motion to Dismiss, or in the alternative for Summary Judgment, the Memorandum of Points and Authorities attached in support thereof, any opposition thereto, and the entire record herein, it is on this _____ day of _____, 2007, that the Court hereby:

ORDERS that the Motion for Summary Judgment is GRANTED; and it further,

ORDERS that the plaintiff's case against defendants is hereby DISMISSED, with prejudice.

_____
JUDGE ROYCE C. LAMBERTH
U.S. District Court for the District of Columbia

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAVERNA SIMMS,
                    Plaintiff,
    v.
DISTRICT OF COLUMBIA, *et. al.*       Case No. 06-02178 (RCL)

             Defendants.

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.  Plaintiff filed suit on December 21, 2006, alleging that she was sexually harassed and subjected to a hostile work environment at the D.C. Jail. (*See* Complaint, *et. seq*.). Specifically, the plaintiff alleges that a DOC employee, Harcourt Masi, sexually harassed her and created, among other things, a hostile work environment. (*Id.*).

2.  On May 4, 2007, plaintiff filed her Amended Complaint, alleging violations of 42 U.S.C. §1983, 1988, and the Fifth and Eighth Amendments to the U.S. Constitution. (*See* Amended Complaint, *et. seq.*).

3.  In the Amended Complaint, plaintiff alleges that she "was at all times relevant herein, was (sic) an employee and part owner and/or incorporator of the Center for Correctional Health and Policy Studies ("CCHPS")." (*Id.*, at ¶¶ 3, 24, and 26.).

4.  Plaintiff began working with CCHPS on or about April 2001. (*Id.*, at ¶24.).

5.  Plaintiff has named CCHPS as a defendant in this lawsuit. (*Id.*).

6.  Plaintiff also states later in her Amended Complaint that CCHPS employed her and owed a duty of care to her and all its employees to ensure their health, safety and a work environment free of sexual harassment and hostility and discrimination." (*Id.*, at ¶ 5.).

7.  As to the District of Columbia and DOC, plaintiff alleges that she was an "employee, agent, and/or contractor, "who provided medical and mental health services to DOC." (*Id.*, at ¶ 3.).

8.  Plaintiff further alleges that the District of Columbia and DOC are responsible for "ensuring the health, safety and a work environment free of sexual harassment and hostility and discrimination for all its employees and contractors." (*Id.*, at ¶ 4.).

9.  On January 23, 2004, plaintiff gave a sworn statement to the D.C. Department of Corrections Office of the Special Inspector ("OSI"). (*See* Interview of Laverna Simms, attached hereto as Exh. A.).

10. In that statement, plaintiff indicated that Corporal Masi began making unwelcome comments to her when she started at DOC in 1997, and continued making these unwelcome comments for approximately two years.  (*Id.*, at pp. 6 & 9.).

11. Plaintiff stated that Masi never touched her, and that his comments were more annoying than sexual in nature. (*Id.*, at p. 7-8.).

12. Sometime in 2003, plaintiff alleged that Masi began making unwelcome comments to her again, and eventually he touched her arm on two occasions in December 2003. (*Id.*, at p. 12-14.).

13. Plaintiff complained to a DOC official and asked that Masi be counseled for his behavior. (*Id.*).

14. Plaintiff refused to file a formal complaint. (*Id.*).

15. Plaintiff stated that Lt. McCormack counseled Masi, but after the counseling session Masi grabbed her arm for a third time. (*Id.*, at p. 13.).

16. After the third unwelcome touch, plaintiff complained to Major Corbett, who contacted the Office of the Special Inspector and filed a formal complaint. (*Id*., at p. 15.).

17. OSI found probable cause of sexual harassment, and proposed Masi's termination.  (*See* Notice of Termination Letter, attached hereto as Exh. B.).

18. Masi appealed the termination, and the hearing officer proposed that Masi be suspended for 180 days without pay.  (*See* Notice of Final Decision Letter, attached hereto as Exh. C.).  Masi was suspended from March 14, 2005 through July 11, 2005.  (*Id.*).

19. Plaintiff filed her Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination on May 12, 2006.  (*See* EEOC Charge, attached hereto as Exh. D.).

20. In her EEOC Charge, plaintiff alleged sexual harassment, hostile work environment and retaliation starting in October 2001.  (*Id*.).

21. Plaintiff also stated that she began working with CCHPS in October 2001. (*Id*.).

22. The EEOC issued plaintiff her Right to Sue Letter on May 17, 2007.  (*See* EEOC Letter, attached hereto as Exh. E.).

Dated: June 4, 2007.                              Respectfully Submitted,

                                                  LINDA SINGER
                                                  Attorney General for the

District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/Nicole Lynch_____
NICOLE L. LYNCH [471953]
Section Chief
General Litigation § II

____/s/Toni Michelle Jackson___
TONI M. JACKSON (453765)
Assistant Attorney General
441 4th Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6602
Fax:  (202) 727-3625
E-Mail:  toni.jackson@dc.gov

# EXHIBIT A

## D.C. DEPARTMENT OF CORRECTIONS
### OFFICE OF THE SPECIAL INSPECTOR

```
- - - - - - - - - - - - - - x
                           :
LA VERNA SIMMS,            :
                           :
        Complainant,   :
                           :   Case No.
    v.                     :
                           :
HORCURT MASI,              :
                           :
        Respondent.    :
                           :
- - - - - - - - - - - - - - x
```

January 23, 2004


Interview of


### LA VERNA SIMMS


a witness of lawful age, by Janet Goldstein,

Investigator, Office of the Special Inspector.


### TAPE TRANSCRIPTION

2

# CONTENTS

WITNESS:                    Page

La Verna Simms              5

3

| 1 | PROCEEDINGS |
|---|---|

1                 **P R O C E E D I N G S**
2        MS. GOLDSTEIN: This is January 23, 2004. This is Investigator
3 Janet Goldstein. I'm at the D.C. Jail with La Verna Simms.
4        Let me just make sure the tape recorder is working.
5        (Off the record.)
6        MS. GOLDSTEIN: Would you state your first and last name, and
7 spell, both, please?
8        MS. SIMMS: La Verna Simms, L-a V-e-r-n-a, last name, Simms, S-
9 i-m-m-s.
10        MS. GOLDSTEIN: Okay. And can you tell me what your position
11 is at the D.C. Jail?
12        MS. SIMMS: I work for a contractor, CCHPS, Center for
13 Correctional Health and Policy Studies, supervise medical and mental health
14 services to the Department of Corrections (inaudible) the outpatient mental health
15 director.
16        MS. GOLDSTEIN: Ms. Simms, I am an investigator, as you know,
17 with the Special Inspector's Office, and I'm here in connection with a complaint
18 against Horcurt Masi -- that's H-o-r-c-u-r-t M-a-s-i.
19        As you know, because we just had a brief training session, I'm a
20 neutral investigator in this matter. My job is to interview as many people as
21 possible who may have information on the case. I then prepare a report and
22 recommendations for the Special Inspector.
23        She reviews the matter and determines whether or not there's probable
24 cause to believe the individual has committed sexual harassment or retaliation, and,
25 if so, what disciplinary action should be taken.
26        You would have the right to review the report prior to her final
27 decision and make whatever comments you want on that report. Do you
28 understand that process?
29        MS. SIMMS: Yes.
30        MS. GOLDSTEIN: Also, you should understand that all the
31 information we take, we take on the record in the form of a tape-recorded
32 interview. That interview is then transcribed, and those transcripts are attached to
33 my report and recommendations for review by the Special Inspector.
34        Do you understand that process?
35        MS. SIMMS: Yes.
36        MS. GOLDSTEIN: As a witness or a complainant in this matter, you
37 have the right to have a representative here with you during this interview or at any
38 future interview. Do you understand that?
39        MS. SIMMS: Yes.
40        MS. GOLDSTEIN: Do you feel comfortable proceeding --
41        MS. SIMMS: Yes.
42        MS. GOLDSTEIN:        -- without a representative?

