**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LAVERNA SIMMS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 06CV02178 |
| | | Judge Royce C. Lamberth |
| DISTRICT OF COLUMBIA ET.AL. | * | Due By: July 16, 2007 |
| Defendants. | * | |
| | * | |

**REQUEST FOR ENTRY OF DEFAULT JUDGMENT**

**TO THE HONORABLE COURT:**

The undersigned counsel, on behalf of Plaintiff, Laverna Simms, moves this Court for entry of a default judgment and for a sum certain of $1,666,665 (one million, six hundred and sixty six thousand and six hundred and sixty five dollars) for compensatory damages-which is one third (1/3rd ) of $5,000,000 million dollars. Plaintiff Simms moves this Court to entry of a default judgment for punitive damages in the amount of $1, 666, 665 (one million, six hundred and sixty six thousand and six hundred and sixty five dollars) against CCHPS-which is one third (1/3rd) of the $5,000,000 Plaintiff stated and requested in her Complaints for punitive damages against all three defendants jointly and severely. See Supporting Exs. 1, 2, 3 and 4

Plaintiff Simms' Request for Entry of Default Judgment in the total amount of $3,333,330 is for a sum certain, which by computation can be made certain, and thus

plaintiff requests judgment in the amount of $3,333,330.00 as CCHPS' one third (1/3[rd]) share of the damages amounts demanded by Plaintiff in her Amended Complaint as more fully set forth and explained below.

In this matter a Default Order was entered against CCHPS on or about May 18, 2007. Pursuant to Fed. R. Civ. Proc. 55 (b) (1), once a default has been entered by the Clerk of the Court, a party who received the default against the other party may request for entry of default judgment. Judgment by default may be entered by the Clerk or a Judge. The following conditions have been met for this Court to enter a Default Judgment for a sum certain against CCHPS:

1.     The plaintiff stated and demanded in her complaint a sum certain, namely she requested $5,000,000 in compensatory damages and $5,000,000 in punitive damages jointly and severely against the three defendants. See Complaint and Amended Complaint.

2.     The defaulted party CCHPS is not an infant or incompetent person.

3.     The defaulted party CCHPS is not in the military service.

4.     The facts upon which this conclusion relies are stated clearly and succinctly in the complaint. Specifically, CCHPS an organization co-founded by the Plaintiff ignored her cries and pleas of being sexually harassed and subjected to a hostile work environment. Simms reported these complaints to CCHPS administrator Estelle Hunter for a period of almost six (6) years. The harassment culminated into Simms being sexually assaulted physically in 2003 and even after the perpetrator was suspended for six

(6) months he continued until the day Simms left the Department of Corrections (DOC) to stalk her and sexually harass her at work. During the six year period Simms was degraded, humiliated and even DOC's own EEOC officer characterized Simm's experience at the Department of Corrections as not being "De Minimis". Ex. 1, page 20-28

Specifically, Defendants, the District of Columbia and the DOC characterized the conduct of the victimizer as conduct that was sexually harassing and such conduct was prohibited and protected in the workplace-statements made by defendants in a recent Office of Employee Appeals hearing where Simms was subpoenaed by the government to testify against her victimizer. See Entire Ex. 1. Moreover, Simms' claims are not based on a note or other written evidence of indebtedness.

5.     Pursuant to the provisions of Rule 55(b) (2), Federal Rules of Civil Procedure, this Court is empowered to enter a default judgment against the defendant CCHPS for relief sought by plaintiff in her complaint.

6.     That the defendants are either government agencies or a private corporation and they do not qualify for any of the provisions under the Soldiers' and Sailors' Civil Relief Act. None of the defendants are in the military service and are not afforded any provisions under 50 U.S.C. App. §520.

7.     Moreover, the defendant CCHPS was properly served when it's Resident Agent CT Corporation System was served twice in this matter. The fact that CT Corporation System almost 30 days after it was served the first time attempted to make a

post hoc claim that it could not or had not effected service is of no consequence here. CCHPS is still a viable and active District of Columbia Corporation. See Ex. 2  CT Corporation System is still identified and listed as its resident Agent.  See Ex. 2 CCHPS is responsible for notifying its Resident Agent and the District of Columbia Consumer of any changes in its address.

## **PRAYER**

WHEREFORE, plaintiff prays that this Court enter a judgment of default against defendant, the Center for Correctional Health and Policy Studies in the amount of $3,333,330.00 plus interest, attorney fees and costs. See Ex.3

## **AFFIDAVIT**

I, Jo Ann P. Myles, do hereby certify that the statements and allegations set forth in the foregoing Request For Entry of Default Judgment are true and accurate to the best of our knowledge and belief.