4

1          Okay. One thing about this tape recording and transcript, you have to
2    wait till I finish the question before answering it. Otherwise, our transcript really
3    turns out to be a mess. Okay?
4          MS. SIMMS: Okay.
5          MS. GOLDSTEIN: Also, all interviews are done under penalty of
6    perjury. So at this point I want to swear you in.
7    Whereupon,
8                        LA VERNA SIMMS
9    was called as a witness and, having been first duly sworn, was examined and
10   testified as follows:
11                        EXAMINATION
12         BY MS. GOLDSTEIN:
13         Q     All right, let's begin. First of all, why don't you give me a two-minute
14   synopsis on yourself, when you joined the Department, in what capacity there
15   you've worked, so at least I know who I'm talking to.
16         A     I started here in March of '97 as the intake coordinator. So I began
17   working in the evenings, and I was working for the receiver. At that time the
18   receiver was here.
19         Q     Okay. And you were the intake coordinator in the Outpatient Mental
20   Health Unit?
21         A     Just for the Mental Health Department at that time.
22         Q     Okay.
23         A     The Mental Health Department is broken into inpatient, outpatient, and
24   then there's the whole department. As the intake coordinator, I worked evening
25   shift. I came in like 2:00, 3:00 --
26         Q     Okay.
27         A     -- and I stayed until 2:00 in the morning and worked four days a week,
28   Monday through Thursday.
29         Q     And you're a licensed -- tell me about your license.
30         A     I'm a licensed professional counselor, a Ph.D./ ABG. So my
31   dissertation is (inaudible).
32         Q     Okay. So you were an intake coordinator and then --
33         A     I stayed on that position for -- it will be seven years?
34         Q     You've got to speak up a little bit.
35         A     I'm thinking. I've been here seven years.
36         Q     Sounds about right.
37         A     Yeah.
38         Q     Almost exactly.
39         A     Almost seven years. So I worked at night for nearly four years, and then
40   I came to the day shift.
41         Q     So that would be around 2001 you were on the day shift. Doing
42   what?

5

1    A    As the outpatient mental health director. At that time it was called the
2    coordinator.
3    Q    And you held that same job —
4    A    Same position, same -- yeah.
5    Q    And how many people do you oversee?
6    A    Directly, I have about 12 clinicians, and indirectly, the mental health
7    nursing, I'm a mental health inpatient leader for females, which is one tier.
8    Roughly, we average 20 patients. To the male tiers, we average 60 patients.
9    Q    And who do you report to?
10    A    I report to the medical director.
11    Q    Who is?
12    A    Dr. Joseph Bastien.
13    Q    How do you spell that? His last name, how do you --
14    A    B-a-s-t-i-e-n, and the health services administrator, who is Miss Hunter,
15    Estelle Hunter.
16    Q    And are they call contract employees or --
17    A    They're all contract employees, and I just happen to play a dual role
18    because I'm also owner-operator.
19    Q    Owner-operator --
20    A    CCHPS. I'm a member of -- there's 12 of us that go in the corporation,
21    CCHPS, one of those.
22    Q    Got it, okay.
23          This case concerns the behavior of Mr. Masi,
24    M-a-s-i. So why don't you start at the beginning when he came on board, or when
25    you first came into contact with him, as early as possible, and then we'll go up to
26    the present time.
27    A    I had contact with him when I first got here, when I first got here. I
28    worked in the evenings. He would always come around to --
29    Q    What was his position? What is his --
30    A    He's a correctional officer.
31    Q    Okay.
32    A    Probably got in as a corporal. And he would come around. My office
33    was over in the infirmary at that time. That's where I saw my patients. And he
34    would come over, ask me out all the time. And, of course, I always said no.
35    Q    What would he say? I mean, how would he go about asking you out?
36    A    Just say he could take me out, he could show me a good time, he liked
37    my style, the two of us would make a good couple. And then he would start talking
38    about his Mason stuff, his position in the Masons, and, you know, always want to
39    buy me a ticket. And I said no. "Bring someone. I'll buy two tickets," kind of
40    thing.
41    Q    Did he make any sexual comments to you?
42    A    Basically, at that time, that's -- you know, that's all. He would just ask

6

1  me out.
2      Q    And how frequently would you say that occurred?
3      A    Four days a week.
4      Q    So virtually every time you saw him?
5      A    Every time. 1 mean, he would come -- come to my office, or come over
6  there. I was seeing people. If I had a patient in there, he'd wait outside.
7      Q    And how would you refuse him? What would you say?
8      A    I'd be very mean to him. I didn't start off being mean to him.
9      Q    Right.
10     A    But it progressed to me being mean to him.
11     Q    And what would you say? And how would you say it? Maybe that's
12 more --
13     A    It's me making little comments. I wasn't nice. It grew to the point
14 where I wasn't nice to him, because he wouldn't take no for no.
15     Q    Okay. Would you say to explain to him to stop the behavior?
16     A    How about comments such as, "If you were the last man on earth, I
17 would not go out with you"? It progressed to those types of answers.
18     Q    And did you tell him to stop asking you?
19     A    Yes.
20     Q    And for how long did this continue?
21     A    It continued for probably two years straight. Then he stopped.
22     Q    Did it continue on a daily basis pretty much for two years straight?
23     A    Maybe not a daily basis after maybe the first like six to nine months.
24 But surely every time he saw me, he had a comment about the way I dressed or --
25 there was always a comment, always an unwanted comment.
26     Q    Okay, about your appearance, about the way you dressed.
27     A    Yes.
28     Q    What else? What other kinds of comments?
29     A    Basically still continuing, continuing to ask me out.
30     Q    Did he ever put his hands on you?
31     A    No.
32     Q    And was anyone else present when he would be asking you out?
33     A    Yes, my co-workers. Specifically at that time I worked with Jacqueline
34 Farmer, who was our nurse, and she's a mental health nurse, and she worked in the
35 evenings with me, and also Janna McCargo, who worked later in the evenings.
36     Q    What was her name, Jan?
37     A    Janna, J-a-n-n-a.
38     Q    And her last name?
39     A    M-c-C-a-r-g-o, McCargo.
40     Q    And she was --
41     A    Also a mental health clinician.
42     Q    Are they still around?

| | | |
|---|---|---|
| 1 | A | Neither of them are still employed here. |
| 2 | Q | Do you have any way of giving me contact information? |
| 3 | A | Yes. |
| 4 | Q | And they were present on a regular basis when he would -- |
| 5 | A | Ms. Farmer probably was around more so because she worked until |
| 6 | midnight. | |
| 7 | Q | Okay. |
| 8 | A | But when he came around -- I had an office on the mental health side |
| 9 | where I stored my things, and on the other side, in the infirmary, was where I | |
| 10 | actually saw patients. | |
| 11 | | So McCargo would be at least on the mental health side, on this |
| 12 | mental health hallway. | |
| 13 | Q | Right. |
| 14 | A | And Ms. Farmer would at least be more in the evening. |
| 15 | Q | Did you complain to them about it? |
| 16 | A | Yeah, and, actually, McCargo used to say stuff to him all the time. |
| 17 | "You need to give up, and leave her alone, and" -- you know. | |
| 18 | Q | Did you complain with the Department? |
| 19 | A | No. |
| 20 | Q | How come? |
| 21 | A | I don't know. I don't know why I didn't, but I never did. I know I said |
| 22 | to a person who worked here that's no longer here, "I never worked at a place like | |
| 23 | this, you know, things like that, where people just harass you." | |
| 24 | | But I did not complain to a supervisor at that time or anybody. |
| 25 | Q | Okay, all right. Go on. |
| 26 | A | But he stopped, he stopped for a while. He was dating someone. |
| 27 | Q | So he stopped somewhere about two years into the process? |
| 28 | A | Yeah, yeah. |
| 29 | Q | Okay. And he began dating someone in the Mental Health Unit? |
| 30 | A | No. |
| 31 | Q | Okay. Someone in the department? |
| 32 | A | I need you to turn that off. |
| 33 | | (Off the record.) |
| 34 | | BY MS. GOLDSTEIN: |
| 35 | Q | -- someone within the department. And then what happened? |
| 36 | A | So he didn't -- he didn't come around saying as many things. He would |
| 37 | do things -- he was then in the bubble. | |
| 38 | Q | Tell me what the "bubble" is. |
| 39 | A | Okay. When you -- when you come on this floor to get inside of this |
| 40 | door, once you get off of the elevator, that's the person who has to let you in. | |
| 41 | Q | Okay. |
| 42 | A | So that's that bubble, right, that controls, whatever they call it. So that |

8

1    person needs to let you in that door and also let you in this door to come on the
2    mental health side.
3          Q    Okay.
4          A    There's no door to go to the mental health side.
5          Q    Okay.
6          A    And he would just -- stood there, he did not let me in, or come here, or
7    knock on the window or just make little comments, but not really bothering me too
8    much, and I was okay with him not bothering me too much.
9          Q    Okay.
10         A    And I can't remember how long that whole thing lasted, but --
11         Q    He would do kind of annoying things.
12         A    Yeah, yeah, just annoying things, and that I didn't bother me so much.
13   When he saw me outside of the bubble, he would make little comments about,
14   "You look good. I like how you dress." That's kind of how he talks. But little
15   comments like that.
16              But nothing like the way it was before, so it probably seemed like
17   nothing to me --
18         Q    Okay.
19         A    -- compared to what he had said and done.
20              Then he -- I can't remember all the time frames -- started dating
21   someone on the medical side, and because he was dating someone on the medical
22   side, we would be out -- we've had instances where we were out together, you
23   know, at the same functions.
24         Q    Social functions?
25         A    Social functions outside of the jail.
26         Q    Hold on one second.
27              (Off the record.)
28              BY MS. GOLDSTEIN:
29         Q    I'm sorry. You said he was dating someone on the medical side.
30   Who was that?
31         A    Sharon Dorsey.
32         Q    And that's D-o-r --
33         A    s-e-y.
34         Q    -- s-e-y. And what was her -- what is her position?
35         A    She was the office manager here. She's no longer here.
36         Q    So she's no longer with the department or --
37         A    She's no longer with CCHPS.
38         Q    Okay.
39         A    And he would make little comments -- he started his little comments
40   again.
41         Q    This is at these social functions or --
42         A    No, during the time he was dating her --