_____/s/_____
Jo Ann P. Myles

Respectfully submitted,


_____/s/_____
Jo Ann P. Myles
Law Office of Jo Ann P. Myles
1300 Mercantile Lane
Suite 139-S
Largo, Maryland 20774
301-773-9652 (Office)
301-925-4070 (Fax)
Bar. No. 04412

Attorney for Plaintiff Laverna Simms


**Dated: July 9, 2007**


## CERTIFICATE OF SERVICE

I HEREBY certify that on this 9th day of July 2007, the following Request For entry of Default Judgment was served upon the following defendants by Electronic Filing and regular mail postage prepaid to:


District of Columbia
Serve: Mayor Adrian Fenty
And or his representative
1350 Pennsylvania Avenue N.W.
Suite 419
Washington, D.C. 20004

Center for Correctional Health and
Policies and Studies (copy mailed)
Serve Resident Agent:
CT Corporation Systems
1015 15th Street N.W.
Washington, D.C. 20005

Center for Correctional Health and
Policies and Studies
1717 K Street N.W. Suite 600
Washington, D.C. 20036 (copy mailed)

Director of District of Columbia
And/or his representative
Department of Corrections
1923 Vermont Avenue
Washington, D.C. 20001

Linda Singer, Esquire
Attorney General
For The District of Columbia
441 4th Street N.W.
6th Floor, Suite 600
Washington, D.C. 20001

_____/s/_____
Jo Ann P. Myles

# EXHIBIT 1

1

## VOLUME 1

GOVERNMENT OF THE DISTRICT OF COLUMBIA

OFFICE OF EMPLOYEE APPEALS

- - - - - - - - - - - - - - - - - x
                                   :
In the Matter of:                  :
                                   :
HARCOURT MASI,                     :
                                   :
       Appellant,              :
                                   :
   -vs-                            : Case Matter
                                   :  1601-0045-05
DISTRICT OF COLUMBIA               :
  DEPARTMENT OF CORRECTIONS,       :
                                   :
      Respondent.             :
                                   :
- - - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, December 14, 2006

Proceedings took place, pursuant to notice,

on Thursday, December 14, 2006, at 10:21 a.m., at the

District of Columbia Office of Employee Appeals, 717

14th Street, N.W., Third Floor, Washington, D.C. 20005

    BEFORE:

        ROHULAMIN QUANDER, SR.
        Administrative Law Judge

**PRO-TYPISTS, INC.**
**PROFESSIONAL TRANSCRIPTION SERVICE**
**WASHINGTON, D.C.**
**(202) 347-5395**
**www.pro-typists.com**

2

APPEARANCES:

On behalf of the Employee:

OMAR VINCENT MELEHY, Esq.
ANDREW J. PERLMUTTER, Esq.
Melehy & Associates, L.L.C.
8403 Colesville Road
Suite 610
Silver Spring, Maryland 20910

On behalf of the Agency:

FRED STATEN, JR., Esq.
Department of Corrections
1923 Vermont Avenue, N.W.
Suite NB-12A
Washington, D.C.  20001

ALSO PRESENT:

HARCOURT MASI, JO ANN P. MYLES, Esq.

20

1    make an opening statement.

2           THE ADMINISTRATIVE LAW JUDGE:  All right,

3    I'll hear from you at this time.

4          **Opening Statement on Behalf of the Agency**

5           MR. STATEN:  Good morning to the Court.

6           THE ADMINISTRATIVE LAW JUDGE:  Good morning.

7           MR. STATEN:  The matter before the Court

8    today is that of Harcourt Masi, an employee of the D.C.

9    Department of Corrections, versus the D.C. Department

10    of Corrections, OEA Matter Number 1601-0045-05.

11          This matter comes before the Court as a

12    petition for appeal filed by Mr. Masi pertaining to a

13    120-day suspension that he was issued in 2005 to serve

14    without pay for sexual harassment violations.

15          The evidence will show that LaVerna Simms, an

16    employee of the Center for Correctional -- CCHPS,

17    Center for Correctional something, I'm sorry --

18          THE ADMINISTRATIVE LAW JUDGE:  We know, it's

19    in the record.

20          MR. STATEN:  It's in the record.  I've always

21    had trouble with that acronym for some reason -- an

22    employee of CCHPS, filed a complaint of sexual

21

1    harassment against Mr. Masi on or about January 6th,

2    2004.

3         And in this complaint, Ms. Simms pointed out

4    how, over a period of about six years, Mr. Masi had

5    repeatedly asked her for dates, repeatedly commented on

6    her appearance, repeatedly commented and made comments

7    regarding her shape, and on at least two occasions,

8    that he invaded her body space by touching her, which

9    she considered to be inappropriate.

10        As a result of tolerating, as the evidence

11   will show, this behavior from Mr. Masi from

12   approximately 1997 until 2003, that Ms. Simms had had

13   enough and so she filed a complaint.

14        The evidence will show as we hear from

15   Carolyn Lerner, Special Inspector, that the D.C.

16   Department of Corrections' sexual harassment program

17   was under the purview of the United States District

18   Court in a class action civil matter of *Bessye Neal*

19   *versus the Department of Corrections*, Judge Royce C.

20   Lamberth, presiding judge, and that a consent decree

21   was signed in 1997 that among other things, provided

22   for the establishment of an Office of Special

22

1    Inspector, and at a designated point which wound up

2    being in February of 2002, that the Special Inspector's

3    office kicked into place.  And they were independently

4    responsible for the investigation of sexual harassment

5    complaints and complaints of retaliated sexual

6    harassment.