9

1      Q     Okay.
2      A     -- he would make his -- he started his comments again about wanting to
3   take me out, how good I looked, and how she didn't compare to me, and just little
4   comments like that.  And I just would threaten to tell her, but, of course, I never
5   did.  But I threatened to tell her.
6      Q     Okay.  Now, these comments, did they ever get to be any more of a
7   graphic sexual nature?
8      A   No, no.
9      Q     And give me a time frame.
10     A   It's tough, it really is.  It really is, but -- I don't know.  He probably
11   dated her up until sometime last year.
12     Q     Okay.  So sometime into 2003.
13     A   Yes.
14     Q     And how long would you say he dated her?
15     A   Probably a year and a half or so.
16     Q     Okay.  And when he started the comments again, for what period of
17   time?  A month, a six months?
18     A   However long he was dating the other person --
19     Q     Okay.
20     A   -- he didn't say anything.
21     Q     Okay.  But about a year and a year or so, he --
22     A   It's been longer than a year and a half before he started back again.
23     Q     Right, right, right.  Okay, he started back again, and the comments
24   were how frequent?
25     A   Generally, if he -- if he saw me and she wasn't around, he would make
26   comments.
27     Q     Okay.
28     A   When she wasn't around, he would definitely make comments, and he
29   would walk through this hallway and make his comments.
30     Q     Okay.  Go on.
31     A   And at that time I know that last year when I definitely told him, "If you
32   do this again, I'm really going to tell her."  And I reported it to my health service
33   administrator.
34     Q     Was there some sort of specific event that precipitated you reporting
35   it?
36     A   Yes, because he was trying to cause a rift between she and I.  Because
37   he would make comments to her about me.  And when we were out at functions, he
38   would take little pictures of me and her as if he was trying to cause a little split.
39   And so I got tired of it.
40         And when I told him I was going to tell her, he laughed it off like, "I
41   know you're not going to tell her."
42         And so that's when I reported it to the health service administrator.

10

| | | |
|---|---|---|
| 1 | Q | And who is that? |
| 2 | A | Ms. Hunter, Ms. Estelle Hunter. |
| 3 | Q | Now, did you -- in what form did you report it? Did you -- tell me |

4  about that.

5      A    I just went in, told her I needed to speak to her, and told her what he was
6  doing, and how I didn't like it, and he needed to stop. And if he wasn't going -- he
7  thought that I wasn't going to say anything to Sharon because I didn't want to hurt
8  her. And it was at that time she told me about another incident with another
9  employee --

10     Q    This is Hunter told you this?

11     A    Yeah.

12     Q    Tell me what she said.

13     A    She said, "I know" -- you know, she basically said how she was going to
14  try to Sharon about this guy. She said he's a big flirt, and how he was harassing the
15  pharmacist as well, and when she tried to talk to Ms. Dorsey about it, Ms. Dorsey
16  didn't believe her.

17         And I said, "Well, it's no use in me talking to her about it either.
18  She's not going to believe me either."

19     Q    Okay. And who is the pharmacist she was referring to?

20     A    Her name is Theresa (phonetic).

21     Q    And is she still around?

22     A    She's still here.

23     Q    And what's her last name? You don't know.

24     A    It's a really long last name.

25     Q    Okay. And do you know anything about whether he's continuing to
26  harass her?

27     A    I'm not sure. I just know that I had talked to her supervisor, and her
28  supervisor said she was going to him.

29     Q    And her supervisor -- you mean Estelle.

30     A    No.

31     Q    Oh, okay.

32     A    Gwendolyn Sinclair.

33     Q    Okay, all right. So we're into another conversation, okay.

34     A    Right. Gwendolyn Sinclair said she had gone to him, trying to tell him
35  like, you know, you need the stop this, and Theresa's coming to me right now, and
36  that she just basically wants you to stop. She doesn't want to file a formal
37  complaint, but she really wants you to stop harassing her.

38     Q    When did you talk to Ms. --

39     A    The first time was last year when all this whole kind of thing went
40  down, and I talked to Ms. Hunter. So the first time I talked to Ms. Sinclair about
41  this was last year at this same time.

42     Q    After you talked to Ms. Hunter.

1       A   Yes.
2       Q      Okay.  And what made you go to Ms. Sinclair?
3       A   I think she kind of came (inaudible).  We are all board members of
4   CCHPS, so --
5       Q      Okay.  And Ms. Sinclair indicated to you that Theresa had
6   complained to her as well?
7       A   Right, and she went to Corporal Masi and he basically got real nasty
8   with her.  He said that Theresa was lying, and da-da-da-da-da.
9       Q      Have you ever spoken to Theresa directly about it?
10      A   No, never.
11      Q      Okay.  Go on.
12      A   And then it kind of died down again.  He was in the bubble, he was
13  annoying, but it -- nothing major.
14      Q      Do you know whether or not he learned that you had gone to Ms.
15  Hunter or Ms. Sinclair?
16      A   I don't think he did.
17      Q      Okay.
18      A   I don't think he did.  I didn't say anything to anyone in that department,
19  so I'm pretty sure he didn't know.
20              And then it died down again and just when he would see me
21  (inaudible), until the last couple of months.  We had a change in our post, in the
22  officer on the post, and he's friends with the officer that's on the post now, and so
23  his -- he started being over here every day.
24      Q      And who was the new officer?
25      A   Officer Short.
26      Q      S --
27      A   S-h-o-r-t.
28      Q      He's the one who's friends with --
29      A   She.  He's friends with Ms. Short.
30      Q      Okay.  And that allowed him more freedom to roam around?
31      A   To be over here, to be over here on this post.  He could relieve her.  He
32  would find out if she was going to be off because she's retiring, and so that he
33  would work those days.
34              Most days when I've come in for the last couple of months, he sitting
35  over here talking to her, most mornings.
36      Q      Over here --
37      A   Really on the mental health side.
38      Q      Okay.
39      A   In the mental health hallway.
40      Q      And before that, he was basically in the bubble.
41      A   Right.
42      Q      Okay.  All right.  And that took place --

12

1    A    That change --
2    Q    -- about a few months ago?
3    A    Yes.
4    Q    Okay.  Go on.
5    A    So once he was up here all the time and sitting in that hallway, the
6  comments seemed like they were right back to the way it was when I first started.
7        He wanted to take me out, "You look so good.  I like your style," all
8  of those kind of comments that were unwarranted, and I told him over and over
9  again, "Leave me alone.  I don't want to go out with you."
10    Q    And would you say this was happening on a daily basis?
11    A    At least two to three times a week.
12    Q    Go on.
13    A    I think what pulled it to a head was maybe a month ago, maybe a little
14  more.  Well, he would do little things, like put his foot out.  He never really
15  touched me.
16    Q    What do you mean by put his foot out?
17    A    When I would walk by, he would just kind of stick his foot out, just
18  annoying things.
19        But I guess a month, four to five weeks ago, as I was going into the
20  restroom, he grabbed my arm, and that's the first time he'd ever done that, and I told
21  him then, "Don't you ever put your hands on me again.  I don't like you.  I'll never
22  like you.  Don't ever do it again."
23        And then, basically, it was like a week after that, as I was going in the
24  restroom, he did it again.
25    Q    Grabbed your arm again?
26    A    Grabbed my arm again.
27    Q    And is he grabbing it hard or --
28    A    No, no, not hard.
29    Q    Okay.
30    A    Not -- you know, kind of like -- and this time he said, "Come here."
31    Q    Okay.
32    A    And I said, "You don't know what sexual harassment means, but you're
33  going to find out if you ever put your hands on me again."
34        Those were my words to him.  And that was when I called the deputy
35  warden --
36    Q    That's Harrison?
37    A    Yes.
38    Q    Okay.
39    A    -- and I told him about -- you all need to do something with Masi, and I
40  just kind of went off.
41    Q    Okay.
42    A    Like, you know, you all need to do something with him.  And it was