7        And so it is that the Special Inspector's

8    office, an independent office, conducted an

9    investigation at which numerous witnesses were

10   interviewed.  And the conclusion of the investigation

11   report, as the testimonial and physical evidence will

12   show, is that Mr. Masi --

13       THE ADMINISTRATIVE LAW JUDGE:  You can lower

14   your voice.

15       MR. STATEN:  Oh, I'm sorry, I'm on a roll --

16   is that Mr. Masi sexually harassed Ms. Simms.  And

17   there were other witnesses who testified to his

18   behavior towards them in violation of Title 7 of the

19   Civil Rights Act of 1964, as amended, in which the

20   court defined sexual harassment -- in which the court

21   defined two distinctive types of sexual harassment, the

22   quid pro quo, which is not at issue here, and a

23

1    hostile, abusive work environment, which is at issue

2    here; that Mr. Masi's behavior towards Ms. Simms

3    created a hostile, abusive working environment that

4    sufficiently and severely affected the terms,

5    conditions and privileges of her employment at the D.C.

6    jail.

7         Ms. Simms, as the evidence will show, did not

8    work for the jail, she worked for a contractor, CCHPS,

9    but her physical location was inside the D.C. jail.

10   And as the program statements will show on sexual

11   harassment, the contract employees were covered just

12   like agency employees.

13        The evidence will show that Mr. Masi has had

14   numerous -- has been to training, has been trained by a

15   Special Inspector, trained prior to that on the issue

16   of sexual harassment.

17        The evidence will further show from witness

18   testimony that he asked other women for a date, that

19   this was his pattern of behavior.  Oh, the witnesses

20   will testify that he's cordial, polite, that he seems

21   like a nice person, but he would ask them for dates.

22        The evidence will show that Mr. Masi has

24

1    denied asking any witness for a date.  And what we view

2    as being very critical to this case is that the

3    testimonies taken by the Special Inspector investigator

4    were testimonies that were given under oath, taped,

5    transcribed testimony, and that these witnesses stated

6    under oath, clearly, categorically, that he repeatedly

7    asked someone for dates.

8            An exception would be Christina Roye who is

9    here, who will testify that Masi did ask her for a date

10   and so she showed him a wedding ring to let him know,

11   "Hey, I'm married.  I'm not interested in a date."

12           The evidence will show that Mr. Masi, in his

13   petition for appeal to this office, and in fact prior

14   to that, in his rebuttal that was prepared by his

15   counsel and submitted to the hearing officer, Tom Hoey,

16   said that Mr. Masi -- they said specifically, in

17   conclusion, "Based on the above, my client requests the

18   following, alternatively or in the aggregate, one,

19   denial of the proposal of termination; two, mitigation

20   of proposed discipline from a termination to a

21   suspension; and three, any other relief to which he is

22   entitled."

25

1          When we look at Mr. Masi's petition for

2     appeal to this office, he didn't deny he didn't do it,

3     he just wanted a lesser penalty.

4          We've raised this motion, Your Honor, and

5     yes, it was denied for summary judgment.  But we're

6     saying here to the Court that there are no genuine

7     issues of material dispute in this case.  The witnesses

8     will testify under the limited circumstances that you

9     have articulated in your order that yes, he asked them

10    for dates.

11         We will show through the direct and through

12    the testimony that Mr. Masi has this pattern of

13    behavior and that with Ms. Simms, he just continued to

14    badger her to the point that she would start to

15    disguise her appearance.  In other words, she would

16    wear her lab jacket, as she will testify to, because

17    Mr. Masi was always commenting about her shape and

18    wanted to know did she work out and those kinds of

19    things.

20         And there were even times that she had to put

21    on -- she felt it necessary to wear sunglasses just so

22    she wouldn't have to just -- he could see her eyes and

26

1    she would have to look at him as she passed to and from

2    the area in which he worked and operated the doors

3    controlling the entry and exit to various locations on

4    the third floor where the medical infirmary was

5    located; that this created this hostile, abusive

6    environment; that it violates Title 7.  And with this

7    violation, it constitutes more than a de minimis

8    violation of the current standards set forth in DPM,

9    Chapter 16.

10          The evidence will show that de minimis is

11    something trifling, insignificant.  Sexual harassment

12    is hardly insignificant, as the testimony will show.

13    It will show that in the class action suit of *Neal*

14    *versus the Department of Corrections*, it cost the

15    government more than $20 million in overall costs.

16          And yet, with all of the cost, with all of

17    the testimony, with all of the training that has gone

18    on in this very critical area of employment, it had no

19    bearing on Mr. Masi, had no impact on him, didn't care.

20    He came to work to see how many dates he could get, how

21    many he could arrange.

22          We'll hear testimony today, as the Employee

27

1    would have this Court to believe, from Sergeant Profit,

2    who will testify that he was a nice guy.  And we're not

3    saying that he's not a nice person, but he wasn't nice

4    to Ms. Simms because he badgered her for sex.  She

5    doesn't know what he did when she wasn't around; all

6    she can testify to is what she saw when she was around.

7         They will put on testimony from Tyrone

8    Jenkins.  Mr. Jenkins will testify that Mr. Masi said

9    that he gave Ms. Robertson money to move, that he was

10   dating her.  Yet, Mr. Masi's own testimony, as the

11   evidence will show, during the testimony taken by the

12   OSI investigator is that he never dated Ms. Robertson,

13   he never asked her for a date, he never went out with

14   her.  This is the evidence and this is what will be

15   pointed out.