13

1    right at this time when Ms. Coakley had come to me and said something about
2    Masi always harassing Ms. Roye.
3            Q    Okay.  Coakley is C-o-a-k-l-e-y.
4            A    Right.
5            Q    Okay.
6            A    And how she always has to go in there and rescue her because he's in
7    there, you know, trying to take her out every morning.
8            Q    Roye is R-o-y-e?
9            A    Yes.
10           Q    Okay.  Then what happened?
11           A    I called Christina in my office and I said, "Are you having a problem
12   with" --
13           Q    Christina --
14           A    Ms. Roye, I'm sorry.
15           Q    Okay.
16           A    "Are you having a problem with anyone up here on the floor?"  She
17   said, "What do you mean?"  I said, "Is anybody bothering you, harassing you?"
18   And she said, "Oh, you're talking about Masi," and then she started saying how
19   she's telling him she's married, and he's coming in there daily, still saying, "I want
20   to take you out."
21           And she even said, "I took my ring and I put it up in his face.  I am
22   married."  And he said, "I'll buy you and your husband a ticket," and started going
23   on, telling her all about the Masons, this, that, and the other.
24           And she said she wasn't interested, and how he was making it difficult
25   for her to do her work because he's in there every morning.
26           She also said that it made her very uncomfortable, the way he would
27   try to find a way to like touch her on her shoulder or -- because she's like, "But I
28   don't want to -- I don't want to complain.  I don't want to, you know, make a
29   complaint or anything like that."
30           I just kind of left it like that.  I didn't say anything further.
31           Q    Okay.  Go on.
32           A    Then I think what really happened was maybe like three weeks ago,
33   when I went to the bathroom, and he did it again.
34           Q    This is the third time.
35           A    That -- that did it.
36           Q    And that's grabbing your arm?
37           A    Yes.  He grabbed my arm again.
38           Q    Did he say anything?
39           A    No, he just thought it was funny.  And I said, "That's it.  You've done
40   it."
41           And I went back to my office, and I, you know, called downstairs and
42   said, you know, "You must think this is a joke.  I don't think it's a joke.  You

14

1    haven't done anything, and now I'm going to do something."
2            And that's basically how this whole thing came about. And then I --
3    that's what I said to Lieutenant -- I mean, to Deputy Warden Harrison.
4        Q    Okay. So you told him again what had happened.
5        A    Yeah, and then I just kind of hung up after I said what I had said. I was
6    really upset about it.
7            And the next morning -- well, he left me a voice mail later in the day.
8    I got it that next morning.
9        Q    "He," being Harrison?
10       A    I'm sorry, Mr. Harrison, saying that he had taken care of the problem.
11           And that next morning when Lieutenant McCormick came to my
12   office, and I was saying to him, I said, you know, "I understand now why the
13   department has so many problems. People try to handle things in a low key way,
14   and when it can't occur, you have to take it all the way."
15           And he said, "What are you talking about?"
16           I said, "I tried to say I didn't want to make a formal complaint, I just
17   wanted to have this person counseled for sexual harassment, but nothing was done
18   about it."
19           And he's like, "Well, wait a minute. What do you mean?" You
20   know, kind of, "What are you talking about?"
21           And I said, "Well, that's all I'm saying. I don't want to say the
22   person's name and all that."
23           And he said, "Are you talking about Corporal Masi?" And I said,
24   "Yeah, well, how did you know that?"
25           And he got up -- he was sitting in my office. He got up and he got on
26   the phone and he called Major Corbett, and he said, "Major Corbett, you know, you
27   cannot bring Ms. Simms down."
28           And when he hung up, I said, "I'm not going down there." And he's
29   like, "Well, you don't have to go down, but I'm going to report it now because you
30   reported it to me. So now I have to report it."
31       Q    So it was McCormick who supplied the name.
32       A    Yeah. Yeah, I didn't mention the name at all. He gave the name.
33       Q    And why do you think -- how do you think he knew?
34       A    I have no idea.
35       Q    Okay.
36       A    I have no idea how he knew.
37       Q    Okay.
38       A    But what I thought --
39       Q    And this is Emmett McCormick, Lieutenant McCormick?
40       A    Lieutenant McCormick, yeah.
41           So we walked downstairs together, and Masi, of course, was sitting
42   on the post when we walked by together. I went down to the major's office, and I

15

1    was talking to the major kind of the same way, without giving a name, and then the
2    major said, "May I ask you something?" And I said, "Yeah." And he said, "Was
3    this Corporal Masi," the same kind of way. And I said, "Well, why do you ask
4    that?" And he said, "Well, because I was asked to talk to him by the deputy
5    warden."
6            So maybe that's why Lieutenant McCormick kind of -- so --
7        Q    Did he indicate whether he had in fact talked to him or not?
8        A    Yes. He said he had spoken to him the day before. The day before he
9    was asked -- he said he was asked to speak to him the day before.
10       Q    Okay.
11       A    So I'm not sure if he spoke to him the day before or that morning.
12       Q    And did you contact the Special Inspector's Office or was that --
13       A    Major Corbett told me. I told him I didn't want to make a formal
14   complaint, and he said that he didn't have a choice. He had to report it to the
15   Special Inspector, because I had not reported it to her.
16           When I initially went to speak to him, (inaudible) the Special
17   Inspector, I said I -- I just wanted to know what my options were. I didn't tell her it
18   was me. I just said, you know, I know some things that are kind of going on. You
19   know, what are the options here?
20           I never said who it was, and I basically said, you know, kind of
21   counsel this person. I just wanted some counselling done. I didn't want to make a
22   formal complaint.
23       Q    How long ago was that?
24       A    Maybe three weeks.
25       Q    Okay.
26       A    Yeah.
27       Q    And what's been going on in the last three weeks?
28       A    Which has made it awfully -- well, the day after I spoke to the major, of
29   course, Corporal Masi no longer speaks to me or my clinicians. He started talking
30   to this one clinician -- well, she's the substance abuse counselor.
31           He started kind of talking to her, buying her lunch, and, you know, I
32   guess, really, befriending her after he had -- because Ms. Roye had said to him,
33   "Well, why don't you try to talk to Ms. Stuckey? She's not married, you know.
34   Nobody else up here really kind of wants you."
35       Q    How do you spell her name?
36       A    Stuckey, S-t-u-c-k-e-y. And he said, "Oh, she's not my type," kind of
37   thing.
38           But then, after this whole thing, he kind of started befriending her.
39       Q    And what's her position?
40       A    She's the substance abuse counselor.
41       Q    Okay.
42       A    She also is under me.




1    Q    Okay.

2    A    So I'm her supervisor as well.

3    So he stopped speaking to Roye, he stopped speaking to (inaudible),

4 stopped speaking to me, which -- I said to the Special Inspector, "I'm happy." Roye

5 came to me and said she was happy. We were all happy.

6    But then it was maybe difficult because he would be up here on the

7 post. Then he wouldn't do -- he would not allow us to do our work. Mainly -- as

8 the clinicians, the clinicians prepare -- they prepare a list of intakes they want to see

9 the evening before that need to be seen and would give it to the officer.

10    Coakley came to me at first and said, you know, "I gave my list to

11 Masi. He didn't call up anyone, or he said none of the people were available," or

12 something to that effect.

13    And I knew what was going on, I knew why. But I said, "Okay, well,

14 let me try to -- try to deal with this."

15    And then Ms. Roye had said, you know, "Masi isn't speaking. I took

16 my list to him. I said these are the people I need to see, and -- you know, and he

17 didn't call them up." And she said he didn't say anything at all. He didn't respond

18 at all.

19    I said, "Take the list back to him, place it on the desk. Don't say

20 anything. Just place the list on the desk."

21    Then I called -- I'm trying to think who I called first. I called

22 Lieutenant Talley (phonetic).

23    Q    How long ago are we now?

24    A    Actually, I called Major Corbett.

25    Q    Okay.

26    A    I called Major Corbett and I said, "I don't understand why you all are

27 still sending him up here. He's not speaking to any of us up here. We can't do our

28 work."

29    And what happened with -- what initiated that call was my clinician,

30 two days in a row, just frustrated. She said, "Ms. Simms, I can't do my work."

31    Q    This is Roye?

32    A    No, this is Coakley.

33    Q    Okay.

34    A    "He won't get the people. He's saying the post is shut down, and he's

35 laying back in the chair asleep."

36    I said, "Give me a memo."

37    And so I called downstairs to Major Corbett, and I said to him, "I

38 don't understand why you are all continuing to send Masi up here," and basically

39 what the clinician had said to me. He's asleep on the post and refusing to bring

40 people up.

41    Q    Okay. So Coakley complained about it, and Roye also complained

42 about it, about Masi refusing to bring the people up?