16        What we're asking the Court, we're saying to

17   the Court that there are no genuine issues of material

18   dispute here and we're asking the Court for summary

19   disposition at this point.  Thank you, Your Honor.

20        THE ADMINISTRATIVE LAW JUDGE:  Mr. Melehy.

21        MR. MELEHY:  Thank you, Your Honor.  I'm

22   going to be fairly brief here.

28

1          THE ADMINISTRATIVE LAW JUDGE:  Let me ask

2      you, first of all, to identify yourself for the record.

3          MR. MELEHY:  My name is Omar Melehy.

4          THE ADMINISTRATIVE LAW JUDGE:  I know who you

5      are, but for the transcript.

6          MR. MELEHY:  I'm counsel for Mr. Masi, the

7      Employee.

8          THE ADMINISTRATIVE LAW JUDGE:  Now are you

9      making an opening statement at this time?

10         MR. MELEHY:  Yes.

11         THE ADMINISTRATIVE LAW JUDGE:  Okay.

12      **Opening Statement on Behalf of the Employee**

13         MR. MELEHY:  Your Honor, Mr. Masi

14      categorically denies that he sexually harassed LaVerna

15      Simms or Christina Roye.  You have indicated through

16      your prior orders that the only issue in this case is

17      whether there was cause for his termination and whether

18      or not he sexually harassed those two employees.

19      That's the only issue in the case.

20          Christina Roye says she was not sexually

21      harassed.  So the only --

22         THE ADMINISTRATIVE LAW JUDGE:  I haven't

32

1    both the Agency and the Employee.  However, since we

2    are hearing the Agency's case, you'll be questioned

3    first by Mr. Staten.  Mr. Staten.

4              MR. STATEN:  Yes, thank you, Your Honor.

5                    **DIRECT EXAMINATION**

6              BY MR. STATEN:

7         Q    Good morning, Dr. Simms.

8         A    Yes.

9         Q    Would you please state your name for the

10   record?

11        A    LaVerna Simms.

12        Q    And do you have a business address, Dr.

13   Simms?

14        A    Yes, I do, 316 F Street, Northeast, 20002.

15        Q    And how long have you been employed at this

16   address, Dr. Simms?

17        A    Well, since I left the Department of

18   Corrections, September 31st.

19              THE ADMINISTRATIVE LAW JUDGE:  This year?

20              THE WITNESS:  Yes, 2006.

21              THE ADMINISTRATIVE LAW JUDGE:  September 30?

22              THE WITNESS:  Yes.

33

1           BY MR. STATEN:   (Resuming)

2      Q    And prior to your current employment, where

3  were you employed?

4      A    I was employed with Center for Correctional

5  Health and Policy Studies.  We had a contract with the

6  District to provide medical and mental health services

7  at the two correctional facilities in the District of

8  Columbia.

9      Q    And does that stand also for CCHPS?

10      A    Yes, it does.

11      Q    And exactly what was the nature of your

12  employment with CCHPS?

13      A    I was the co-founder of the not-for-profit

14  and also worked as -- the last position was as the

15  mental health director.

16      Q    Now how long had you been an employee of

17  CCHPS prior to September 30th of 2006?

18      A    CCHPS held the contract with the District for

19  six years, so I was there the six years that CCHPS held

20  the contract.  And prior to that, I was there under the

21  Receiver.

22      Q    And do you recall exactly when you started?

PRO-TYPISTS, INC.                    (202) 347-5395

34

1        A    I started in -- I think it was March 17,

2    1997.

3        Q    Dr. Simms, do you know the employee in the

4    matter before this office today?

5        A    Yes.

6        Q    Would you point him out and identify him for

7    the Court, please?

8        A    Corporal Masi (pointing).

9            MR. STATEN:   Your Honor, please let the

10   record reflect that the witness has identified the

11   employee in this matter, by pointing him out and

12   calling his name, Corporal Masi?

13           THE ADMINISTRATIVE LAW JUDGE:   Yes.

14           BY MR. STATEN:   (Resuming)

15       Q    Now where do you know the employee from, Dr.

16   Simms?

17       A    From my tenure at the Department of

18   Corrections.

19       Q    And do you recall what his title, what his

20   duties were at the Department of Corrections?

21       A    Corporal.   I'm assuming in Safety and

22   Security.

35

1      Q   And do you recall when you first met or

2  became introduced or became aware of the employee?

3      A   I don't remember the exact date, but I do

4  know that it was shortly after I began working under

5  the Receivership.  I'm not sure if that was at the end

6  of '97 or '98, but it was shortly after I began my

7  tenure there.

8      Q   After you became introduced or became aware

9  and had knowledge of Mr. Masi, did you have any

10  interaction with him?

11           THE ADMINISTRATIVE LAW JUDGE:  You'll have to

12  answer with words.

13           THE WITNESS:  No, I'm trying to think.  Okay,

14  did I have any interaction with him?  The interaction

15  that I had with him, initiated by him, yeah, I did.  I

16  mean I guess it's kind of how you're asking the

17  question, did I have any interaction with him.  Are you

18  asking me what was my interaction with him?  Maybe that

19  would be --

20           BY MR. STATEN:  (Resuming)

21      Q   What was your interaction with him?  I wanted

22  to establish that you had some.