1    A    Right.
2    Q    Anyone else?
3    A    No, those are the only two that complained to me about it.
4    Q    Okay. And Coakley gave you a memo?
5    A    Yes.
6    Q    And you have a copy of that that you could provide to me?
7    A    Yes.
8    Q    Okay. Go on.
9    A    Captain Talley -- well --
10   Q    Well, you called Corbett.
11   A    I called Corbett. I called -- I called Captain Talley as well.
12   Q    Okay.
13   A    I called Captain Talley, because he said something, did I -- have I talked
14   to her or whatever. I said, "No."
15        So I called Captain Talley, because he had -- let me back that up. He
16   said, "I'm going to send Captain Talley up there." Or he called me back and he
17   said, "Is he asleep right now?" And I said, "I don't know. I haven't been around the
18   corner. Let me call my clinician."
19        And I called the clinician. She said, "Yeah, he's out there. He's still
20   asleep, laying back in the chair asleep. They're calling him on the radio, and he's
21   not even answering." That's what she said to me.
22   Q    Coakley said that to you?
23   A    Yes. And so I got back on the other phone, and I told Major Corbett the
24   clinician said, "Yeah, he's still asleep right now."
25        And he said, "I'm going to send Captain Talley up there, and I'm
26   going to have her stop and talk to you." Because I had called her before I called
27   Corbett, but she wasn't in her office.
28        And so when she went around there -- I guess, in the interim, the
29   detail guy had started vacuuming right before she got up there, so by the time she
30   got up there, Masi was up.
31        That came from Coakley, because my office is around the corner.
32        So Captain Talley came to my office and I just told her I was
33   frustrated. I said that I didn't want to make a formal complaint about this, but he --
34   now he's stopping everyone from doing their work. He's retaliating against us
35   already, and we haven't done anything. We're trying not to do anything.
36        And she said, "Well, you know, I didn't know anything about this.
37   This is the first I heard about it, and, you know, I'll make sure he doesn't come back
38   up here on the post."
39        Which that didn't happen. He was still up on the post the next day, so
40   --
41   Q    Okay. And is he still on the post?
42   A    No. Yesterday he was not on the post, so --

18

| | | |
|---|---|---|
| 1 | Q | And this — |
| 2 | A | That was last week. |
| 3 | Q | This conversation with Talley was — |
| 4 | A | Last week. |
| 5 | Q | — was last week? |
| 6 | A | It was last week. Oh, wait a minute. It was last week, yeah. |
| 7 | Q | And he continued to be up on the post until this week? |
| 8 | A | Yes, until — yesterday another officer was in the post. On Wednesday |

9 he was still on the post.

10       Q     Okay. And did he continue to refuse to call people or did that
11 change?

12       A    Yes. He continued to refuse to call people. And I — at that point I was
13 really just kind of frustrated, and I called the Special Inspector's Office and said,
14 you know, "I didn't want to do anything, but he's retaliating against me and my staff
15 now. What can I do?"

16       You know, I don't know what to do. I didn't want to do anything. I
17 didn't want to try to have a person lose their job, but I don't know what my options
18 are at this point.

19       Q     Okay. And this refusal to call people so you could do your work, that
20 started after you —

21       A    After.

22       Q     — spoke to Corbett.

23       A    Spoke to Corbett.

24       Q     Okay.

25       A    I had not been to Corbett, who's — we did not have that problem with
26 him prior to that.

27       Q     Okay. All right.

28       Anything else? I have a few questions, but are we basically through
29 with the chronology?

30       A    I think that's it. But on the time of the bathroom I can give to you
31 because I started writing down when he was doing things, and when I talked to
32 other people.

33       So from that point, I started keeping my own kind of documentation,
34 because I didn't like the way things were going.

35       Q     And would you have a problem giving me a copy of that
36 documentation?

37       A    No.

38       Q     Okay. That would be very helpful.

39       We talked about potential witnesses, and we talked about early on the
40 witnesses to him asking you out.

41       How about when it started up again, and he was grabbing your arm
42 and all of that? Any other people who might have seen?




1     A    Well, I know one person who did, but she's his friend, so I know she's
2  not going to -- not going to say that she witnessed it.
3     Q    Is that -- who is that?
4     A    That's the correctional officer who's on the post right now, Officer
5  Short.
6     Q    Okay.
7     A    I mean, I have no problems working with her, and my staff don't that I
8  know. That's a friend, and she's not going to --
9     Q    Okay. Anyone else?
10    A    If they did, I don't know that they did.
11    Q    Okay. Anyone else who might have heard his more recent asking you
12 out? There was the earlier period, and then --
13    A    It's a pretty -- I mean, if you walk through that hallway, it's pretty
14 narrow. So anyone in that corridor could have heard, you know, they could have
15 possibly heard. But I'm -- you know, I haven't said anything to anyone about, "Did
16 you hear anything?" or -- the offices are pretty close together. It's a small hallway.
17    Q    Did you complain to anyone at the time?
18    A    No. The only person that I said something to again was to Ms. Hunter,
19 and she and I and Ms. St. Clair talked about it. That was it.
20    Q    Okay.
21    A    Because I told -- went to her and said -- at first I went to her and said,
22 you know, "I don't want to make a formal complaint."
23         Then I went to her later and said, "I am making a formal complaint,
24 and I do have those dates."
25    Q    And did they generate any documents, do you know?
26    A    No. Masi came to her -- came to Ms. Hunter earlier this week and said
27 to her that people are defaming his character.
28         And what she said to me was that he didn't give names and go into
29 detail, so she didn't say anything in terms of what knew what was going on. She
30 didn't say anything.
31    Q    So (inaudible)?
32    A    Yes. Yesterday the same kind of thing. He was not on the post, but he
33 walked over, and I was in the office with the two lead clinicians, and he came over
34 to see the officer that was on the post yesterday, and he started kind of talking loud
35 about people defaming his character, and how he wasn't going to put up with it.
36         I just closed the door.
37    Q    And that's Officer Short?
38    A    No.
39    Q    That's somebody else he was --
40    A    That was a officer that's -- his name is alluding me. It's a long name.
41 (Inaudible) or something like that.
42    Q    Okay. All right. Anything else that you can think of on the spot

20

```
 1    now?  I know we've been talking a long time.
 2             A    No, no.
 3             Q       Okay.
 4             A    I know that -- I don't know -- I don't even remember if I mentioned this,
 5    but I know at some point last year McCargo did tell him, you know, "Leave me
 6    alone," or she was going to be the third party (inaudible).
 7                      I don't know if I mentioned that whole --
 8             Q       Okay.
 9             A    Did I mention that?
10             Q       No, no.  So -- can you place this in time?
11             A    That was during the time when I said he started back up again --
12             Q       Okay.
13             A    -- and he would walk by and make little comments.
14             Q       Okay.  And this was Janna McCargo said that?
15             A    Yes.
16             Q       And she's not here anymore.
17             A    No.
18             Q       But you have contact information for her.
19             A    Her phone, yeah.
20             Q       Okay.
21                     Okay.  I'm going to stop it for now.  We may -- we probably will
22    have to talk again, especially after I take a look at your notes and whatever
23    documents.
24                      Do you have any questions before I stop?
25             A    No.
26             Q       Okay.  Do you solemnly swear that the testimony gave has been
27    truthful to the best of your recollection and belief?
28             A    Yes.  I may have a little chronology -- but for the most part, it's pretty
29    accurate.
30             Q       Okay.  And we try and keep each person's testimony confidential so
31    that they're unaffected by what other people say, so I'd appreciate if you'd keep the
32    contents of what we talked about confidential.
33             A    Who else will have privy to this?
34             Q       At the conclusion, when I file the report, the respondent will get a
35    copy of it.  The Special Inspector gets it, and I don't know who -- that's all that I
36    know of.  Whether there's a process of giving it to the director or the warden, I don't
37    know that, but we can certainly find that out.
38             A    Okay.
39             Q       Okay?
40                     (The interview was concluded.)
41                                    * * * * *
```

# EXHIBIT B

**OFFICE OF THE SPECIAL INSPECTOR**
**DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS**
CAROLYN LERNER, SPECIAL INSPECTOR
1730 M Street, N.W., Suite 412
Washington, D.C. 20036

**INVESTIGATOR:** JANET GOLDSTEIN

September 22, 2004

Harcourt Masi
Correctional Officer
D.C. Department of Corrections
1901 D Street S.E.
Washington, D.C.  20003

Dear Mr. Masi:

This is a twenty (20) day advance notice of a proposal to terminate you from your position of Correctional Officer with the DC Department of Corrections. This action is proposed in accordance with the provisions of Chapter 16 of the District Personnel Manual (DPM). The proposed action is based on charges of Malfeasance; any on-duty or employment related act or omission that interferes with the efficiency or integrity of government operations. The details in support of the proposed action are stated below.