36

1      A   Yes.

2      Q   Okay, then the next question, what was your

3  interaction with him?

4      A   Initially, well, I know that Corporal Masi

5  introduced himself to me, I do recall that.  He would

6  ask me out, that's how I was first -- that's how I

7  first came to know who Corporal Masi was, by him asking

8  me out.

9      Q   When you say out, do you mean --

10     A   Asking me out on a date.

11     Q   Out on a date.

12     A   Yes.

13     Q   And this happened, again, in approximately

14  1997?

15     A   As soon as I met him, as soon as he

16  introduced himself.  He introduced himself and asked me

17  out on a date.

18     Q   And what did you say?

19     A   That I was not interested.

20     Q   Did he ask you out again?

21     A   Every time I saw him.

22     Q   And what was the frequency of seeing him?

37

1       A       Initially when I began work there, I worked

2    evenings, so I would come in about 2:00 o'clock; I

3    worked four days a week, so I'd come in about 2:00 to

4    3:00, between 2:00 and 3:00 p.m.

5               And he would come around and stand outside my

6    office and as I would bring a patient in, he would

7    still be standing there, bring another patient in.  And

8    every time I came out, he would make comments, asking

9    me out on dates and just other unwanted comments.

10      Q       Describe in your own words to the Court these

11   comments.

12      A       He would make comments referencing my body,

13   my dress, how we would do as a couple.  For instance,

14   if I said, you know, "I don't want to go out with you,

15   I'm dating someone," "Oh, I'll pay for both of you to

16   go, bring your friend, too."

17      Q       When you say he made comments about your

18   body, it was just your whole body or did he make any

19   comment about a specific body part?

20      A       He did say that I had a nice body, wanted to

21   know if I worked out.  He liked the way my clothes fit

22   me.

38

| | | |
|---|---|---|
| 1 | Q | And what was your response to these comments? |
| 2 | A | Usually, I ignored them or just would ask him |
| 3 | | to leave me alone. |
| 4 | Q | And would he? |
| 5 | A | Until the next time he saw me. |
| 6 | Q | And then what would happen the next time he |
| 7 | | saw you? |
| 8 | A | It would start all over again.  It was |
| 9 | | constant, it was humiliating, it was frustrating. |
| 10 | Q | And approximately how long did this go on? |
| 11 | A | Initially, two years.  Initially, it was two |
| 12 | | years before there was any break in his behavior.  From |
| 13 | | the moment I met him, two straight years. |
| 14 | Q | Then there was a break. |
| 15 | A | Yes. |
| 16 | Q | Approximately how long of a break? |
| 17 | A | I can't give you a specific time of the |
| 18 | | break, but I know I can give you when the break |
| 19 | | generally started was at some point in '99, late '99, |
| 20 | | 2000. |
| 21 | Q | And then it resumed, is that correct? |
| 22 | A | Yes, it did. |

39

1      Q    And what happened, describe his conduct after

2    it resumed.

3      A    Well, I would tell him that I was going to

4    tell the Warden, you know, that I was going to tell the

5    Warden about his behavior, and he would just laugh

6    because of their relationship.

7      Q    Who was the Warden at that time?

8      A    Patricia Britton, Patricia Britton Jackson.

9      Q    Describe, when the conduct resumed, describe,

10    if you will, please, the frequency, to the best of your

11    recollection, of the conduct after it resumed.

12      A    After it resumed, he was in a different spot,

13    he was in the bubble.  I don't know if you're familiar

14    with the jail, but it's a glass, plexiglass, and so he

15    could see everything around it and he controlled who

16    would go in or out.  So where the Mental Health hallway

17    was, I had to, you know, press a button and then he

18    could let me out.  And then to go out, to exit the

19    facility, he would have to push another button.

20          So when I would get there, he would always

21    say, "Open your lab jacket, let me see your body," all

22    of that before he would open the door.

PRO-TYPISTS, INC.                    (202) 347-5395

40

```
1        Q    Now this bubble, it controls the doors in and

2   out.

3        A    Yes.

4        Q    And he could control the doors from within

5   the bubble.

6        A    He was the only person who could control

7   them, yes.

8        Q    How did you view those comments?

9        A    Humiliating, frustrating.  You're trying to

10  leave the building and he's not going to open the door.

11       Q    Do you remember approximately when this

12  occurred?

13       A    When he came onto that post, as soon as he

14  came onto that post.  That had to be around '99, 2000.

15            THE ADMINISTRATIVE LAW JUDGE:  Is this the

16  same as the sally port?

17            THE WITNESS:  That's the sally port, yeah.

18            BY MR. STATEN:  (Resuming)

19       Q    Dr. Simms, there's evidence in the record

20  that you filed a complaint against Mr. Masi in January

21  of '03 -- I'm sorry, January of 2004.  Is that correct?

22       A    Yes.
```

44

1    Thank you very much.

2                    BY MR. STATEN:   (Resuming)

3        Q    Dr. Simms, my question to you was that the

4    record reflects that you filed a complaint of sexual

5    harassment against Mr. Masi on January 6th, 2004.   And

6    I ask you specifically, what led to the filing of the

7    complaint at that time?