<u>Specifications</u>: From approximately April 1999 through July 2003, you were assigned to the infirmary control bubble where you controlled entry and exit to the third floor medical unit. Following the shift change in July 2003, you continued to work on the third floor as relief officer until your reassignment on January 24, 2004. During your employment, you have also worked overtime on the mental health post on the third floor.

On December 30, 2003, LaVerna Simms, owner-operator of the Center for Correctional Health and Policy Studies (CCHPS), which is contracted to provide medical and mental health services to DCDC inmates, informed Deputy Warden Dennis Harrison that you were sexually harassing her and one of her employees, Christina Roye, Mental Health Clinician.

On January 6, 2004, Ms. Simms notified the Office of the Special Inspector (OSI) that you were retaliating against her for having complained to Deputy Warden Harrison. The OSI accepted for investigation both the sexual harassment complaint and retaliation claim.

Ms. Simm began working with the DCDC in March 1997 as the Intake Coordinator. Ms. Simms alleges that during the past six years, you have sexually harassed her by repeatedly making unwanted overtures towards her. Your overtures allegedly included asking her out, making comments on her appearance and body, seeking her out at work

Teresa Nwankwo, Pharmacist, stated that she began working at the D.C. Jail on April 3, 2000. Nwankwo stated that shortly thereafter, you would beckon her to come to you in the control bubble to talk to you whenever she passed through the sally port area. Although Nwankwo could not recall your specific comments to her, she told you that she was not interested in you and that she was married with children. Nwankwo went to her supervisor Gwendolyn Sinclair because she felt that you were not getting the message.

Gwendolyn Sinclair, Director of Pharmacy stated that Nwankwo complained to her about your conduct. Nwankwo told her that you would delay opening the exit door until she spoke to you and that your behavior was beyond professional. Nwankwo further expressed to Sinclair that she couldn't go where she needed to go freely because you insisted on her stopping to say hello. Sinclair further stated that she spoke to you regarding Nwankwo's complaint.

Gloria Robertson, Nurse, stated that she too was subjected to your unwanted advances between 1996 and 2001 or 2002. Robertson stated that you often invited her to social functions and out on dates. She stated that she refused all of your invitations. Robertson said that you made frequent comments on her physical appearance. She also complained that when you worked the control bubble, you would not open the door until she turned around and looked at you. She stated that this occurred whenever she exited by herself. According to Robertson, there appeared to be no legitimate security reasons for these constant delays. She further stated that you did not delay opening the door when others were present. Robertson further alleged that in 2001 or 2002 you came up from behind her while she was sitting in the nurses' station and put your hands on her shoulders. Robertson responded, "I don't know who you think you are but don't you ever touch me again."

Cynthia Kittrell, Dental Assistant, stated that you made unwelcome advances toward her between 1999 and 2003. Kittrell further stated that you frequently delayed her exit from the third floor area. She explained that instead of allowing her to exit whenever she wanted, you would ask her questions and ask her to come over to talk to you. When she would step over to find out what you wanted, you would ask her out or make other comments that were not work related. Kitrell said that you asked her out on dates at least twenty times. She stated that she always refused your offers to take her out. Kittrell alleges that you also offered her financial assistance and from time to time you would pull out a wad of money and say, "money's not a problem with me." Kittrell stated that she found your behavior annoying and persistent.

Coryne Farmer, Secretary, stated that she began working at DCDC in July 2002. She stated that shortly thereafter while in the sally port area, you stopped her and offered her your business card and asked her to call you "in relation to going out." Farmer said she was amazed at your overtures toward her because she had not paid you any attention. In fact, Farmer said she had been quite rude to you because she had heard from others that you made advances to women. Farmer stated that thereafter you asked her on two separate occasions why she had not called you. She informed you on each occasion that

she was not interested. Farmer further advised that before asking her out, you sometimes delayed her exit from the medical area for no apparent reason. She stated, "He might appear to be looking off into space, or not paying attention to you, or something of that nature, but it was understood that you were his focus." Farmer further stated that you only delayed her exit when she was alone.

During our interviews, you stated that you never made sexual overtures to or asked out any of the aforementioned women. Specifically, you testified that Ms. Simms is biased against you because you are a "foreigner" and that she brought false charges against you to insure that Corporal Reise would be assigned to the mental health post following the retirement of the post officer.

You recalled coming into contact with Cynthia Kittrell approximately 5 to 7 years ago but denied asking her out or commenting on her appearance.

You testified that Teresa Nwankwo's allegations against you were the product of a "mental condition."

You stated that Coryne Farmer might have made accusations against you because she was angry that her supervisor was fired shortly after she was hired.

You allege that Gloria Robertson "came on" to you and that you had been told she had a crush on you. You claim that your refusal to loan Robertson money and help her move soured the relationship between the two of you.

You also denied retaliating against LaVerna Simms by refusing to perform your duties.

The Supreme Court recognized in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986) that sexual harassment is a form of sex discrimination which violates Title VII if it, explicitly or constructively, alters the terms or conditions of an individual's employment. Sexual harassment includes conduct of a sexual nature that unreasonably interferes with an individual's job performance or creates an intimidating, hostile or offense work environment. Meritor Savings Bank v. Vinson 477 U.S.56, 66 (1986), 29 C.F.R. Section 1604.11(a)(1) & (2). LaVerna Simms' allegations and the testimony of the other five medical employees present this type of "hostile environment" claim.

The evidence is overwhelming that you created a hostile environment by making unwanted advances toward LaVerna Simms and five additional women in the Medical Unit. Therefore, I recommend a probable cause finding of sexual harassment against you. It is further recommended that a finding of no probable cause be made on the claim that you retaliated against Ms. Simms for having complained to Deputy Warden Harrison regarding your behavior.

Your conduct violates Title VII of the Civil Rights Act of 1964; the District Court's injunction prohibiting sexual harassment in Neal v. Department of Corrections, Civil

Action No. 93-2420; and the Department of Corrections' Department Order/Program Statement 3310.4, Sexual Harassment Against Employees.

Your behavior also violates D.C. Personnel Regulations, Chapter 18, 1800.2, which states in part: the maintenance of unusually high standards of honesty, integrity, impartiality, and conduct by employees is essential to assure the proper performance of government business and the maintenance of confidence by citizens in their government.

In view of the seriousness of these matters and in the best interest and mission of the D.C. Department of Corrections, it is proposed that you be removed from your position of Correctional Officer with the D.C. Department of Corrections.

The bases for the recommended penalty of removal are as follows:

(1)     Your misconduct is exceedingly disturbing in both its duration and the number of women it affected. The evidence shows that you targeted women in the 3rd floor medical and mental health units with your unwanted advances for at least seven years. Moreover, without undertaking any type of comprehensive search, this investigator readily identified six victims of your misconduct. While victims like Nwankwo and Farmer endured only brief periods of harassment, others like Simms and Harrison were targeted for years.

(2)     You used your position and authority as a Correctional Officer assigned to the control bubble to harass female employees in the Medical and Mental Health Units. As the floor control officer, you forced all six women to endure your attentions by delaying their exit. Your misuse of power is akin to a supervisor's use of his authority to take advantage of his employees.

(3)     You persisted in these unwelcome advances, despite prior warnings to cease. Director of Pharmacy Gwendolyn Sinclair spoke with you in 2000 about Nwankwo's complaints. Instead of heeding to this admonition, you disparaged Nwankwo and continued to engage in similar activities with other women. In fact you also continued to ignore the complaints from these other women to stop your offensive behavior.

(4)     Your verbal attacks on your victims during the interview process in this case demonstrate your unwillingness to take responsibility for your actions. This investigator is particularly struck by your claim that Simms called you a "fucking foreigner"—an allegation that appears patently untrue. This is not the only instance where you chose to attack others in an attempt to avoid responsibility for your own conduct. As noted in the Report of Investigation, you went as far as to file a false complaint against Joanne Claiborne, a witness in a sexual harassment case brought against you. This behavior casts serious doubts on your ability to act appropriately in the future.

(5)     Your repeated lies throughout this investigation likewise raises questions about your potential for rehabilitation. As set forth in detail in the body of the investigative report, you lied not only about you victims but also about your past record. You testified that no formal or informal sexual harassment complaints had been made against you, despite the fact that three such complaints were made between 1996 and 2001.

In contrast to the above factors, there are few mitigating circumstances. During your interview, you provided this investigator with letters from the Medical Director at the Jail dated April 18, 2002 and June 2, 2003 commending the performance of the 3rd floor correctional personnel which includes you. This investigator also has reviewed your performance ratings from April 1, 2001 through March 31, 2003. You received an outstanding rating in the earliest rating and an excellent rating in the subsequent ones. While these records reflect that you performed your work well in certain respects, they provide little counterweight to the serious misconduct described above.