8        A    I guess over the years, because he just

9    wouldn't stop, and it kept increasing.   And when he

10   went to work in the bubble, all of that was prior to me

11   filing the complaint, which had also led up to me

12   filing the complaint.   He wouldn't open the door, he

13   would just make comments, "Open your jacket, let me see

14   your body," you know, rear back in the chair with his

15   hands behind his neck.   I mean because he was in

16   control, you could not leave out without him opening

17   the door.

18       Q    Were there other things that you tried, other

19   than filing the complaint, to get him to just leave you

20   alone?

21       A    Initially, I wasn't sure what to do or who to

22   talk to or who to go to.   So initially, I spoke to my

45

1    peers about it and they talked to him and would ask him

2    to just leave me alone.

3            It's a punitive environment when you work in

4    the jail already and because of my job there, I relied

5    on the officers for my safety and security.  Okay, so I

6    just wanted it to go away.  There's some fear that

7    comes into light there if you're just going to go and

8    say something about an officer.  That's one part of it.

9            The other part of it was his relationship

10   with the Warden.  I mean where do you go?

11           THE ADMINISTRATIVE LAW JUDGE:  Excuse me,

12   when you say peer group, you spoke to his peers or your

13   peers?

14           THE WITNESS:  My peers.

15           THE ADMINISTRATIVE LAW JUDGE:  Your peers.

16           THE WITNESS:  Yes.

17           BY MR. STATEN:   (Resuming)

18       Q    Did you become aware that he was also dating

19   someone at work --

20       A    Yes.

21       Q    -- with CCHPS?

22       A    Yes.

49

1        BY MR. STATEN:   (Resuming)

2        Q    Dr. Simms, are you aware of any employee that

3    worked for CCHPS that Mr. Masi was dating?

4        A    Yes.

5        Q    Would you name that employee?

6        A    Sharon Dorsey.

7        Q    Sharon Dorsey.  And how is it that you know

8    that Mr. Masi was dating Sharon Dorsey?

9        A    Sharon Dorsey and I worked very closely

10   together, she was the office manager.  We went out, we

11   had a mutual friend, and so we were at several social

12   gatherings together and Corporal Masi was with Sharon

13   Dorsey.

14       Q    Did there come a point prior to the filing of

15   your formal complaint that you told Mr. Masi if his

16   conduct were to continue, you would let Ms. Dorsey

17   know?

18       A    Yes, I did.

19       Q    Can you describe briefly that exchange?

20       A    Well, actually, I mean I told him that on

21   several occasions when he kept calling my office, when

22   he would call my assistant and have it transferred.  He

50

1   just laughed, he laughed, he said she wouldn't believe

2   it.   I talked to my administrator, who also said that

3   she wasn't going to believe me because there was an

4   issue with someone else and their supervisor had spoken

5   to him and also to the person and Sharon, she didn't

6   believe it, so --

7       Q    Now would you identify your administrator for

8   the record, please?

9       A    Estelle Hunter.

10      Q    Do you recall anyone else that you may have

11  told or discussed about how Masi was treating you?

12      A    I talked to Gwendolyn Sinclair.  She was also

13  a co-founder of Center for Correctional Health and

14  Policy Studies, she was the pharmacist there.

15          I spoke to one of his colleagues, Officer

16  Riese, about it.  I spoke with I think he was the

17  deputy warden at the time, Dennis Harrison, about it.

18  I spoke to I think it was Captain McCormick about it.

19  And I'm sure there were other people along that time

20  that were his peers, as well as mine.  I spoke to a lot

21  of my peers about it, probably on a daily basis.

22      Q    Describe for us what happened after you filed

51

1    the complaint.  In other words, was an investigation

2    conducted?

3        A    Yes, an investigation was conducted.  The air

4    became very chilly at the jail, very chilly at the

5    jail.  I was fearful to go to the units, actually, and

6    the Department had said that they would have someone

7    escort me when I went to the units.

8        Q    Do you recall -- I'm sorry, you may finish,

9    I'm sorry.

10       A    After I filed, I would still see Corporal

11   Masi, although he wasn't supposed to come to my post,

12   he was supposed to be like 300 feet away from me.  He

13   continued to come up on my post, he continued to be

14   stationed on my post.

15             There came a time, and I don't have it here

16   with me, but I could bring it, where he just -- when

17   you work on the Mental Health post, it's your

18   responsibility to call the units and get those clients

19   up there.  And I just told the clinicians to begin

20   putting the notes --

21             MR. MELEHY:  Your Honor, I object to this

22   line of questioning, this goes to the retaliation

52

1      issue.

2              MR. STATEN:  There wasn't a question.

3              THE ADMINISTRATIVE LAW JUDGE:  The Court is

4      not going to make a formal finding on the issue of

5      retaliation, so I think I've already stated that.  This

6      Court is going to deal with the actual sexual

7      harassment and I'm ruling that the witness can testify

8      as to sexual harassment.  Because the Court can still

9      find that there was sexual harassment ongoing, without

10     making a formal finding of retaliation.