You have already been given an opportunity to respond to the Report of Investigation and finding of probable cause. In addition, you obtained a copy of the Report and all other documents relied on to propose this action against you from the Department of Corrections' Office of Human Resource Management. You have the right to review these materials and to prepare a written response to this notice, including affidavits and other documentation within six (6) days of receipt of this notice. You are entitled to an administrative review by a Hearing Officer. Upon request, the Hearing Officer will conduct a hearing. You are further informed of your right to be represented by an attorney or other representative.

Your response, should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or proposed penalty.

Tom Hoey has been appointed Hearing Officer to conduct the administrative review and/or hearing of the proposed removal action. Accordingly, any response you prepare must be submitted to:

> Tom Hoey, Hearing Officer
> DC Department of Corrections
> 1923 Vermont Avenue N.W.
> Washington, D.C., 20001
> Telephone (202) 671-2053

In conducting the administrative review and/or hearing, Mr. Hoey will review this written notice and your response, if there is one. After conducting the administrative review, Mr.

Hoey will make a written report and recommendation to Carolyn Lerner, Deciding Official, who will issue a final decision.

Although you have already obtained a copy of the material upon which this proposed action is based, you may arrange for further review by contacting Denise Shell, Management Liaison Specialist, Office of Human Resources, at 671-2131.

Please be advised that you will remain in an active duty status during the period of advance notice.

Sincerely,

Janet Goldstein
Investigator

7

## ACKNOWLEDGEMENT OF RECEIPT

----------------------------------------------
Employee                    Date

9/22/04

----------------------------------------------
Witness                     Date

9/23/04

# EXHIBIT C



**OFFICE OF THE SPECIAL INSPECTOR**
**DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS**
1730 M Street, N.W.  Suite 412  Washington, D.C. 20036
Phone (202) 293-8090  FAX: (202) 293-7110

Carolyn N. Lerner, Special Inspector                        Sexual Harassment Hotline
Email: clerner@hellerhuron.com                              Phone: (202) 448-2424

March 3, 2005

Harcourt Masi
Central Detention Facility
1901 D Street, S.E.
Washington, D.C. 20003

Dear Mr. Masi:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1614, this is
the notice of final decision regarding the proposal to remove you from your position of
Correctional Officer with the D.C. Department of Corrections.  The action is based on a charge
of Malfeasance, to wit: any on-duty or employment related act or omission that interferes with
the efficiency or integrity of government operations.  The charges were set forth in the advance
notice dated September 22, 2004, which apprised you of your right to review all materials upon
which the action was based and to respond in writing within six (6) days of receipt of the notice.
You were further advised of your right to be represented by an attorney or other representative.

I have reviewed the proposing official's recommendations on disciplinary action, your October
15, 2004 reply to the proposed disciplinary action, and the Hearing Officer's Recommendation.
Based on this review, I have decided to uphold the proposed charge of "Malfeasance." However,
I have decided to reduce the proposed penalty of termination, and I accept the Hearing Officer's
recommendation of 120 days suspension without pay.

These actions are premised on a probable cause finding by the Office of the Special Inspector
that you violated the Department's Program Statement on Sexual Harassment when you harassed
La Verna Simms, a contractor for the D.C. Department of Corrections.  You were previously
provided with a copy of the Report of Investigation and given an opportunity to respond to the
probable cause finding.

Accordingly, you will be suspended from your position of Correctional Officer for 120 calendar
days without pay beginning March 14, 2005 through and including July 11, 2005. You will be
expected to return to duty as scheduled on July 12, 2005 unless you request and receive approval
for leave. You are also required to attend an individual counseling session with a sexual
harassment trainer from the Office of the Special Inspector, which will be scheduled for you.



You are informed of your right to grieve this final decision either through the negotiated grievance procedure set forth in the collective bargaining agreement; or Appeal to the Office of Employee Appeals (OEA). You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal may be forwarded to me at 1730 M Street, N.W., Suite 412, Washington, D.C. 20036. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have any questions concerning your appeal rights and the grievance procedures, they should be directed to the Fraternal Order of Police, 711 4th Street N.W., Washington, D.C. 20001, telephone number (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of the effective date of your suspension. The OEA is located at 717 14th Street, N.W., Third Floor, Washington, DC 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA, at 727-0004.

Sincerely,

Carolyn Lerner
Special Inspector

ACKNOWLEDGEMENT OF RECEIPT

_____    3/8/05
Employee                    Date

_____    3/8/05
Witness                     Date

ED388114374US



ED 388114374 US

**EXPRESS MAIL**
Label 11-B, March 2004

Customer Copy

UNITED STATES POSTAL SERVICE®

**Post Office To Addressee**

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code
20003

Day of Delivery
☑ Next ☐ 2nd ☐ 2nd Del. Day

Postage
$ 13.65

Scheduled Date of Delivery
Month        Day

Return Receipt Fee
$

Date Accepted
3 7 05
Mo.   Day   Year

Scheduled Time of Delivery
☐ Noon   ☐ 3 PM

COD Fee
$

Insurance Fee
$

Time Accepted
12:41    ☑ AM ☐ PM

Military
☐ 2nd Day   ☐ 3rd Day

Total Postage & Fees
$ 13.65

Flat Rate ☐ or Weight
lbs. 1.9 ozs.

Int'l Alpha Country Code

Acceptance Emp. Initials

**DELIVERY (POSTAL USE ONLY)**

Delivery Attempt
Mo.      Day

Time      ☐ AM ☐ PM

Employee Signature

Delivery Attempt
Mo.      Day

Time      ☐ AM ☐ PM

Employee Signature

Delivery Date
Mo.      Day

Time      ☐ AM ☐ PM

Employee Signature

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

☐ WAIVER OF SIGNATURE (Domestic Mail Only) Additional merchandise insurance is void if customer requests waiver of signature. I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

☐ NO DELIVERY
☐ Weekend ☐ Holiday

Mailer Signature

FROM: (PLEASE PRINT)   PHONE (

D.C. Department of Corrections
Central Detention Facility
1901 D Street, S.E.
Washington, D.C.   20003

TO: (PLEASE PRINT)   PHONE (

Mr. Harcourt Masi
1109 Chaplin Street, S.E.
Washington, D.C.   20019

ZIP + 4 (U.S. ADDRESSES ONLY, DO NOT USE FOR FOREIGN POSTAL CODES)

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

**FOR PICKUP OR TRACKING**
Visit www.usps.com
Call 1-800-222-1811

*EMS*

 

**OFFICE OF THE SPECIAL INSPECTOR**
**DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS**
1730 M Street, N.W.   Suite 412   Washington, D.C. 20036
Phone (202) 293-8090   FAX: (202) 293-7110

**Carolyn N. Lerner, Special Inspector**                    Sexual Harassment Hotline
Email: clerner@hellerhuron.com                    Phone: **(202) 448-2424**

March 3, 2005

Harcourt Masi
Central Detention Facility
1901 D Street, S.E.
Washington, D.C.  20003

Dear Mr. Masi:

Pursuant to provisions of the District Personnel Manual (DPM) Chapter 16, Section 1614, this is
the notice of final decision regarding the proposal to remove you from your position of
Correctional Officer with the D.C. Department of Corrections. The action is based on a charge
of Malfeasance, to wit: any on-duty or employment related act or omission that interferes with
the efficiency or integrity of government operations. The charges were set forth in the advance
notice dated September 22, 2004, which apprised you of your right to review all materials upon
which the action was based and to respond in writing within six (6) days of receipt of the notice.
You were further advised of your right to be represented by an attorney or other representative.

I have reviewed the proposing official's recommendations on disciplinary action, your October
15, 2004 reply to the proposed disciplinary action, and the Hearing Officer's Recommendation.
Based on this review, I have decided to uphold the proposed charge of "Malfeasance." However,
I have decided to reduce the proposed penalty of termination, and I accept the Hearing Officer's
recommendation of 120 days suspension without pay.

These actions are premised on a probable cause finding by the Office of the Special Inspector
that you violated the Department's Program Statement on Sexual Harassment when you harassed
La Verna Simms, a contractor for the D.C. Department of Corrections.  You were previously
provided with a copy of the Report of Investigation and given an opportunity to respond to the
probable cause finding.

Accordingly, you will be suspended from your position of Correctional Officer for 120 calendar
days without pay beginning March 14, 2005 through and including July 11, 2005. You will be
expected to return to duty as scheduled on July 12, 2005 unless you request and receive approval
for leave. You are also required to attend an individual counseling session with a sexual
harassment trainer from the Office of the Special Inspector, which will be scheduled for you.