11             I do feel that it is important to get a clear

12     picture from this witness as to the circumstances and

13     the conditions at work that were evident before and

14     then approximately at the time the complaint was filed

15     and if it continued.  It didn't necessarily have to be

16     retaliatory, but it could have still continued.  So I'm

17     going to allow the witness to testify.  Continue, I

18     still think it's relevant.

19             BY MR. STATEN:  (Resuming)

20       Q     Please continue.

21       A     So I just started telling the clinicians to

22     put a note in the chart saying, you know, who worked

53

1   the post and if the client was not brought up to the

2   area for them to receive their mental health

3   assessment.

4           After that point, he didn't really say

5   anything to me, he just would stare me down or make --

6   I mean like if he was talking with one of his peers,

7   you know, he may, you know -- but nothing directly to

8   me.  He just would stare me down.

9       Q    Did there come a point either prior to you

10  filing the complaint or after you filed the complaint

11  and during the investigation, where Mr. Masi actually

12  touched you, invaded your body space?

13      A    Yes, he did.

14      Q    Please explain to the Court.

15      A    He was actually working the post that day and

16  I was on my way to the ladies' room.  And as I was

17  trying to enter the ladies' room, he stood up and

18  fondled my arm, across my chest.

19      Q    And what did you do?

20      A    I mean I really just lost it, you know, just

21  started telling him if he ever touched me again -- and

22  then that's when I went down to the Warden's Office and

54

1    basically, how the whole thing got out of the way.  The

2    Warden was like, you know, "Let me talk to him first,

3    let me talk to him," "Let me talk to him before, you

4    know, you file."

5              THE ADMINISTRATIVE LAW JUDGE:  Let me clarify

6    something.  We're talking about just before or just

7    after the complaint was filed?

8              THE WITNESS:  This was before, before it was

9    filed.

10              THE ADMINISTRATIVE LAW JUDGE:  Is this close

11    to the last act?

12              THE WITNESS:  Yes, that was the next to the

13    last.  The last act was when he did it the second time,

14    the same way, on my way into the ladies' room, the

15    exact same thing.

16              BY MR. STATEN:  (Resuming)

17       Q    So even after you put him on notice the first

18    time that he fondled your arm and across your shoulder,

19    he did it a second time?

20       A    Yes.

21       Q    On a different day.

22       A    Yes, like a week later, after the Warden had

55

1    spoken with him.

2          Q    And was this the last straw?

3          A    That was it.  That's when I -- yes, that was

4    the last straw.  That's when I spoke with Corbett and

5    he told me what steps I had to take.

6                THE ADMINISTRATIVE LAW JUDGE:  Is Corbett the

7    Warden?

8                THE WITNESS:  He was the Warden.

9                THE ADMINISTRATIVE LAW JUDGE:  What's his

10   first name or her first name?

11               THE WITNESS:  Larry.

12               MR. STATEN:  Larry Corbett, Mr. Larry

13   Corbett.

14               THE ADMINISTRATIVE LAW JUDGE:  Continue.

15               MR. STATEN:  Thank you, Your Honor.

16               BY MR. STATEN:  (Resuming)

17         Q    What happened, what was the process after you

18   filed with the Special Inspector?

19         A    After I called Carolyn Lerner, I had to set

20   up an appointment and go over and meet with her.  I met

21   with her and then she assigned a Special Inspector,

22   Janet Goldstein, to the case.

PRO-TYPISTS, INC.                    (202) 347-5395

56

1        Q    And were you interview by Janet Goldstein?

2        A    Yes, I was.

3        Q    And what was the nature, the method of the

4    interview?

5        A    It was taped.  I had several conversations

6    with her that were taped.  I had several more

7    conversations with her over the telephone, telephone

8    interviews.

9        Q    Do you recall whether or not your testimony

10   during this taped interview was sworn testimony?

11       A    It was, even the telephone conversation was.

12       Q    Explain to the Court how the employees'

13   conduct toward you, how did that make you feel as a

14   person and as a woman?

15       A    Well, especially for me in my field, you feel

16   like you can handle it yourself, initially.  And then

17   there is some embarrassment towards it happening to

18   you.  Then you feel powerless, it's humiliating.  At

19   some point, I felt like I was being stalked by him.  I

20   mean imagine someone's supposed to be working and

21   they're just standing outside of your office.

22       Q    Were there times when you and Mr. Masi would

**EXHIBIT 2**

| DC HOME | ABOUT DC | RESIDENTS | BUSINESS | VISITORS | DC GOVERNMENT |



**WELCOME TO WASHINGTON**
**District of Columbia**

**MAYOR**
**Adrian M. Fenty**

## Organization Information



**DCRA HOME**

**SERVICES**
Basic Business License
Business Resource Center
Building/Land Regs
Compliance/Enforcement
Organization Registration
Inspections
Land Plats
Licensing Center
Building Plan Review
 Status
Permits

**INFORMATION**

**ONLINE SERVICE**
 **REQUESTS**

### Online Organization Registration
**Search Registered Organizations**

**Organization Details - Step** [1] [2] [3]

To view another organization from the search, select the **Return to Search Results** button below. You may also **print** the organization details, or start a **new search**. Use the **Back to Main Page button** to continue the registration process.

| **Organization** | | **Registered Agent** |
|---|---|---|
| **Organization Name:** | CENTER FOR CORRECTIONAL HEALTH & POLICY STUDIES, INC. | C T Corporation System<br>1015 15th Street, N.W. Ste. 1000<br>Washington, DC 20005 |
| **State:** | DC | |
| **Status:** | ACTIVE | |
| **Initial Date of Registration:** | 7/30/1999 | |
| **File No.:** | 992335 | |
| **Organization Type:** | DOMESTIC NON PROFIT CORPORATION | |

[ << Back to Main Page ]   [ < Return To Search Results ]   [ Print Results ]
[ New Search ]

For more information, contact the BBL Info Center at (202) 442-4432 or Ask the Director .