You are informed of your right to grieve this final decision either through the negotiated grievance procedure set forth in the collective bargaining agreement; or Appeal to the Office of Employee Appeals (OEA). You may elect only one (1) of the grievance procedures. Once you have selected a grievance procedure, [it] is binding.

If you elect to appeal through the negotiated grievance procedure, your appeal may be forwarded to me at 1730 M Street, N.W., Suite 412, Washington, D.C. 20036. Your appeal may be made by completing a grievance resolution form and forwarding it to the above address during the period beginning with the day after the effective date of this letter, but not later than ten (10) calendar days after the effective date.

If you have any questions concerning your appeal rights and the grievance procedures, they should be directed to the Fraternal Order of Police, 711 4th Street N.W., Washington, D.C. 20001, telephone number (202) 737-3505.

If you elect to file an appeal with the Office of Employee Appeals (OEA), it must be filed within thirty (30) calendar days of the effective date of your suspension. The OEA is located at 717 14th Street, N.W., Third Floor, Washington, DC 20005. Enclosed are the OEA appeal form and a copy of the OEA regulations. For additional information on filing an appeal, you should contact OEA, at 727-0004.

Sincerely,

*Carolyn Lerner*

Carolyn Lerner
Special Inspector

## ACKNOWLEDGEMENT OF RECEIPT

-----------------------------------          3/8/05
Employee                                     Date

-----------------------------------          3/8/05
Witness                                      Date

ED388114374US



EXPRESS
MAIL

UNITED STATES POSTAL SERVICE®

Customer Copy
Label 11-B, March 2004

Post Office To Addressee

ED 388114374 US

FROM: (PLEASE PRINT)

D.C. Department of Corrections
Central Detention Facility
1901 D Street, S.E.
Washington, D.C.  20003

Mr. Harcourt Masi
1109 Chaplin Street, S.E.
Washington, D.C.  20019

FOR PICKUP OR TRACKING
visit www.usps.com
Call 1-800-222-1811

# EXHIBIT D

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 100-2006-00018 |

| D.C. Office Of Human Rights | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Laverna Simms** | **(202) 528-0164** | **07-02-1957** |

| Street Address | City, State and ZIP Code |
|---|---|
| **P.O. Box 4085** | **Annapolis, MD 21403** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **DC DEPARTMENT OF CORRECTIONS** | **500+** | **(202) 673-8136** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1901 D Street, S.E.** | **Washington, DC 20003** |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest          Latest |
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | **11-01-2001    03-29-2006** |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)* | ☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I.   In approximately 10/01, I commenced working for Respondent as a Mental Health Coordinator pursuant to a contract between Respondent and Correctional Health and Policy Studies, Inc. From 11/01 to 12/05, male Correctional Officers sexually harassed me by subjecting me to unwelcome sexual comments, advances and touching of my bodily parts. This conduct created a hostile work environment for me. In approximately 12/03, I complained to Larry Corbett, the Deputy Warden, about this conduct. Later, in approximately 12/05, I complained to Dennis Harrison, the Warden, about this conduct. To my knowledge, nothing was done to correct this problem. Moreover, from 12/03 to 3/29/06, in retaliation for my opposition to sexual harassment, Respondent unjustifiably hampered me in the performance of my duties (e.g., delaying in opening doors to housing units, failing to contacts inmates for my assessment). Additionally, on 3/29/06, I was further retaliated against by being informed that I will be terminated effective 9/30/06 without justification. Currently, I am working for Respondent as a Mental Health Director.

II.  I believe that I have been discriminated against based upon my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended. Furthermore, I believe that I have been retaliated against in violation of Section 704(a) of Title VII.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 5/12/06 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date          Charging Party Signature | |

# EXHIBIT E

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  Laverna Simms<br>P.O. Box 4085<br>Annapolis, MD 21403 | From:  Baltimore Field Office<br>10 South Howard Street<br>3rd Floor<br>Baltimore, MD 21201 |

☐ On behalf of person(s) aggrieved whose identity is
    CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 100-2006-00018 | Mattie J. Whitfield,<br>Investigator | (410) 209-2752 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X]  More than 180 days have passed since the filing of this charge.

[ ]  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]  The EEOC is terminating its processing of this charge.

[ ]  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ]  The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Judy W Cassell for*

MAY 17 2007

Gerald S. Kiel,
Director

*(Date Mailed)*

Enclosures(s)

cc:    Fred Staten, Jr.
       EEO Officer
       DC DEPT. OF CORRECTIONS
       1923 Vermont Ave., N.W.
       Ste. NB-12A
       Washington, DC 20001

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| LAVERNA SIMMS | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 06-2178 |
| | ) | |
| v. | ) | |
| | ) | |
| District of Columbia | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## AFFIDAVIT OF MIA POWELL LILEY

I, MIA POWELL LILEY , being duly sworn, states that the following is true to the best of my knowledge, information and belief:

1.      I am the Manager, Settlements and Judgments for the Tort Liability Division, District of Columbia Office of Risk Management.  The Tort Liability Division receives, processes and investigates potential claims against the District of Columbia, pursuant to D.C. Official Code § 12-309 (2001 ed.).  The Office of Risk Management commenced to receive potential claims on January 15, 2004.

2.      Receipt of written notice of claims against the District of Columbia, are forwarded directly to the Tort Liability Division for processing.  When the Tort Liability Division receives notices of claims either from the Mayor's Office or directly, the Tort Liability Division records the receipt of such notice in its claims management system.

3.    Claims previously handled by the Claims Unit for the Office of the Attorney General

still under investigation as of January 15, 2004, were also transferred to the Office of

Risk Management and recorded in its claims management system.

4.    I have conducted a diligent search of the records placed in the Risk

Management system in the DC Office of Risk Management.  The result of this

search has revealed that the Tort Liability Division of the District of Columbia

Office of Risk Management, has received no claim notice from LaVerna Simms

that referred to claims described in the complaint in Civil Action No. 06-2178

Description of complaint Civil Rights-Fifth & Eight Amendment, Retaliation Hostile

Work Environment, Sexual Harassment, Negligent Supervision, Negligent Retention

and Intentional Infliction of Emotional Distress due to Correction officer.

_____

**MIA POWELL LILEY**

**DISTRICT OF COLUMBIA, ss:**

I, _____, a Notary Public in and for the District of

Columbia, do hereby certify that MIA POWELL LILEY , whose name is signed to

the foregoing affidavit, bearing the date of the _____ day of June, 2007, personally

appeared before me and executed the said release, and acknowledged the same to be

her act and deed.

Given under my hand and official seal this _____ day of June, 2007.

_____

**NOTARY PUBLIC**

My Commission Expires: _____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| LAVERNA SIMMS | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 06-2178 |
| | ) | |
| v. | ) | |
| | ) | |
| District of Columbia | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AFFIDAVIT OF MIA POWELL LILEY

I, MIA POWELL LILEY , being duly sworn, states that the following is true to the best of my knowledge, information and belief:

1.      I am the Manager, Settlements and Judgments for the Tort Liability Division, District of Columbia Office of Risk Management.  The Tort Liability Division receives, processes and investigates potential claims against the District of Columbia, pursuant to D.C. Official Code § 12-309 (2001 ed.).  The Office of Risk Management commenced to receive potential claims on January 15, 2004.

2.      Receipt of written notice of claims against the District of Columbia, are forwarded directly to the Tort Liability Division for processing.  When the Tort Liability Division receives notices of claims either from the Mayor's Office or directly, the Tort Liability Division records the receipt of such notice in its claims management system.

3.    Claims previously handled by the Claims Unit for the Office of the Attorney General

still under investigation as of January 15, 2004, were also transferred to the Office of
Risk Management and recorded in its claims management system.

4.    I have conducted a diligent search of the records placed in the Risk
Management system in the DC Office of Risk Management.  The result of this
search has revealed that the Tort Liability Division of the District of Columbia
Office of Risk Management, has received no claim notice from LaVerna Simms
 that referred to claims described in the complaint in Civil Action No. 06-2178
Description of complaint Civil Rights-Fifth & Eight Amendment, Retaliation Hostile
Work Environment, Sexual Harassment, Negligent Supervision, Negligent Retention
and Intentional Infliction of Emotional Distress due to Correction officer.

_____
**MIA POWELL LILEY**

**DISTRICT OF COLUMBIA, ss:**

I, _____, a Notary Public in and for the District of
Columbia, do hereby certify that **MIA POWELL LILEY** , whose name is signed to
the foregoing affidavit, bearing the date of the ____ day of June, 2007, personally
appeared before me and executed the said release, and acknowledged the same to be
her act and deed.

    Given under my hand and official seal this ____ day of June, 2007.

_____
**NOTARY PUBLIC**
**My Commission Expires:** _____