**Government of the District of Columbia**
**Citywide Call Center :** (202) 727-1000
TTY/TDD Directory

Telephone Directory by
Topic | Agencies | DC
Council | Search |
Elected Officials

Feedback | Translation
| Accessibility | Privacy
& Security | Terms &
Conditions

**John A. Wilson Building**
**1350 Pennsylvania Avenue, NW**
**Washington, DC 20004**

| DC HOME | ABOUT DC | RESIDENTS | BUSINESS | VISITORS | DC GOVERNMENT |



**District of Columbia**



**MAYOR**
**Adrian M. Fenty**

## Organization Information

**DCRA HOME**

**SERVICES**
Basic Business License
Business Resource Center
Building/Land Regs
Compliance/Enforcement
Organization Registration
Inspections
Land Plats
Licensing Center
Building Plan Review
 Status
Permits

**INFORMATION**

**ONLINE SERVICE
REQUESTS**

# Registered Organization Search
## STEP  1  2  3  Your Search Results

Searched for: **992335**

We have found the following results for your query. Click on the radio button next to the
organization you wish to view, then click the **Continue To** button below to view the
organization's registration information and status.

| Organization Name / State | Status | Date | File No. |
|---|---|---|---|
| CENTER FOR CORRECTIONAL HEALTH & POLICY STUDIES, INC., DC | ACTIVE | 7/30/1999 | 992335 |

Page 1

| Return To Organization Homepage | Print Page | New Search | Continue To >> |

Review Organization Information

For more information, contact the BBL Info Center at (202) 442-4432 or Ask the Director .

Government of the District of Columbia
Citywide Call Center : (202) 727-1000
TTY/TDD Directory

Telephone Directory by Topic
|  Agencies  |  DC Council
|  Search  |  Elected
Officials
Feedback  |  Translation  |
Accessibility  |  Privacy &
Security  |  Terms &
Conditions

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

LAVERNA SIMMS,                          *

     Plaintiff,                       *

     v.                               *          Civil Action No. 06CV02178

                            Judge Royce C. Lamberth

DISTRICT OF COLUMBIA ET.AL.             *

     Defendants.                      *          Due: July 16, 2007

_____*

## AFFIDAVIT IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT

    I, Jo Ann P. Myles, declare under penalty of perjury that the following facts are true and correct to the best of my information and belief:

    1.   I am the attorney for the plaintiff in this action. I am over 18 years of age and competent to give testimony in the above captioned matter. I have personal knowledge about the facts and/or circumstances in this matter.

    2.   That Original and Amended Complaints were served upon the defendant, the Center for Correctional Health Policy Studies ("CCHPS") on April 18, 2007 and May 4, 2007 respectfully, no response has been served within the time allowed by law nor has defendant sought additional time within which to respond, and Default has entered against the defendant, on May 18, 2007.

    3.   The claim of the plaintiff is for the sum of $ 3, 333,330.00, plus interest from the date of judgment as provided by law, together with the costs of this action.

                    _____/s/_____
                         Jo Ann P. Myles

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LAVERNA SIMMS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 06CV02178 |
| | | Judge Royce C. Lamberth |
| DISTRICT OF COLUMBIA ET.AL. | * | Due: July 16, 2007 |
| Defendants. | * | |
| | * | |

## DEFAULT JUDGMENT

The defendant, the CENTER FOR CORRECTIONAL HEALTH AND POLICY

STUDIES ("CCHPS")  having failed to plead or otherwise defend in this action, and default

having heretofore been entered; upon application of plaintiff and upon affidavit that defendant is

indebted to plaintiff in the principal sum of $ 3,333,330.00 plus interest thereon; that defendant

had been defaulted for failure to appear and/or plead pursuant to Rule 55(a) of the Federal Rules of

Civil Procedure; and that the claim is for a sum certain or for a sum which can by computation be

made certain; it is hereby,

ORDERED, ADJUDGED, and DECREED that plaintiff, LAVERNA SIMMS shall

recover of the defendant,   CENTER FOR CORRECTIONAL HEALTH AND POLICY

STUDIES ("CCHPS") the sum of $ 3,333,330.00, pl us costs and interest according to law from

the date of this judgment until the entire amount is paid.

This judgment is entered by the Clerk at the request of the plaintiff and upon affidavit that

said amount is due, in accordance with Rule 55(b)(l) of the Federal Rules of Civil Procedure.

CLERK

By _____
Deputy Clerk