## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

_____

LAVERNA SIMMS,                              *

     Plaintiff,                              *

     v.                                      *          Civil Action No. 06CV02178

                                           Judge Royce C. Lamberth

DISTRICT OF COLUMBIA ET.AL.                 *

     Defendants.                             *

_____     *

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

     Plaintiff, Laverna Simms by and through her undersigned counsel, hereby opposes Defendants the District of Columbia and the Director of the District of Columbia Department of Corrections (DOC) Motion To Dismiss Or In, the Alternative For Summary Judgment. Plaintiff Simms also moves this court for discovery pursuant to Fed. R. Civ. P. 56 (e) and (f). See Ex. 3, Affidavit of Plaintiff's Counsel

     In support of this opposition Simms avers to this that the defendants' motion should be denied in its entirety and the grounds for denial are as follows:

     1.     Pursuant to Fed. R. Civ. P. 56 (e) and (f) plaintiff cannot fully defend this motion because full discovery, opposing affidavits, depositions, answers to interrogatories, request for admissions  and other supporting certified documents and papers are necessary, wherefore Plaintiff pleads that she requires further testimony and evidence in order to fully and completely respond to the defendants' motion. See Counsel

Affidavit Ex. 1 Nonetheless without prejudice responds to the Defendants motion to dismiss and/or in the alternative motion for summary judgment.

2.      That Plaintiff's Amended Complaint does not fail to state a claim against a the District of Columbia Government under 42 USC Sec. 1983;

3.      That the sexual harassment and hostile work environment and retaliation that have been alleged is sufficient and substantially rises to the level of a constitutional violation as to Counts I, II, II and IV;

4.      That Plaintiff's claims are not barred by the applicable statue of limitations as to Counts, I, II, III, IV, V and VI;

5.      Plaintiff's Common Claims are permissible, timely and ripe and should not be dismissed; and

6.      Plaintiff has properly given notice to the District of Columbia for those claims that are required in accordance with D.C. Code Sec. 12-309; and

7.      Plaintiff did not sue the DOC, she sued the **Director of the DOC** (an individual in his/or her official capacity, which is permitted under the law) as to Counts I, II, III, IV, V, wherefore defendants are incorrect in its assumption that the Department of Corrections was sued.[1]

## I.      INTRODUCTION

Plaintiff LaVerna Simms, a female and former, contractor, employee of the District of Columbia government and founder of the Center for Correctional Health Studies Policies (CCHPS) filed a sex discrimination, harassment and  hostile environment

---

[1] It is clear on the outside of the Plaintiff's Complaint that she sued the Director of the DOC in his/or her official Capacity. There is no language on the front of the complaint that shows that Simms sued the DOC as a government agency.

complaint against the defendants the District of Columbia, the Director of the Department of Corrections (DOC) in his/or her individual capacity on December 21, 2006. See Docket Entry 1, Amended Complaint.

Simms alleged throughout her Complaint that since 2001 or earlier she had been sexually harassed by the male employees at the DOC. She specifically alleged that DOC Correctional Officer Harcourt Masi sexually harassed her for years, namely a six year period on a routine and daily basis up and until she left the DOC on September 30, 2006. Simms alleges that the daily harass was pervasive, unwanted, offensive, hostile humiliating and degrading. See Compl ¶¶20-51

## II.    FACTUAL BACKGROUND

Plaintiff LaVerna Simms is an African American female who worked as contractor and employee of the District of Columbia government and specifically at the District of Columbia Department of Corrections from 2001 and until September 30, 2006, the last day she worked and was employed by defendants.

Simms has alleged repeatedly that she and other females throughout her employment at the DOC were being sexually harassed on a daily basis. She further alleged that the defendants at all times relevant had knowledge, condoned and/or participated in the sexual harassment. Compl¶10

Specifically, Simms alleged that she and other female contractors and employees were routinely subjected to a pattern and practice of sexual harassment and hostile work environment at the DCDOC and that the sexual harassment practices was the standard operating procedure—the regular rather than the unusual practice at the District of Columbia Department of Corrections. Compl ¶ 11

Since 1979 this Court has legally found that the DOC has maintained a sexually hostile work environment. In 2002 in the Bessey Neal Case the defendants entered into a court ordered agreement to clean up the sexual and hostile work environment in the District of Columbia Department of Corrections.

Simms alleges that the defendants failed to post notices informing employees and contractors that sexual harassment violates Title VII, to develop an effective complaint procedure, to develop appropriate sanctions for employees found to have sexually harassed female employees, and to instruct all employees about sexual harassment.

Simms was never notified, instructed or provided information about their sexual harassment and discrimination complaint procedure or policies. Defendants failed to post notices of its discrimination complaint procedures until after Simms had complained the last time and after she was sexually groped and battered in late 2003 in the workplace by Correctional Officer Harcourt Masi.

Simms on or about 1997, a licensed professional counselor, began working for the District of Columbia Receiver at the DOC. At that time Ms. Simms served as the Intake Coordinator on the evening shift at DOC.

Soon after starting work at DOC, Ms. Simms met Correctional Officer Harcourt Masi who after seeing her for the first time approached her and introduced himself to her. Immediately after introducing himself to Ms. Simms, Masi asked Ms. Simms out on a date, to which Ms. Simms replied no. Compl ¶18

Thereafter for over a period of approximately five years, on a daily basis and/or on each occasion that Officer Masi saw Ms. Simms at DCDOC, he would stand outside of her office door, stare at her while she would be interviewing inmates and evaluating

them for medical services and/or for the need of mental health care medical services. While Simms was interviewing and assessing the inmates, Officer Masi would steadfast continue to wait outside of Ms. Simms office door from 15 to 45 minutes or more and stare at her until she had completed her inmate interviews. Compl¶ 19

Simms further alleged that after seeing her last patient, Masi still standing and staring at her outside of her door would then enter Simms' office and approach Simms and repeatedly ask her out on dates. He would repeatedly make comments about her body. He would repeatedly make comments about her shape. He would repeatedly make comments about her appearance. He would repeatedly stare at her and undress her with his eyes and he would repeatedly make comments to her by telling her what he could do for her, all of these things were not allowed in the workplace. See 2, Program Statement   Masi during a period of years from 1997 until 2003 on a daily basis and/or on each occasion that he saw Simms at the DOC he engaged in this conduct. Although, MASI was finally issued a "Stay Away" order prohibiting from being near Simms in 2005, he continued intimidating and harassing conduct towards Simms until Simms left the DOC on September 30, 2006. Compl ¶20

When Masi engaged in this Conduct Simms would repeatedly and explicitly tell Mr. Masi that she had no interest in going out with him and for him to stop harassing her.  However, Masi never stopped the harassment and stalking of Ms. Simms which was continuous and ongoing up until the time Ms. Simms left DCDOC on September 30, 2006.  Compl¶21

Simms was so threatened by Masi's behavior that she began to wear sunglasses inside the jail and to wear a coat over her body to disguise her looks and to prevent Masi from staring at her and undressing her with his stares. Compl¶22

Simms initially in 1997 complained to co-workers about Masi's behavior and conduct because she did not know where to complain. Ex1. page 44- 45  She was not aware of any complaint procedures and was fearful of her job because at the time from at least from 1999 until 2004, Masi carried on a well known, publicized and advertised sexual relationship with the female warden Patricia Jackson-Britton, who was later promoted to Deputy Director of the DCDOC in or about 2006.  Compl ¶23

However, in or about 2001, Simms became one of the founders of the Center For Correctional Health And Policy Studies Inc. (CCHPS) Ex. 1, page 33   Under CCHPS she began working the day shift in her last position at the DCDOC as Outpatient Mental Health Director. Simms was an employee of CCHPS, a corporation that had a contract with the District of Columbia to provide mental health services for the DCDOC by managing and providing mental health services within the DOC. Compl ¶24

Although a contractor, Simms worked directly for the District of Columbia government, she had an office inside the DOC and she performed her work for the Defendant District of Columbia at the DOC. Plaintiff's work was overseen by the defendants.  Thus because of the nature of her work and the contract that CCHPS had with the District of Columbia Government Ms. Simms was both a contractor and employee for the District Government and DOC. Compl¶ 25 and Ex. 2 Defendants in

their own documents and by their own words characterized Simms as a contract employee. Ex, 2 page 1

During the period of 2001 until 2006 CCHPS as Plaintiff Simms employer also had a duty to protect her from the sexual harassment, stalking and assault and battery made upon her by Masi and any other male employee at DOC.

In her amended complaint Simms alleges that during the period of 2001 until 2006 she complained to authorities at CCHPS of the harassment and assault and battery and it failed to report the incidents and/or complaints to DOC. CCHPS failed to investigate her complaints against Masi, Washington and others. Compl 27

CCHPS showed a deliberate indifference and dismissive attitude concerning Simms' harassment and assault and battery complaints concerning Masi, Washington and others. Compl 28

The defendants had a duty to provide Simms and other females at DCDOC with a safe working environment free of sexual overtures, overtones, touching, and a hostile work environment. These defendants also had a duty to monitor its employees and to assure a safe working environment but failed to do so. Compl 29

Simms characterizes Officer Masi's conduct as becoming more aggressive towards her and other female employees, which culminated to Masi's fondling her in late December 2003. He accosted Ms. Simms as she was attempting to enter the ladies room and fondled, touched and/or caressed her chest and arm and then grabbed her arm bringing her body close towards him. Ex. 1 pages   Simms became so upset that she reported this first touching incident to the DOC Warden and CCHPS and nothing was done after this first incident, although the Warden said he would speak to Masi.

Then approximately a week later Masi fondles, touches and/or caresses Simms again over her chest and/or arm again and then grabbing her and bringing her close to his body.  Simms again complained to DOC and CCHPS. It was not until this second incident was reported that the DOC Warden advised Simms that the incidents had to be reported to the Special Investigator. DOC and CCHPS took no action and/or failed to correct the problem in response to Simms complaints. Compl ¶¶30, 21, 34, 36-39 and 41-48

Plaintiff also during the period from 1997 until September 30, 2006 was subjected to relentless and blatant sexual harassment which she endured on a daily basis by other DOC male employees. Plaintiff was propositioned, solicited and sought after by male guards and male inmates, at the direction and/or with the knowledge of the DOC correctional officers and management.  Compl ¶32

Furthermore, plaintiff alleges in her complaint that while she worked at the DOC, there existed a culture in the D.C. Jail where women were preyed upon by Correctional Officers, jail personnel and male inmates where sex, drugs, alcohol and other contraband were exchanged for perks and favors. Compl ¶44-51

Plaintiff specifically alleges that there exists a sexually charged culture that thrived at the D.C. Jail because the Director, Warden, Managers and Correctional Officers themselves were either engaging in sexual relationships with other employees and/or contractors. The few who were not so involved were too fearful of being labeled a snitch and/or violating the code of silence which existed in the Correctional Officer "fraternity." Specifically, the Warden who was married for a period from 1999 until

approximately 2003 had an openly and public sexual relationship with Correctional Officer Masi.  Compl ¶23

According to the allegations in Simms amended complaint she tried to avoid the elicited and illegal behavior of Masi and other male employees and as a result her entire existence was threatened.   She discovered that the Correctional System itself condoned and encouraged the conditions at the DOC and intimidated female workers and made them fear for their life or jobs if they complained. Plaintiff suffered with emotional stress and strain because she would not acquiesce to the sexual demands of male workers and because DCDOC and CCHPS refused to correct the sexual hostile environment, Ms. Simms was subjected to harsher treatment and more extreme mental pressure and emotional distress. Compl¶35

More importantly, after Simms filed her discrimination complaints and the OSI rendered a favorable decision for Simms in late 2004 and/or early 2005, she was retaliated against by the District of Columbia and the Department of Corrections. In approximately two to four months after the OSI's decision in favor of Simms, in early 2005 the Defendants, the District of Columbia and DOC told CCHPS and Simms that it was terminating CCHPS' contract and it would not allow CCHPS to bid on the up coming medical and/or mental health contract to provide services to the DC government. Prior to this decision by the DC Government and DOC, CCHPS was according to these same Defendants doing a satisfactory job. This action by defendants the District of Columbia and DOC directly impacted on Simms' livelihood in that she no longer had a job or salary of $100,000.   Compl ¶ 35a

Plaintiff further alleges in her amended complaint that all of the above activities she has mentioned thus far were covered-up at all levels.  The sexually explicit and harassing conduct by DOC, Masi and other males towards Simms and other females at the jail were ignored by the DC government, DOC's Director, Warden, managers and CCHPS at all levels and  first line supervisors. These same defendants and individuals who had the ultimate power and authority at DOC concealed sexually impermissible conduct in the workplace by Correctional Officials and employees by burying it under the rug. Compl ¶36

At the time of  Defendants' the District of Columbia and DOC's male employees' disgusting treatment  and exploitation of  Simms and other female workers, employees in the D.C. Jail, the Department of Corrections was still under a Federal Court Order to eliminate the sexual misconduct that is the very subject of this lawsuit. Notwithstanding that mandate, it is a fact that the Director, warden, and number of Correctional managers and Officers were negligent in the performance of their duties; that Correctional officers engaged in sexual misconduct with female employees and continued to condone males sexually harassing Simms and other females at the DCDOC, all without fear of disclosure or if disclosure occurred, fear of adverse consequences. Compl¶37

The Office of Special Inspector ("OSI") in completing its investigation in 2005 found approximately 15 other females who were also being sexually harassed by Masi and other males at the DCDOC during the same time period identified by Simms. The OSI found the DCDOC negligent in its duty to protect the females working at the DCDOC from sexual harassment and free from a hostile work environment.  Compl¶38 and Ex. 5 SI's Decision

Plaintiff was subjected to sexual harassment and sexual discrimination that was both blatant and outrageous. As a result of the above described conduct of the DC Government, the DOC Director, Warden, mid level managers, guards, CCHPS and civilians employed at the D.C. Jail, Plaintiff has and still suffers with extreme humiliation, mental anguish and embarrassment. Moreover, the injuries she suffered at the jail were condoned by the District of Columbia Government and DOC's administrators, officers and managers CCHPS who knew of what was taking place and refused to prevent or stop the indecent and degrading and treatment she was being subject to.

Defendants showed no fear of any consequences as to their conduct whish is supported by the indifference of the Director, Warden and other Officials of the DOC who took no action to discover or eradicate the problem at the D.C. Jail even though the District, CCHPS, DCDOC and their other officials had a direct duty to assure that the women workers, employees and contractors in the D.C. Jail were not subjected to the hostile environment in which defendants fostered and nurtured to exist. Compl  ¶ 40

At all times relevant to this action the District of Columbia and Margaret Moore had in effect and were responsible for the policies and procedures followed by the Department of Corrections in the actions taken relating to the plaintiff, and were further responsible for the hiring, training, supervision, monitoring ad disciplining of the various officers involved. Compl¶ 41

Although the OSI investigator in late 2004 and early 2005 found probable cause against Officer Masi, following the investigator's findings against Masi for sexual harassment, MASI continued to work at the DCDOC's Detention Facility until approximately February 2005. Simms was subjected to retaliation by Masi and his

fellow correctional officers. Even after Masi returned to work in or about august of

2005, after his return to the DOC he continued to intimidate and harass Simms until she

was terminated by the Defendants the DC Government and DCDOC on September 30,

2006. Compl¶ 42

   Specifically, MASI was also allowed to continue to work and enter the

correction facility up until approximately February 2005. Masi was suspended for

approximately six (6) months and returned to DCDC in or about August of 2005. Up and

until February 2005, the defendants continued to allow MASI to work and to be assigned

to the mental health post where Simms worked-well after filing her complaint.

Compl¶43

   MASI and/or other Correctional Officers would refuse to call the inmates

that required comprehensive mental and medical assessments to Simms' work area thus

jeopardizing her job and the safety of the employees and inmates.  Under the contract

with the DC Government CCHPS was required within 24 hours to assess all inmates for

mental health services. When MASI refused to bring inmates for mental health

assessment his refusal jeopardized not only my safety but also the inmate population's

safety, the medical and mental health staff, as well as jeopardizing the well being of the

patients' requiring these services. Not only did his refusal and or/delay to bring inmates

for mental health assessments delay inmates receiving treatment, he also placed the

DOC population and employees at risk and jeopardized the CCHPS' contract with the

DC Government. Compl¶ 44

   In retaliation after Simms engaged in protected activities, when she entered the

jail housing units where the inmates lived, Officer Masi from 2004-2005 delayed

opening the doors for Ms. Simms in order that she might exit the housing units or he would substantially delay opening the doors to the housing units, thus subjecting Ms. Simms to being in the presence of inmates longer than necessary thus purposely jeopardizing Simms safety and placing her in fear of her life.  When Ms. Simms complained to defendants about these incidents to the respondents her complaints went unanswered, ignored and/or resolved in an inadequate manner. Compl¶45

For example, in late 2004, Ms Simms reported to Warden Smith that Correctional Officer MASI was retaliating against her for having filed a sexual harassment complaint against him. She complained to Warden Smith about MASI being assigned to her work in my area and his repeated refusal to bring inmates to her work area to be assessed for mental and medical health services. Warden Smith's response to complaint was non-responsive and negligent at the very least. Warden Smith response to Simms' Retaliation Complaint was that "Anyone who works for DCDOC can enter the building and be assigned to work anywhere." Warden Smith's inaction and refusal to reassign MASI to another work area jeopardized the mental health and physical safety of the inmates, employees including Simms and jeopardized Simms' work and employer's contract. Compl¶ 46

Through the course of conduct described above, the defendants the District of Columbia and DCDOC terminated and/or interfered with her and/or CCHPS' ability to make any future contracts with the DC Government in 2006 when it refused to allow CCHPS to bid on the medical and/or mental health contract. The DC Government and DOC

conspired and secretly hired another company without allowing CCHPS to bid on the

current for medical and/or mental health services. Simms lost her employment with the

defendants as of September 30, 2006 in retaliation for having complained and being

subjected to discrimination in the workplace. Compl ¶ 47

Masi's daily harassment of Simms during Simms  tenure at DCDOC to include but

not limited to his threatening and intimidating starring of her, his constant sexual advances

even after he had a stay away order to stay at least 300 feet from Simms continued  until she

left on September 30, 2006. His conduct and actions caused LaVerna Simms extreme

emotional distress, great anxiety, and fear.  Masi and other male employees actions were un-

welcomed by Simms and was humiliating.  Comp¶ 48

At all times relevant to this action, Masi acted within the scope of his employment in

his capacity as agent of the Department of Corrections and the District of Columbia. Compl

¶ 49

Defendants had notice and knowledge of prior instances and complaints from other

females concerning similar conduct by Harcourt Masi and other Department male

employees toward female employees of the Department of Corrections, both prior and

subsequent to the incidents described in this complaint. Defendant failed to take adequate

remedial action to prevent the reoccurrence of such conduct and its resulting harm to

Simms. Comp1 ¶50

Defendants the District of Columbia, DCDOC and CCHPS, individually and

through their agents, failed to comply with polices and procedures and Consent Decree that

existed and was in place at the time. The Defendants failed to provide the proper standard of

care. Defendants had a duty to provide Simms with a safe work environment that was not

discriminatory, or pervasively hostile towards women because of their sex.  Defendants

were required to promptly address and adequately resolve Simms' complaints of sexual

harassment and they all ignored and failed miserably of carrying out these duties and

responsibilities. Compl 51

## III.    LEGAL STANDARDS

### a.    Legal Standard For 12(b)(6) Motion

The defendants have complained about the alleged failure of plaintiff to allege

sufficient facts upon which constitute claims or upon which any relief can be granted.

However, the standards by which courts consider a motion brought pursuant to Fed. R.

Civ. P. 12(b)(6) are well-documented and established.

This circuit, the Supreme Court of the United States and other Courts in recent

discrimination cases have plainly laid to rest what a Plaintiff must do in pleading their

employment discrimination case. Specifically, this Court described with great

particularity the legal sufficiency of a complaint and the governing law.

> A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. The
> complaint need only set forth a short and plain statement of the claim, giving the
> defendant fair notice of the claim and the grounds upon which it rests. "such
> simplified notice pleading is made possible by the liberal opportunity for
> discovery and the other pre-trial procedures established by the Rules to disclose
> more precisely the basis of both claim and defense to define more narrowly the
> disputed facts and issues. It is not necessary for the plaintiff to plead all
> elements of his prima facie case in the complaint or 'plead law or match facts to
> every element of a legal theory.

Runkle v. Gonzales, 391 F. Supp. 2d 210, 220 (D.D.C. 2005) (Citations and internal

punctuation omitted.)   As utilized in employment discrimination cases, it is also well-

settled that a Plaintiff does not need to plead a formal prima facie case. Swiekiewicz  v.

Sorema N.A., 534 U.S. 506, 515 (2002) (involving allegedly discriminatory demotion and termination); Sparrow v. United Air Lines, Inc., 216 F.3d 1111 (D.C. Cir. 2000) (involving allegedly discriminatory failure to promote and termination). Yet because "[T]he Supreme Court's holding in Swierkiewicz v. Sorema did not alter the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of his claim," Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002), quoted in Major v. Plumbers Local Union No. 5, 370 F. Supp.2d 197, 201 (D.D.C. 2004); the Court may explore whether or not Plaintiff has alleged any set of facts that could ever state a violation of Title VII.

Moreover, a complaint should never be dismissed except "after accepting all well-plead allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears with a certainty that plaintiff cannot under any circumstance prove any set of facts supporting his/or her claim and entitling him or her to relief. Slade v. Hampton Roads Regional Jail, 407 F.3d 243, 248 (4th Cir. 2005) The Court must view the facts as alleged in the light most favorable to the plaintiff, although it need not accept legal conclusions drawn from the facts or "accept as true unwarranted inferences, unreasonable conclusions, or arguments". Eastern Shore Markets, Inc. v. J.D. Associates, Ltd. Partnership, 213 F.3d 175 (4th Cir. 2000). However, a court may not grant a 12 (b)(6) motion based on doubt of the factual allegations listed in the complaint. Wright v. MetroHealth Medical Center, 58 F.3d 1130, 1138 (6th Cir.).

More importantly because this is a employment discrimination case this court must take extra measures to ensure that wrongs that have been alleged are not ceremoniously dismissed, Specifically, one sister court has held that "we must be

especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged. <u>Harrison v. United States Postal Serv</u>., 840 F.2d 1149 (4th Cir. 1988) (internal quotation marks omitted).

The federal rules are replete with provisions that provide a prevailing view against rejecting pleadings for allegedly failing to state a claim, although plaintiff avers that no such situation appears in her case. Rule 15(a) protects litigants who have tried and been unsuccessful in stating a claim. Pending before the Court is plaintiff's amended complaint.  This liberal rule supports the federal policy that leave to amend shall be freely given when justice so requires and that the law favors resolving cases on their merits instead of disposing of them on technicalities. <u>Conley v. Gibson</u>, 355 U.S. 41, 48, 78 S.Ct. 99 (1957.

**b.    Legal Standard for Motion For Summary Judgment Rule 56**

Summary Judgment pursuant to Rule 56 ( c ) is appropriate only when the pleadings, depositions, answers to interrogatories, production of documents, request for admissions, affidavits show no genuine issue of any material fact and that the movant is entitled to a judgment as a matter of law. The defendants in this matter have filed a premature motion for summary judgment. Premature motions for summary judgment are adequately dealt with under Rule 56 (e) and (f), which allows a summary judgment motion to be denied if the nonmoving party has not had an opportunity to make full discovery and in this case **no discovery has been had**. Ex. 3, Affidavit of Counsel  Rule 56 (e) and (f) is an alternative response in opposition to a motion for summary judgment and safeguards against the premature granting of a motion for summary judgment.

<u>Shavrnoch v. Clark Oil & Ref. Corp.</u>, 726 F.2d 291, 294 (6th Cir. 1984) and <u>Pasternak v.</u>

<u>Lear Petroleum Exploration, Inc.</u>, 790 F.2d 828, 832-33 (10th Cir. 1986).

    In this case Plaintiff has not been afforded the opportunity to take depositions or

any other discovery which permits her to challenge the witnesses, evidence , which

would provide a more adequate record of the events that encompasses Ms. Simms'

claims.

### III.    ARGUMENT

**A.    ALL CONSTITUIONAL CLAIMS AGAINST THE DISTRICT SHOULD NOT BE DISMISSED BECAUSE THE PLAINTIFF HAS STATED A CLAIM FOR MUNICIPAL LIABILTIY UNDER 42 U..C. § 1983 (COUNTS I, II, III AND IV)**

    Contrary to defendants' motion and brief, Plaintiff Simms has clearly alleged

sufficient facts that the District of Columbia had a pattern and policy and "standard

operating procedure" condoning, participating and ignoring sexual harassment and

discrimination in the workplace at the DOC.[2] Compl ¶ ¶ 11-14

    11.    As is more fully set forth in the paragraphs which follow, Simms and other female contractors and employees are routinely subjected to a pattern and practice of sexual harassment and hostile work environment at the DCDOC. Together these practices reflect that discrimination is the standard operating procedure—the regular rather than the unusual practice at the District of Columbia Department of Corrections.

    12.    Supervisors and co-workers throughout the DCDOC engage in offensive conduct of a sexual nature, including the expression of sexual remarks about women, unwelcome physical contact such as kissing, pinching and grabbing, hugging, physical touching and repeated pressure to engage in sexual relations with the male employees. This conduct is severe, pervasive and unwelcome, altering the terms and

---

[2] At Harcourt Masi's hearing the defendants moved the court for summary disposition and stated that there was no material dispute in the facts that Masi had sexually harassed. Simms and other women at the jail. Ex. 2, page 27.

conditions of employment for all women at the District of Columbia Department of Corrections.

13. Supervisors and co-workers throughout the DCDOC engage in offensive conduct of a sexual nature, including the expression of sexual remarks about women, unwelcome physical contact such as kissing, pinching and grabbing, hugging, physical touching and repeated pressure to engage in sexual relations with the male employees. This conduct is severe, pervasive and unwelcome, altering the terms and conditions of employment for all women at the District of Columbia Department of Corrections.

14. As early as 1979 this court found that sexual harassment was the "standard operating procedure" at the District of Columbia Department of Corrections (DCDOC). On Appeal the D.C. Circuit ruled that being subjected to unwelcome sexual advances caused harm remedial under Title VII <u>Bundy v. Jackson</u>, 641 F.2d 934 (D.C. Cir. 1981). The Court of Appeals directed that, on remand, this court enter an injunction "enjoining the Director of DCDOC and all employees and agents of the department from: causing, encouraging, condoning, or permitting the practice of sexual harassment of female employees by male supervisors and employees within the Department …."

Simms has clearly alleged that the defendants have policy, pattern and practice of condoning and participating in sexual harassment in the workplace and ignoring the complaints of female workers who complain about sexual harassment. Compl ¶  Simms also alleged that the defendants have a policy, pattern and practice of retaliating against those females who complain of sexual harassment and a sexually hostile work environment in the workplace. Compl¶  Thus, defendants' argument that Simms has not alleged sufficient facts to support her allegations that the defendants have a policy, pattern and practice of condoning and participating in sexual harassment in the workplace is incorrect. Compl¶ ¶  23, 47

Most importantly, the defendants are in violation of its own laws and two of this Court's Orders and not "internal protocol" as alleged by defendants. Specifically, the

defendants are in violation of the following orders and laws: See Ex. 2, DOC Program

Statement Dated December 22, 2003, page 2 (only partial program from pages 1-9):

a.      Order of the United States District Court in civil Action No. 93-2420,

dated 6/28/99

b.      31 DCR 56, "Equal Employment Opportunity Rules Governing

Complaints of Discrimination of Columbia Government, "dated 1/6/84.

c.      Mayor's Order 79-89, "Sexual Harassment", dated 5/24/79: and the Order

of the United States District Court in Civil Action No. 77-1359.

d.      DC Human Rights Act of 1977, as amended, DC Code section 2.1401.01

et seq., (Act).

Thus, defendants allegations that Simms' are allegedly are tenuous is in of itself a

feeble argument because the record is clear that her claims are fully and completely

substantiated and convincing and she rests her claims on the DC's own laws, Mayor

Orders and the D.C. Human Rights Act of 1977.   Simms makes no claims that the

defendants "deviated from internal protocol" and defendants had no internal protocol.

Clearly stated clearly and or it can be inferred that based on Simms' allegations in her

Amended Complaint that defendants openly and willingly, defied this Court's Orders and

they substantially breached the Consent Agreement in the Bessey Neal case and there is

nothing "tenuous" about either. At a minimum the defendants should be held in outright

contempt of the two United States District Court Orders that are still in place against

defendants.

Simms testified at the OEA hearing that during the years of 1997-1999 she

complained to both her administrator and her peers about Masi sexually harassing her.

Ex.12, page 76-77  During the period of 1997-1999 Simms was an employee of the

defendants and she worked for the trustee. Simms also admitted that she had follow-up

conversations with her administrator who told Simms she had spoken to Masi about his

behavior, but Masi's  sexually harassing behavior never stopped. Ex. 2, page 78

Specifically, Simms for approximately three years reported sexual harassment to

CCHPS, it was not until 2003, when Correctional Officer Harcourt Masi sexually

battered and assaulted Simms twice by fondling her arm, shoulder and chest that she by-

passed CHHPS who had never responded to their complaints and complained directly to

the DOC Warden .   Simms testified at the OEA hearing in 2007, that in 2003 on an

occasion she was attempting to enter the ladies bathroom Masi saw her, stood up from his

seat and stopped her from entering the bathroom by fondling her arm, shoulder and chest.

According to Simms she "lost it.". She began yelling at Masi and told him emphatically

to never touch her again. Exh. 1, page 53,  Simms testified that when Masi touched her

sexually and inappropriately , she had had it and that it was the last draw. Ex. 1, Page 54.

Simms immediately complained to DOC Warden Larry Corbett. Ex. 2, page 54

When Simms spoke to Warden Corbett the first time about being battered by

Masi, DOC Warden Corbett assured in 2003 he was going to take care of the problem

and talk to Officer Masi. Ex. 1, page 54 Corbett told Simms not to file a complaint

initially and to wait until he talked to Masi. Ex. 1, page 54 A week went by and Masi

sexually fondled Simms again. Ex. 1, 54 and 55.  Warden Corbett told Simms who to file

a complaint with only after the second incident with Masi. Ex. 1, page 55 Simms learned

about the Special Inspector(SI) for the first time in late 2003 and/or early 2004. Ex. 1

page 55 Simms spoke to Carolyn Lerner the SI and the investigator Janet Goldstein in 2003-2004. Ex. 1, page 56.

Nonetheless, Simms can bring her constitutional and due process claims under the theory of "state endangerment". Butera v. District of Columbia, 235 F.3d 637, 651 (D.C. Cir. 2001) In the Butera case the Court held that "an individual can assert a substantive due process right protection by the District of Columbia from third party violence when District of Columbia officials affirmatively act to increase or create danger that ultimately results in the persons' harm," Simms in her complaint alleged that the defendants' own officials including a female warden who was later promoted to assistant director engaged in, condoned and participated in the sexual harassment at the DOC and nothing was done about when females complained. Compl ¶ 23, 34   In other words defendants' own officials caused the sexual harassment and placed Simms and other women in danger, thus she can bring her constitutional and . Compl ¶ 34

Additionally, Simms never alleged, testified or stated in her complained that the defendants promptly investigated her complaints in 2003. Defendants have mischaracterized Simms complaint. To the contrary Simms alleged that it was not until she was fondled the second time that Warden Corbett mentioned to Simms here to complain to the SI. Corbett failed to do anything the first time it was reported to him. Compl ¶

Moreover, there were sufficient facts that were alleged by Simms and sufficient inferences can be made that the defendants clearly had a policy and practice to allow sexual harassment to go on in the workplace at DOC and that Simms can bring constitutional and 42 U.S.C. § 1983 claims.

**C.    Plaintiff's Claims Should not Be Dismissed Because They Are Not Barred By the Applicable Statue of Limitations.**

Contrary to defendants claims, Simms' 42 U.S.C. § 1983 and violations of the Fifth and Eighth Amends of the U.S. Constitution and common law claims are not barred by any statue of limitations. Simms has repeatedly alleged throughout her complaint that she was discriminated against up and until she was fired from the DOC on September 30, 2006. Simms' was stalked during the period of 2006 by Masi up and until the very day she left. Compl ¶ Although there was a Cease and Desist Order issued against Masi to stay away from Simms he refused to do so. Compl ¶ 20  The Undersigned Counsel had to write a letter to the defendants after Simms once again reported Masi's conduct to the defendants. Her complaints were ignored and only one the undersigned Counsel wrote a letter did the defendants belatedly attempted to do something about it. Just as important Simms was denied the right to contract with the defendants and she was an employee of the defendants beyond 2001, in fact she was considered a contract employee. She was considered as a hybrid meaning both a contractor and employee. The fact that Simms was working for the Receiver when the DC government was in receivership from 1997 until 2001 and again when she became a contract employee in 2001 does not bar her from bringing her claims under 42 U.S.C. Sec 1983 or Title VII (Simms has pending before the

Specifically, Simms was at all times relevant covers and protected under 42 USC Section 1983 and Title VII against the defendants from 1997 until the present. Simms worked for the Receiver from 1997 until 2001. She was not part of the Bessey Neal Class Action and although she complained to her Administrator from 1997 until 2001 nothing

was done about her sexual harassment complaints. She was never advised of where and when to complain prior to making her final complaint against Masi in late 2003. Simms only learned of a complaint procedure of the defendants after she had complained to the defendants Warden twice about Masi fondling and touching her sexually and in an inappropriate manner.

Nonetheless pursuant to 42 USC Section 1983 Section 968 contractors are treated as employees especially if they are employees providing inmates medical care and services. Farrow v. West , 2003, 320 F.3d 1235, C.A. (Ala.) Simms was clearly providing medical services to the inmates thus she bring the above claims.

Plaintiff has also pending before this Court her Amended Complaint which has a Title VII claim. Simms' sexual harassment and hostile work environment claims has no statue of limitations. Lively v. Flexible Packaging Ass'n, 830 A.2d 874 D.C. (2003)  In Lively, the Court held that this Circuit has adopted the Morgan approach as to hostile work environment claims. Morgan, supra, 536 U.S. at 124n11, 122 S. Ct. 2061  Sexual harassment and hostile work environment claims do not occur on one day but many days and the claim is based on the cumulative effect of the individual acts. Simms has filed a timely claim and complaint about discrimination and thus all acts of harassment no mater how long ago they took place are actionable, thus her claims are not time barred.

**D.    Plaintiff's Claims Against The District States a Claim and This Court Has Subject Matter Jurisdiction.**

If this Court finds that it has subject matter jurisdiction as to Simms' federal or constitutional law claim and I should not, then it may exercise supplemental jurisdiction over the common law claims. Moreover, if this court finds that Simms has no federal or

constitutional claims, it should not dismiss Simms' state law common law claims because this court still has jurisdiction over any claim brought between parties that are diverse and the amount in controversy is over $75,000. See 28 U.S.C. § 1332   This Court has supplemental jurisdiction over District of Columbia law claims pursuant to 28 USC § 1367. This Court can also exercise supplemental jurisdiction over the Plaintiff's state law claims arising under D.C. Code Ann. §§ 32-1101 (6), 32-1103 (a)(1)and (2).

Simms avers that this Court still has jurisdiction over her common law state law claims pursuant to The United States Constitution, Article III, § 2 which gives the U.S. Congress the power to permit federal courts to hear diversity cases through legislation authorizing such jurisdiction. The provision was included because the framers of the Constitution were concerned that, where a case was brought in one state involving parties from both that state and another, the state court might be biased towards the party from its own state. Congress first exercised that power and granted federal trial district courts diversity jurisdiction in the Judiciary Act of 1789. Diversity jurisdiction is presently codified at 28 U.S.C. § 1332.

**E.    Simms Cleary Complied with D.C. Code Sec 12-309**
**Plaintiff Complied with the D.C. Code 12-309. Defendants Have**
**Provided Perjured Testimony and Affidavits Before This Court.**

Defendants have also committed perjury before this court my making false claims before this court that allegedly the D.C. government had no notice of Simms' District of Columbia claims. Simms is not required to provide notice of her federal claims. However, the record is replete with evidence that at all times relevant the D.C. government had proper notice under D.C. Code 12-309 of her state and federal claims.

See Exs.1-5 Attached to Plaintiff's Opposition To Defendants Motion To Set Aside
Order of Default.

Specifically, the record shows the following:

On March 18, 2005, Mayor Anthony Williams was served with Notice of Claims
in a letter from Counsel and the 500 page binder of the OSI's investigation. See Ex. 1 See
Attached to Plaintiff's Opposition To Defendants Motion To Set Aside Order of Default.
The Court should note that documents sent  weighed over 5.0 lbs. The Fed Ex  receipt
shows that a Ms. T. Braxton in the Mayor's Office signed for the notice. See Ex. 1.
Attached to Plaintiff's Opposition To Defendants Motion To Set Aside Order of Default.

On May 26, 2005, Robert J. Spagnoletti, the Attorney General for the District of
Columbia was served with a second notice of claims. See Ex. 2 Attached to Plaintiff's
Opposition To Defendants Motion To Set Aside Order of Default.  In the letter to
Spagnoletti, the undersigned counsel identifies the log in number for the March 17, 2005
notice sent to the Mayor, namely IQ#439127.

On August 9, 2006, the defendants received notice of Simms' continuing claims
against them. See Ex. 3 Attached to Plaintiff's Opposition To Defendants' Motion To Set
Aside Order of Default. The D.C. government signed for the third Notice of Claims letter
which was sent by certified mail.

On August 9, 2006, the undersigned sent the same letter and notice to the D.C.
government that she sent on August 8, 2006. the D.C. government signed for that letter
on August 10, 2006. See Ex. 4 Attached to Plaintiff's Opposition To Defendants Motion
To Set Aside Order of Default.

On September 25, 2006, the EEO Officer Mr. Staten fro the DOC received a letter from the undersigned once again complaining of Correctional Officer Harcourt Masi intimidating and threatening Ms. Simms. Ex. 5 The letter also evidences that the D.C. government and the DOC had subpoenaed Ms. Simms in the OEA appeal that Masi had taken against the government. Ms. Simms was the defendants' key witness.  Simms did not voluntarily testify in that matter, which was heard in or about February of 2007.

Moreover, there is no statue of limitations issue since Masi continued his sexual harassment of Ms. Simms up and until the day she was forced out of the DOC on September 30, 2006. See Ex. 5 Attached to Plaintiff's Opposition To Defendants' Motion To Set Aside Order of Default.

### IV.    CONCLUSION

Wherefore for all the stated above reasons the defendants motion to dismiss and/or in the alternative motion for summary judgment should be denied in the entirety. Plaintiff request that she be allowed to conduct full and complete discovery, that is allowed to file her Second Amended Complaint and for any other relief that seems proper and just.

Respectfully submitted,

_____/s/_____
Jo Ann P. Myles

Law Office of Jo Ann P. Myles
1300 Mercantile Lane
Suite 138-B
Largo, Maryland 20774
301-773-9652 (Office)
301-925-4070 (Fax)
Bar. No. 04412

Attorney for Plaintiff Laverna Simms

**Dated: September 14, 2007**

## CERTIFICATE OF SERVICE

I HEREBY certify that on this 14TH day of September 2007, the following Plaintiff's

Opposition To Defendants' Motion To Dismiss and In the Alternative Motion For Summary

Judgment was served upon the following defendants by filing in the U.S. District Court for

the District of Columbia to:

District of Columbia
Serve: Mayor Adrian Fenty
And or his representative
1350 Pennsylvania Avenue N.W.
Suite 419
Washington, D.C. 20004

Center for Correctional Health and
Policies and Studies
Serve Gwendolyn Sinclair
1102 Cavendish Drive
Sliver Spring, Md. 20905

Director of District of Columbia
And/or his representative
Department of Corrections
1923 Vermont Avenue

Washington, D.C. 20001

Linda Singer, Esquire
Attorney General
For The District of Columbia
441 4th Street N.W.
6th Floor, Suite 600
Washington, D.C. 20001

_____/s/_____
Jo Ann P. Myles

# EXHIBIT 1

1

### VOLUME 1

GOVERNMENT OF THE DISTRICT OF COLUMBIA

OFFICE OF EMPLOYEE APPEALS

- - - - - - - - - - - - - - - - - x
                           :

In the Matter of:           :

HARCOURT MASI,          :

        Appellant,        :

   -vs-                   : Case Matter
                           :   1601-0045-05

DISTRICT OF COLUMBIA     :
   DEPARTMENT OF CORRECTIONS,  :

        Respondent.      :

- - - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, December 14, 2006

Proceedings took place, pursuant to notice, on Thursday, December 14, 2006, at 10:21 a.m., at the District of Columbia Office of Employee Appeals, 717 14th Street, N.W., Third Floor, Washington, D.C. 20005

     BEFORE:

        ROHULAMIN QUANDER, SR.
        Administrative Law Judge

**PRO-TYPISTS, INC.**
**PROFESSIONAL TRANSCRIPTION SERVICE**
**WASHINGTON, D.C.**
**(202) 347-5395**
**www.pro-typists.com**

2

APPEARANCES:

On behalf of the Employee:

OMAR VINCENT MELEHY, Esq.
ANDREW J. PERLMUTTER, Esq.
Melehy & Associates, L.L.C.
8403 Colesville Road
Suite 610
Silver Spring, Maryland 20910

On behalf of the Agency:

FRED STATEN, JR., Esq.
Department of Corrections
1923 Vermont Avenue, N.W.
Suite NB-12A
Washington, D.C.  20001

ALSO PRESENT:

HARCOURT MASI, JO ANN P. MYLES, Esq.

20

1    make an opening statement.

2                    THE ADMINISTRATIVE LAW JUDGE:  All right,

3    I'll hear from you at this time.

4          **Opening Statement on Behalf of the Agency**

5                    MR. STATEN:  Good morning to the Court.

6                    THE ADMINISTRATIVE LAW JUDGE:  Good morning.

7                    MR. STATEN:  The matter before the Court

8    today is that of Harcourt Masi, an employee of the D.C.

9    Department of Corrections, versus the D.C. Department

10   of Corrections, OEA Matter Number 1601-0045-05.

11                   This matter comes before the Court as a

12   petition for appeal filed by Mr. Masi pertaining to a

13   120-day suspension that he was issued in 2005 to serve

14   without pay for sexual harassment violations.

15                   The evidence will show that LaVerna Simms, an

16   employee of the Center for Correctional -- CCHPS,

17   Center for Correctional something, I'm sorry --

18                   THE ADMINISTRATIVE LAW JUDGE:  We know, it's

19   in the record.

20                   MR. STATEN:  It's in the record.  I've always

21   had trouble with that acronym for some reason -- an

22   employee of CCHPS, filed a complaint of sexual

PRO-TYPISTS, INC.                    (202) 347-5395

21

1    harassment against Mr. Masi on or about January 6th,

2    2004.

3           And in this complaint, Ms. Simms pointed out

4    how, over a period of about six years, Mr. Masi had

5    repeatedly asked her for dates, repeatedly commented on

6    her appearance, repeatedly commented and made comments

7    regarding her shape, and on at least two occasions,

8    that he invaded her body space by touching her, which

9    she considered to be inappropriate.

10          As a result of tolerating, as the evidence

11    will show, this behavior from Mr. Masi from

12    approximately 1997 until 2003, that Ms. Simms had had

13    enough and so she filed a complaint.

14          The evidence will show as we hear from

15    Carolyn Lerner, Special Inspector, that the D.C.

16    Department of Corrections' sexual harassment program

17    was under the purview of the United States District

18    Court in a class action civil matter of *Bessye Neal*

19    *versus the Department of Corrections*, Judge Royce C.

20    Lamberth, presiding judge, and that a consent decree

21    was signed in 1997 that among other things, provided

22    for the establishment of an Office of Special

22

1    Inspector, and at a designated point which wound up

2    being in February of 2002, that the Special Inspector's

3    office kicked into place.  And they were independently

4    responsible for the investigation of sexual harassment

5    complaints and complaints of retaliated sexual

6    harassment.

7            And so it is that the Special Inspector's

8    office, an independent office, conducted an

9    investigation at which numerous witnesses were

10   interviewed.  And the conclusion of the investigation

11   report, as the testimonial and physical evidence will

12   show, is that Mr. Masi --

13           THE ADMINISTRATIVE LAW JUDGE:  You can lower

14   your voice.

15           MR. STATEN:  Oh, I'm sorry, I'm on a roll --

16   is that Mr. Masi sexually harassed Ms. Simms.  And

17   there were other witnesses who testified to his

18   behavior towards them in violation of Title 7 of the

19   Civil Rights Act of 1964, as amended, in which the

20   court defined sexual harassment -- in which the court

21   defined two distinctive types of sexual harassment, the

22   quid pro quo, which is not at issue here, and a

23

1    hostile, abusive work environment, which is at issue

2    here; that Mr. Masi's behavior towards Ms. Simms

3    created a hostile, abusive working environment that

4    sufficiently and severely affected the terms,

5    conditions and privileges of her employment at the D.C.

6    jail.

7         Ms. Simms, as the evidence will show, did not

8    work for the jail, she worked for a contractor, CCHPS,

9    but her physical location was inside the D.C. jail.

10   And as the program statements will show on sexual

11   harassment, the contract employees were covered just

12   like agency employees.

13        The evidence will show that Mr. Masi has had

14   numerous -- has been to training, has been trained by a

15   Special Inspector, trained prior to that on the issue

16   of sexual harassment.

17        The evidence will further show from witness

18   testimony that he asked other women for a date, that

19   this was his pattern of behavior.  Oh, the witnesses

20   will testify that he's cordial, polite, that he seems

21   like a nice person, but he would ask them for dates.

22        The evidence will show that Mr. Masi has

24

1    denied asking any witness for a date.  And what we view

2    as being very critical to this case is that the

3    testimonies taken by the Special Inspector investigator

4    were testimonies that were given under oath, taped,

5    transcribed testimony, and that these witnesses stated

6    under oath, clearly, categorically, that he repeatedly

7    asked someone for dates.

8        An exception would be Christina Roye who is

9    here, who will testify that Masi did ask her for a date

10   and so she showed him a wedding ring to let him know,

11   "Hey, I'm married.  I'm not interested in a date."

12       The evidence will show that Mr. Masi, in his

13   petition for appeal to this office, and in fact prior

14   to that, in his rebuttal that was prepared by his

15   counsel and submitted to the hearing officer, Tom Hoey,

16   said that Mr. Masi -- they said specifically, in

17   conclusion, "Based on the above, my client requests the

18   following, alternatively or in the aggregate, one,

19   denial of the proposal of termination; two, mitigation

20   of proposed discipline from a termination to a

21   suspension; and three, any other relief to which he is

22   entitled."

25

1          When we look at Mr. Masi's petition for

2     appeal to this office, he didn't deny he didn't do it,

3     he just wanted a lesser penalty.

4          We've raised this motion, Your Honor, and

5     yes, it was denied for summary judgment.  But we're

6     saying here to the Court that there are no genuine

7     issues of material dispute in this case.  The witnesses

8     will testify under the limited circumstances that you

9     have articulated in your order that yes, he asked them

10    for dates.

11         We will show through the direct and through

12    the testimony that Mr. Masi has this pattern of

13    behavior and that with Ms. Simms, he just continued to

14    badger her to the point that she would start to

15    disguise her appearance.  In other words, she would

16    wear her lab jacket, as she will testify to, because

17    Mr. Masi was always commenting about her shape and

18    wanted to know did she work out and those kinds of

19    things.

20         And there were even times that she had to put

21    on -- she felt it necessary to wear sunglasses just so

22    she wouldn't have to just -- he could see her eyes and

26

1    she would have to look at him as she passed to and from

2    the area in which he worked and operated the doors

3    controlling the entry and exit to various locations on

4    the third floor where the medical infirmary was

5    located; that this created this hostile, abusive

6    environment; that it violates Title 7.  And with this

7    violation, it constitutes more than a de minimis

8    violation of the current standards set forth in DPM,

9    Chapter 16.

10              The evidence will show that de minimis is

11   something trifling, insignificant.  Sexual harassment

12   is hardly insignificant, as the testimony will show.

13   It will show that in the class action suit of *Neal*

14   *versus the Department of Corrections*, it cost the

15   government more than $20 million in overall costs.

16              And yet, with all of the cost, with all of

17   the testimony, with all of the training that has gone

18   on in this very critical area of employment, it had no

19   bearing on Mr. Masi, had no impact on him, didn't care.

20   He came to work to see how many dates he could get, how

21   many he could arrange.

22              We'll hear testimony today, as the Employee

27

1    would have this Court to believe, from Sergeant Profit,

2    who will testify that he was a nice guy.  And we're not

3    saying that he's not a nice person, but he wasn't nice

4    to Ms. Simms because he badgered her for sex.  She

5    doesn't know what he did when she wasn't around; all

6    she can testify to is what she saw when she was around.

7         They will put on testimony from Tyrone

8    Jenkins.  Mr. Jenkins will testify that Mr. Masi said

9    that he gave Ms. Robertson money to move, that he was

10   dating her.  Yet, Mr. Masi's own testimony, as the

11   evidence will show, during the testimony taken by the

12   OSI investigator is that he never dated Ms. Robertson,

13   he never asked her for a date, he never went out with

14   her.  This is the evidence and this is what will be

15   pointed out.

16        What we're asking the Court, we're saying to

17   the Court that there are no genuine issues of material

18   dispute here and we're asking the Court for summary

19   disposition at this point.  Thank you, Your Honor.

20        THE ADMINISTRATIVE LAW JUDGE:  Mr. Melehy.

21        MR. MELEHY:  Thank you, Your Honor.  I'm

22   going to be fairly brief here.

28

1          THE ADMINISTRATIVE LAW JUDGE:  Let me ask

2    you, first of all, to identify yourself for the record.

3          MR. MELEHY:  My name is Omar Melehy.

4          THE ADMINISTRATIVE LAW JUDGE:  I know who you

5    are, but for the transcript.

6          MR. MELEHY:  I'm counsel for Mr. Masi, the

7    Employee.

8          THE ADMINISTRATIVE LAW JUDGE:  Now are you

9    making an opening statement at this time?

10         MR. MELEHY:  Yes.

11         THE ADMINISTRATIVE LAW JUDGE:  Okay.

12         **Opening Statement on Behalf of the Employee**

13         MR. MELEHY:  Your Honor, Mr. Masi

14   categorically denies that he sexually harassed LaVerna

15   Simms or Christina Roye.  You have indicated through

16   your prior orders that the only issue in this case is

17   whether there was cause for his termination and whether

18   or not he sexually harassed those two employees.

19   That's the only issue in the case.

20         Christina Roye says she was not sexually

21   harassed.  So the only --

22         THE ADMINISTRATIVE LAW JUDGE:  I haven't

32

1    both the Agency and the Employee.  However, since we

2    are hearing the Agency's case, you'll be questioned

3    first by Mr. Staten.  Mr. Staten.

4         MR. STATEN:  Yes, thank you, Your Honor.

5                    **DIRECT EXAMINATION**

6         BY MR. STATEN:

7         Q    Good morning, Dr. Simms.

8         A    Yes.

9         Q    Would you please state your name for the

10   record?

11        A    LaVerna Simms.

12        Q    And do you have a business address, Dr.

13   Simms?

14        A    Yes, I do, 316 F Street, Northeast, 20002.

15        Q    And how long have you been employed at this

16   address, Dr. Simms?

17        A    Well, since I left the Department of

18   Corrections, September 31st.

19        THE ADMINISTRATIVE LAW JUDGE:  This year?

20        THE WITNESS:  Yes, 2006.

21        THE ADMINISTRATIVE LAW JUDGE:  September 30?

22        THE WITNESS:  Yes.

33

1            BY MR. STATEN:   (Resuming)

2       Q    And prior to your current employment, where

3    were you employed?

4       A    I was employed with Center for Correctional

5    Health and Policy Studies.  We had a contract with the

6    District to provide medical and mental health services

7    at the two correctional facilities in the District of

8    Columbia.

9       Q    And does that stand also for CCHPS?

10      A    Yes, it does.

11      Q    And exactly what was the nature of your

12   employment with CCHPS?

13      A    I was the co-founder of the not-for-profit

14   and also worked as -- the last position was as the

15   mental health director.

16      Q    Now how long had you been an employee of

17   CCHPS prior to September 30th of 2006?

18      A    CCHPS held the contract with the District for

19   six years, so I was there the six years that CCHPS held

20   the contract.  And prior to that, I was there under the

21   Receiver.

22      Q    And do you recall exactly when you started?

PRO-TYPISTS, INC.                    (202) 347-5395

34

1      A    I started in -- I think it was March 17,

2    1997.

3      Q    Dr. Simms, do you know the employee in the

4    matter before this office today?

5      A    Yes.

6      Q    Would you point him out and identify him for

7    the Court, please?

8      A    Corporal Masi (pointing).

9           MR. STATEN:  Your Honor, please let the

10   record reflect that the witness has identified the

11   employee in this matter, by pointing him out and

12   calling his name, Corporal Masi?

13           THE ADMINISTRATIVE LAW JUDGE:  Yes.

14           BY MR. STATEN:  (Resuming)

15      Q    Now where do you know the employee from, Dr.

16   Simms?

17      A    From my tenure at the Department of

18   Corrections.

19      Q    And do you recall what his title, what his

20   duties were at the Department of Corrections?

21      A    Corporal.  I'm assuming in Safety and

22   Security.

35

1        Q    And do you recall when you first met or

2   became introduced or became aware of the employee?

3        A    I don't remember the exact date, but I do

4   know that it was shortly after I began working under

5   the Receivership.  I'm not sure if that was at the end

6   of '97 or '98, but it was shortly after I began my

7   tenure there.

8        Q    After you became introduced or became aware

9   and had knowledge of Mr. Masi, did you have any

10  interaction with him?

11            THE ADMINISTRATIVE LAW JUDGE:  You'll have to

12  answer with words.

13            THE WITNESS:  No, I'm trying to think.  Okay,

14  did I have any interaction with him?  The interaction

15  that I had with him, initiated by him, yeah, I did.  I

16  mean I guess it's kind of how you're asking the

17  question, did I have any interaction with him.  Are you

18  asking me what was my interaction with him?  Maybe that

19  would be --

20            BY MR. STATEN:  (Resuming)

21       Q    What was your interaction with him?  I wanted

22  to establish that you had some.

PRO-TYPISTS, INC.                    (202) 347-5395

36

1          A     Yes.

2          Q     Okay, then the next question, what was your

3     interaction with him?

4          A     Initially, well, I know that Corporal Masi

5     introduced himself to me, I do recall that.  He would

6     ask me out, that's how I was first -- that's how I

7     first came to know who Corporal Masi was, by him asking

8     me out.

9          Q     When you say out, do you mean --

10         A     Asking me out on a date.

11         Q     Out on a date.

12         A     Yes.

13         Q     And this happened, again, in approximately

14    1997?

15         A     As soon as I met him, as soon as he

16    introduced himself.  He introduced himself and asked me

17    out on a date.

18         Q     And what did you say?

19         A     That I was not interested.

20         Q     Did he ask you out again?

21         A     Every time I saw him.

22         Q     And what was the frequency of seeing him?

37

1    A    Initially when I began work there, I worked

2    evenings, so I would come in about 2:00 o'clock; I

3    worked four days a week, so I'd come in about 2:00 to

4    3:00, between 2:00 and 3:00 p.m.

5         And he would come around and stand outside my

6    office and as I would bring a patient in, he would

7    still be standing there, bring another patient in.  And

8    every time I came out, he would make comments, asking

9    me out on dates and just other unwanted comments.

10    Q    Describe in your own words to the Court these

11    comments.

12    A    He would make comments referencing my body,

13    my dress, how we would do as a couple.  For instance,

14    if I said, you know, "I don't want to go out with you,

15    I'm dating someone," "Oh, I'll pay for both of you to

16    go, bring your friend, too."

17    Q    When you say he made comments about your

18    body, it was just your whole body or did he make any

19    comment about a specific body part?

20    A    He did say that I had a nice body, wanted to

21    know if I worked out.  He liked the way my clothes fit

22    me.

38

1        Q    And what was your response to these comments?

2        A    Usually, I ignored them or just would ask him

3    to leave me alone.

4        Q    And would he?

5        A    Until the next time he saw me.

6        Q    And then what would happen the next time he

7    saw you?

8        A    It would start all over again.  It was

9    constant, it was humiliating, it was frustrating.

10       Q    And approximately how long did this go on?

11       A    Initially, two years.  Initially, it was two

12   years before there was any break in his behavior.  From

13   the moment I met him, two straight years.

14       Q    Then there was a break.

15       A    Yes.

16       Q    Approximately how long of a break?

17       A    I can't give you a specific time of the

18   break, but I know I can give you when the break

19   generally started was at some point in '99, late '99,

20   2000.

21       Q    And then it resumed, is that correct?

22       A    Yes, it did.

39

1    Q    And what happened, describe his conduct after

2    it resumed.

3    A    Well, I would tell him that I was going to

4    tell the Warden, you know, that I was going to tell the

5    Warden about his behavior, and he would just laugh

6    because of their relationship.

7    Q    Who was the Warden at that time?

8    A    Patricia Britton, Patricia Britton Jackson.

9    Q    Describe, when the conduct resumed, describe,

10   if you will, please, the frequency, to the best of your

11   recollection, of the conduct after it resumed.

12   A    After it resumed, he was in a different spot,

13   he was in the bubble.  I don't know if you're familiar

14   with the jail, but it's a glass, plexiglass, and so he

15   could see everything around it and he controlled who

16   would go in or out.  So where the Mental Health hallway

17   was, I had to, you know, press a button and then he

18   could let me out.  And then to go out, to exit the

19   facility, he would have to push another button.

20        So when I would get there, he would always

21   say, "Open your lab jacket, let me see your body," all

22   of that before he would open the door.

40

1          Q    Now this bubble, it controls the doors in and

2    out.

3          A    Yes.

4          Q    And he could control the doors from within

5    the bubble.

6          A    He was the only person who could control

7    them, yes.

8          Q    How did you view those comments?

9          A    Humiliating, frustrating.  You're trying to

10   leave the building and he's not going to open the door.

11         Q    Do you remember approximately when this

12   occurred?

13         A    When he came onto that post, as soon as he

14   came onto that post.  That had to be around '99, 2000.

15              THE ADMINISTRATIVE LAW JUDGE:  Is this the

16   same as the sally port?

17              THE WITNESS:  That's the sally port, yeah.

18              BY MR. STATEN:  (Resuming)

19         Q    Dr. Simms, there's evidence in the record

20   that you filed a complaint against Mr. Masi in January

21   of '03 -- I'm sorry, January of 2004.  Is that correct?

22         A    Yes.

44

1    Thank you very much.

2              BY MR. STATEN:   (Resuming)

3         Q    Dr. Simms, my question to you was that the

4    record reflects that you filed a complaint of sexual

5    harassment against Mr. Masi on January 6th, 2004.  And

6    I ask you specifically, what led to the filing of the

7    complaint at that time?

8         A    I guess over the years, because he just

9    wouldn't stop, and it kept increasing.  And when he

10   went to work in the bubble, all of that was prior to me

11   filing the complaint, which had also led up to me

12   filing the complaint.  He wouldn't open the door, he

13   would just make comments, "Open your jacket, let me see

14   your body," you know, rear back in the chair with his

15   hands behind his neck.  I mean because he was in

16   control, you could not leave out without him opening

17   the door.

18        Q    Were there other things that you tried, other

19   than filing the complaint, to get him to just leave you

20   alone?

21        A    Initially, I wasn't sure what to do or who to

22   talk to or who to go to.  So initially, I spoke to my

PRO-TYPISTS, INC.                    (202) 347-5395

45

1    peers about it and they talked to him and would ask him

2    to just leave me alone.

3         It's a punitive environment when you work in

4    the jail already and because of my job there, I relied

5    on the officers for my safety and security.  Okay, so I

6    just wanted it to go away.  There's some fear that

7    comes into light there if you're just going to go and

8    say something about an officer.  That's one part of it.

9         The other part of it was his relationship

10   with the Warden.  I mean where do you go?

11        THE ADMINISTRATIVE LAW JUDGE:  Excuse me,

12   when you say peer group, you spoke to his peers or your

13   peers?

14        THE WITNESS:  My peers.

15        THE ADMINISTRATIVE LAW JUDGE:  Your peers.

16        THE WITNESS:  Yes.

17        BY MR. STATEN:  (Resuming)

18   Q    Did you become aware that he was also dating

19   someone at work --

20   A    Yes.

21   Q    -- with CCHPS?

22   A    Yes.

49

1          BY MR. STATEN:   (Resuming)

2     Q    Dr. Simms, are you aware of any employee that

3   worked for CCHPS that Mr. Masi was dating?

4     A    Yes.

5     Q    Would you name that employee?

6     A    Sharon Dorsey.

7     Q    Sharon Dorsey.  And how is it that you know

8   that Mr. Masi was dating Sharon Dorsey?

9     A    Sharon Dorsey and I worked very closely

10  together, she was the office manager.  We went out, we

11  had a mutual friend, and so we were at several social

12  gatherings together and Corporal Masi was with Sharon

13  Dorsey.

14    Q    Did there come a point prior to the filing of

15  your formal complaint that you told Mr. Masi if his

16  conduct were to continue, you would let Ms. Dorsey

17  know?

18    A    Yes, I did.

19    Q    Can you describe briefly that exchange?

20    A    Well, actually, I mean I told him that on

21  several occasions when he kept calling my office, when

22  he would call my assistant and have it transferred.  He

50

1    just laughed, he laughed, he said she wouldn't believe

2    it.  I talked to my administrator, who also said that

3    she wasn't going to believe me because there was an

4    issue with someone else and their supervisor had spoken

5    to him and also to the person and Sharon, she didn't

6    believe it, so --

7         Q    Now would you identify your administrator for

8    the record, please?

9         A    Estelle Hunter.

10        Q    Do you recall anyone else that you may have

11   told or discussed about how Masi was treating you?

12        A    I talked to Gwendolyn Sinclair.  She was also

13   a co-founder of Center for Correctional Health and

14   Policy Studies, she was the pharmacist there.

15             I spoke to one of his colleagues, Officer

16   Riese, about it.  I spoke with I think he was the

17   deputy warden at the time, Dennis Harrison, about it.

18   I spoke to I think it was Captain McCormick about it.

19   And I'm sure there were other people along that time

20   that were his peers, as well as mine.  I spoke to a lot

21   of my peers about it, probably on a daily basis.

22        Q    Describe for us what happened after you filed

51

1    the complaint.  In other words, was an investigation

2    conducted?

3        A    Yes, an investigation was conducted.  The air

4    became very chilly at the jail, very chilly at the

5    jail.  I was fearful to go to the units, actually, and

6    the Department had said that they would have someone

7    escort me when I went to the units.

8        Q    Do you recall -- I'm sorry, you may finish,

9    I'm sorry.

10       A    After I filed, I would still see Corporal

11   Masi, although he wasn't supposed to come to my post,

12   he was supposed to be like 300 feet away from me.  He

13   continued to come up on my post, he continued to be

14   stationed on my post.

15            There came a time, and I don't have it here

16   with me, but I could bring it, where he just -- when

17   you work on the Mental Health post, it's your

18   responsibility to call the units and get those clients

19   up there.  And I just told the clinicians to begin

20   putting the notes --

21            MR. MELEHY:  Your Honor, I object to this

22   line of questioning, this goes to the retaliation

52

1    issue.

2              MR. STATEN:   There wasn't a question.

3              THE ADMINISTRATIVE LAW JUDGE:   The Court is

4    not going to make a formal finding on the issue of

5    retaliation, so I think I've already stated that.   This

6    Court is going to deal with the actual sexual

7    harassment and I'm ruling that the witness can testify

8    as to sexual harassment.   Because the Court can still

9    find that there was sexual harassment ongoing, without

10   making a formal finding of retaliation.

11             I do feel that it is important to get a clear

12   picture from this witness as to the circumstances and

13   the conditions at work that were evident before and

14   then approximately at the time the complaint was filed

15   and if it continued.   It didn't necessarily have to be

16   retaliatory, but it could have still continued.   So I'm

17   going to allow the witness to testify.   Continue, I

18   still think it's relevant.

19             BY MR. STATEN:   (Resuming)

20        Q    Please continue.

21        A    So I just started telling the clinicians to

22   put a note in the chart saying, you know, who worked

53

1    the post and if the client was not brought up to the

2    area for them to receive their mental health

3    assessment.

4           After that point, he didn't really say

5    anything to me, he just would stare me down or make --

6    I mean like if he was talking with one of his peers,

7    you know, he may, you know -- but nothing directly to

8    me.  He just would stare me down.

9        Q    Did there come a point either prior to you

10   filing the complaint or after you filed the complaint

11   and during the investigation, where Mr. Masi actually

12   touched you, invaded your body space?

13       A    Yes, he did.

14       Q    Please explain to the Court.

15       A    He was actually working the post that day and

16   I was on my way to the ladies' room.  And as I was

17   trying to enter the ladies' room, he stood up and

18   fondled my arm, across my chest.

19       Q    And what did you do?

20       A    I mean I really just lost it, you know, just

21   started telling him if he ever touched me again -- and

22   then that's when I went down to the Warden's Office and

54

1   basically, how the whole thing got out of the way.  The

2   Warden was like, you know, "Let me talk to him first,

3   let me talk to him," "Let me talk to him before, you

4   know, you file."

5              THE ADMINISTRATIVE LAW JUDGE:  Let me clarify

6   something.  We're talking about just before or just

7   after the complaint was filed?

8              THE WITNESS:  This was before, before it was

9   filed.

10             THE ADMINISTRATIVE LAW JUDGE:  Is this close

11  to the last act?

12             THE WITNESS:  Yes, that was the next to the

13  last.  The last act was when he did it the second time,

14  the same way, on my way into the ladies' room, the

15  exact same thing.

16             BY MR. STATEN:  (Resuming)

17     Q    So even after you put him on notice the first

18  time that he fondled your arm and across your shoulder,

19  he did it a second time?

20     A    Yes.

21     Q    On a different day.

22     A    Yes, like a week later, after the Warden had

55

1    spoken with him.

2        Q    And was this the last straw?

3        A    That was it.  That's when I -- yes, that was

4    the last straw.  That's when I spoke with Corbett and

5    he told me what steps I had to take.

6            THE ADMINISTRATIVE LAW JUDGE:  Is Corbett the

7    Warden?

8            THE WITNESS:  He was the Warden.

9            THE ADMINISTRATIVE LAW JUDGE:  What's his

10   first name or her first name?

11           THE WITNESS:  Larry.

12           MR. STATEN:  Larry Corbett, Mr. Larry

13   Corbett.

14           THE ADMINISTRATIVE LAW JUDGE:  Continue.

15           MR. STATEN:  Thank you, Your Honor.

16           BY MR. STATEN:  (Resuming)

17       Q    What happened, what was the process after you

18   filed with the Special Inspector?

19       A    After I called Carolyn Lerner, I had to set

20   up an appointment and go over and meet with her.  I met

21   with her and then she assigned a Special Inspector,

22   Janet Goldstein, to the case.

56

1      Q     And were you interview by Janet Goldstein?

2      A     Yes, I was.

3      Q     And what was the nature, the method of the

4    interview?

5      A     It was taped.  I had several conversations

6    with her that were taped.  I had several more

7    conversations with her over the telephone, telephone

8    interviews.

9      Q     Do you recall whether or not your testimony

10   during this taped interview was sworn testimony?

11     A     It was, even the telephone conversation was.

12     Q     Explain to the Court how the employees'

13   conduct toward you, how did that make you feel as a

14   person and as a woman?

15     A     Well, especially for me in my field, you feel

16   like you can handle it yourself, initially.  And then

17   there is some embarrassment towards it happening to

18   you.  Then you feel powerless, it's humiliating.  At

19   some point, I felt like I was being stalked by him.  I

20   mean imagine someone's supposed to be working and

21   they're just standing outside of your office.

22     Q     Were there times when you and Mr. Masi would



# DISTRICT OF COLUMBIA
# DEPARTMENT OF CORRECTIONS

# Program Statement

| | |
|---|---|
| **OPI:** | **HRM** |
| **Number:** | **3310.4F** |
| **Date:** | **December 22, 2003** |
| **Subject:** | **Sexual Harassment Against Employees** |

1.  **PURPOSE AND SCOPE.** To implement an Order of the United States District Court in <u>Bessye Neal, et al v. Margaret Moore, Director, DC Department of Corrections</u>, Civil Action No. 93-2420, dated June 28, 1999 and to implement procedures for reporting, filing, investigating, and adjudicating claims of sexual harassment and/or retaliation against sexual harassment within the District of Columbia Department of Corrections. This directive applies to employees, contract employees and volunteers under the direction or control of the DC Department of Corrections (DOC).

2.  **POLICY.** It is the policy of the DC Department of Corrections to prohibit sexual harassment as well as retaliation for objecting to or reporting incidents of sexual harassment.

3.  **NOTICE OF NONDISCRIMINATION.** In accordance with the DC Human Rights Act of 1977, as amended, DC Code section 2.1401.01 et seq., (Act) the District of Columbia does not discriminate on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, matriculation, political affiliation, disability, source of income, or place of residence or business. Sexual harassment is a form of sex discrimination which is also prohibited by the Act. Discrimination in violation of the Act will not be tolerated. Violators will be subject to disciplinary action.

4.  **PROGRAM OBJECTIVES.** The expected results of this program are:

    a.  DOC employees will have a clear understanding of what constitutes sexual harassment and retaliation, what the penalties are for engaging in such conduct, and what the proper procedures are for reporting incidents of sexual harassment and related retaliation.

    b.  To explain the Office of the Special Inspector (OSI) which is responsible for promulgating policies and procedures regarding the intake, investigation and

adjudication of complaints of sexual harassment and related retaliation as well as establishing models and protocols for sexual harassment/retaliation training.

c.  DOC will take appropriate and prompt action in matters relating to sexual harassment as directed by the Special Inspector (SI).

## 5.  DIRECTIVES AFFECTED

**a.  Directives Rescinded**

PS 3310.4E "Sexual Harassment Against Employees" (4/30/02)

**b.  Directives Referenced.** None

## 6.  AUTHORITY

a.  Order of the United States District Court in Civil Action No. 93-2420, dated 6/28/99.

b.  31 DCR 56, "Equal Employment Opportunity Rules Governing Complaints of Discrimination in the District of Columbia Government," dated 1/6/84.

c.  Mayor's Order 79-89, "Sexual Harassment", dated 5/24/79; and the Order of the United States District Court in Civil Action No. 77-1359.

d.  DC Human Rights Act of 1977, as amended, DC Code section 2.1401.01 et seq., (Act).

## 7.  STANDARDS REFERENCED

a.  American Correctional Association (ACA) 2nd Edition Standards for Administration of Correctional Agencies 2-CO-1C-11.

b.  American Correctional Association (ACA) 3rd Edition Standards for Adult Local Detention Facilities 3-ALDF-1C-07-1.

## 8.  DEFINITIONS. For the purpose of this PS, the following definitions apply:

**a.  Adverse Employment Action** — Any negative change in the terms and condition of an employee's employment. It can include such things as transfers, shift changes, negative performance evaluations, unwarranted discipline, harassment or denial of promotion or shift requests. It also can include the creation of a hostile work environment because the employee engaged in a legally protected activity related to a claim of sexual harassment.

**b.  Cease and Desist Order** — An order prohibiting unnecessary contact between the complainant and respondent while an allegation of a particular course of harassment or retaliation is investigated.  However, to ensure the continued efficient

PS 3310.4F
December 22, 2003
Page 3 of 15

operation of the agency, it does not always prohibit interaction between the complainant and the respondent as may be required to carry out the employee's respective duties and responsibilities.

c.  **Complainant** – An employee who alleges he or she is the victim of sexual harassment and/or retaliation or who files a sexual harassment and/or retaliation complaint.

d.  **Disciplinary Action/Discipline** — Action taken against employees who have violated DOC policy, rules or regulations established by the District Personnel Manual (DPM), or any District of Columbia law or regulation.

e.  **Investigators** – Persons who are specially trained by the OSI to conduct inquiries into allegations of sexual harassment and retaliation, determine the facts associated with sexual harassment and/or retaliation complaints filed with the OSI, and make recommendations of probable cause and, if applicable, disciplinary action.

f.  **Ombudsperson** — A DOC employee or contractor who assists the OSI in monitoring DOC's sexual harassment policies and procedures.

g.  **Legally Protected Activity** — Resisting, opposing or reporting sexual harassment, making oral or written complaints about sexual harassment, or testifying at, assisting in, or otherwise participating in the investigation of a sexual harassment complaint. Such activities are protected regardless of whether the conduct complained of is ultimately proven to have constituted sexual harassment.

h.  **Sexual Harassment Advisory Committee** — A committee established by the OSI to provide feedback and make recommendations to the Special Inspector about policies, procedures and systemic problems related to sexual harassment and/or retaliation at DOC. The Committee also serves as a resource for individual employees with questions or concerns about sexual harassment and retaliation.

i.  **Respondent** – The employee who is accused of sexual harassment and/or retaliation.

j.  **Retaliation** – For purposes of this Policy Statement, retaliation is defined as taking or threatening to take an adverse employment action against an employee because that employee has engaged in legally-protected activity, as defined above.

k.  **Sexual Harassment** – Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other conduct (verbal or physical) of a sexual nature when:

  1)  Submission to such conduct is made a term or condition of employment, either explicitly or implicitly;

PS 3310.4F
December 22, 2003
Page 4 of 15

2)    Submission to or rejection of such conduct by an employee is used as the basis for employment decisions affecting such employee;

3)    Such conduct has the purpose or effect of unreasonably interfering with an employee's work performance; or

4)    Such conduct creates an intimidating, hostile, or offensive working environment.

I.    **Inappropriate Behavior** – The following list includes examples of sexual harassment. This list is not exhaustive, but is given to illustrate the range of conduct that must not be engaged in at work or during any work-related activities, including those that occur off-site. The list includes acts that are always sexual harassment, acts that may be sexual harassment under certain circumstances, or acts that may be inappropriate behavior for DOC employees even when not meeting the legal definition of sexual harassment.

1)    **Verbal Behavior**

a)    Making suggestive or sexual comments about another person's or one's own anatomy, figure, appearance, or clothing;

b)    Making suggestive sounds, for example, kissing, sucking, groaning, howling or other simulated sex noises;

c)    Asking personal questions about an employee's sex life, preferences, habits or sexual history;

d)    Subjecting another employee to information about your own sex life, preferences, habits or sexual history;

e)    Describing sexually explicit or pornographic acts, films, dreams, or fantasies;

f)    Asking out a person who has made it clear that she or he is not interested;

g)    Turning work discussions to sexual topics;

h)    Telling sexual or sexist jokes;

i)    Referring to employees or other persons in sexist or sexual terms;

j)    Repeatedly contacting an employee at home or initiating contact outside of the workplace about non-work related matters when the employee has made it clear that she or he has no interest in such contact.

2)    **Non Verbal or Physical Behavior**

a)    Looking a person up and down, fixing eyes on sexual parts of anatomy;

b)    Giving unwanted gifts, letters, notes;

    c) Making suggestive facial gestures, such as winking, wagging the tongue, throwing kisses, licking lips;

    d) Simulating sex acts;

    e) Displaying sexually explicit or sexually suggestive pictures, images, or objects;

    f) Transmitting sexually explicit, profane, obscene, intimidating, defamatory or otherwise unlawful or inappropriate material in the office, via e-mail, or downloading such materials from the Internet;

    g) Touching a person's body, hair or clothing;

    h) Giving a person a massage around the neck or shoulders, hugging, kissing, patting, or stroking a person;

    i) Touching or rubbing oneself sexually in view of another person;

    j) Pulling another person's clothing off or up, or sticking a hand down another person's clothes, or undressing in front of or exposing oneself to another person;

    k) Forcing another person to engage in activities such as dancing, drinking alcohol or coming to one's hotel room uninvited while on travel status;

    l) Putting sexually suggestive objects in a person's desk, locker or workspace.

## 9. GENERAL PROHIBITION AGAINST SEXUAL HARASSMENT AND RETALIATION

    a. Each DOC employee is prohibited from engaging in sexual harassment or inappropriate sexual conduct and is protected from retaliation for complaining about or witnessing sexual harassment or conduct, as defined above, against another employee.

    b. Any employee who is found to have engaged in such conduct will be subject to discipline that, according to the severity of the offense, may include termination.

    c. Consistent with all applicable personnel laws and regulations regarding employee discipline, any corrective or adverse action against an employee for sexual harassment or retaliation will be placed in the employee's official personnel file, and will be considered a significant negative factor in DOC performance evaluations, promotion decisions and consideration for reemployment as set forth in DPM Chapter 8.

## 10. OFFICE OF THE SPECIAL INSPECTOR. The Office of the Special Inspector (OSI) was established on April 30, 2002. Carolyn Lerner is the Special Inspector (SI).

    a. **Independent Status of the OSI.** For three years after the office was established,

PS 3310.4F
December 22, 2003
Page 6 of 15

the SI will operate independently of the DOC. The court may extend the independent status of the SI for one or two years.

b.  **Authority of the OSI.** Subject to applicable laws and regulations, the 081 has authority over all complaints of sexual harassment and/or retaliation related to such complaints. The SI has authority to determine what relief, if any, to provide to complainants and what disciplinary action, if any, to impose on respondents. The SI has the authority to hire contract investigators and trainers to work directly for the SI, as well as such other staff as may be necessary to carry out the responsibilities of the OSI.

c.  **Investigations and Findings.** OSI Investigators will investigate all complaints of sexual harassment and related retaliation and propose findings as to whether sexual harassment or retaliation has occurred. If the Investigator finds probable cause that sexual harassment or retaliation has occurred, the Investigator will recommend what relief, if any, to provide to the Complainant, and will suggest what discipline, if any, should be imposed against the Respondent consistent with the DPM, Chapter 16.

d.  **Findings of No Probable Cause**

    1)  When the Investigator recommends a finding of no probable cause, the Investigator's report and recommendation ("Investigative Report") will be given to the SI.

    2)  The SI may either remand the Investigative Report to the Investigator for further investigation or revisions, or send a copy of the Investigative Report directly to the Complainant and Respondent at the addresses listed on their locator sheets. Complainant and Respondent will each have 30 days from receipt of the Investigative Report to present any written submissions (including comments and objections) to the SI. Receipt will be deemed effective within 3 days of mailing.

    3)  The SI will review the Investigative Report along with any written submissions of the Complainant and Respondent. The SI will then issue findings as to whether sexual harassment and/or retaliation occurred, and make a final determination as to what relief, if any, to provide the Complainant and what discipline, if any, to impose against the Respondent. A copy of the SI's findings and determination will be provided to the Complainant and the Respondent.

    4)  In lieu of issuing findings, the SI may remand the investigation to the Investigator for additional investigation or further analysis consistent with the concerns of the SI that caused the remand. The Investigator will follow the above procedures with respect to any report prepared on remand.

    5)  The SI's findings and determination on probable cause, relief and discipline will

PS 3310.4F
December 22, 2003
Page 7 of 15

constitute the final decision of DOC.

e.  **Probable Cause Finding - Discipline and Relief**

1)  **Proposed Discipline Less Than Termination**

a)  When the Investigator recommends a finding of probable cause and where the proposed discipline is less than termination, the Investigative Report will be given to the SI. The SI will either remand the Investigative Report to the Investigator for further investigation or revisions, or may send a copy of the Investigative Report directly to the Complainant and Respondent. The copy sent to the Complainant will not include the proposed discipline. Copies will be sent to the addresses listed on their locator sheets. Complainant and Respondent will each have 30 days from receipt of the Investigative Report to present any written submissions (including comments and objections) to the SI. Receipt will be deemed effective within 3 days of mailing.

b)  The SI will review the Investigative Report along with any written submissions of the Complainant and Respondent. The SI will then issue findings as to whether sexual harassment and/or retaliation occurred, and make a final determination as to what relief, if any, to provide the Complainant and what discipline, if any, to impose against the Respondent. A copy of the SI's findings and determination will be provided to the Complainant and Respondent.

c)  In lieu of issuing findings, the SI may remand the investigation back to the Investigator for additional investigation or further analysis consistent with the concerns of the SI that caused the remand. The Investigator will follow the above procedures with respect to any report prepared on remand.

d)  will constitute the final decision of DOC.

e)  The SI will inform the Director or designee of the decision, and the Director or designee will immediately sign all necessary papers implementing the disciplinary ruling of the SI as the Deciding Official.

2)  **Proposed Discipline of Termination**

a)  When the Investigator recommends a finding of probable cause and where the proposed discipline is termination, the Investigative Report will be given to the SI. The SI will either remand the Investigative Report to the Investigator for further investigation or revisions, or may send a copy of the Investigative Report directly to the Complainant and Respondent. The copy sent to the Complainant will not include the proposed discipline.

PS 3310.4F
December 22, 2003
Page 8 of 15

Copies will be sent to the addresses listed on their locator sheets. The Respondent will be assigned a Hearing Officer to evaluate the recommendation of termination. The Respondent will have 30 days from notification of assignment of a Hearing Officer to present any written submissions (including comments and objections) to the Hearing Officer, with a copy to the Special Inspector. Receipt will be deemed effective within 3 days of mailing.

b)    The Hearing Officer will review the Investigative Report; review the Respondent's responses, if any; and conduct a hearing should the Hearing Officer determine that the written record is inadequate.

c)    The Hearing Officer's recommendation concerning the proposed termination will then be submitted to the SI and the Respondent.

d)    The Respondent will have the right to present any written submissions to the SI on the proposed termination within 30 days of receipt of the Hearing Officer' s recommendation. Receipt will be effective within 3 days of mailing.

e)    The SI will review the proposed discipline, any written submissions, and the recommendation of the Hearing Officer. The SI will then make a final determination as to what discipline, if any, to impose against the Respondent, and what relief, if any, to provide the Complainant.

f)    The SI's findings and determination on probable cause, relief and discipline will constitute the final decision of DOC.

g)    The SI will inform the Director or designee of the decision, and the Director or designee will immediately sign all necessary papers implementing the disciplinary ruling of the SI as the Deciding Official.

## f.    Relief Awarded

1)    When the SI sustains an allegation of sexual harassment and/or retaliation, the SI may also order remedial action. In this regard, the SI may order any remedial action that the DOC Director may impose under the DC Human Rights Act.

2)    The SI will advise the DOC Deputy Director as to the remedial measures to be taken, who will then be responsible for promptly implementing these measures.

3)    The findings and decision of the SI constitute the final decision of the Director of DOC on the matter in question. The relief awarded to Complainant by the SI may include remedial personnel actions (including modifications of performance ratings) and back pay, but will not include compensatory

PS 3310.4F
December 22, 2003
Page 9 of 15

damages, punitive damages, or attorneys fees.

g.  **Responsibility for Policies and Training**

1)  The SI will develop and implement policies and procedures, consistent with federal and District of Columbia law, as necessary to carry out his/her responsibilities relating to claims of sexual harassment and/or retaliation.

2)  The SI will design and make available training programs that new employees must attend promptly upon hire, and that current employees must attend at least annually. The SI and his/her staff will select trainers, training materials, schedule training sessions, and supervise all sexual harassment and retaliation training.

3)  The SI, or the DOC Training Administrator working with the SI, will maintain records of employees who receive sexual harassment/retaliation training.

11. **SEXUAL HARASSMENT ADVISORY COMMITTEE AND HOTLINE**

a.  Advisory Committee

1)  The SI will establish an Advisory Committee on sexual harassment and related retaliation. The committee will meet at the SI's discretion to discuss issues brought to it by DOC employees or the SI, and to make recommendations to the SI about policies, procedures and systemic problems (not individual complaints) related to sexual harassment/ retaliation at DOC.

2)  The Advisory Committee will also provide feedback from employees to the SI regarding the effectiveness of training and other OSI programs. The SI will select members from among current DOC employees who respond to a general notice soliciting candidates, and will attempt to ensure that members represent employees from all levels and units of

3)  DOC.

4)  The Advisory Committee members will also serve as a resource to all employees to discuss matters related to sexual harassment or related retaliation. The Advisory Committee members will keep all such communications confidential unless the employee authorizes otherwise.

b.  **Hotline**

Employees may contact the Sexual Harassment of Employees hotline to report allegations of sexual harassment/retaliation or to receive information on procedures for pursuing a complaint. The hotline telephone number is (202) 448-2424.

PS 3310.4F
December 22, 2003
Page 10 of 15

12. **OMBUDSPERSON.** The SI will select either a DOC employee or contractor to serve as the Ombudsperson.

    a.   The Ombudsperson shall monitor agency compliance for the prevention of sexual harassment against employees and provides feedback to the SI on where potential problem areas or actual problems exist.

    b.   The Ombudsperson is available to employee's on a confidential basis to hear concerns about possible sexual harassment or retaliation.

    c.   The Ombudsperson may also serve as a mediator for complaints.

13. **EMPLOYEE COUNSELING.** The SI will coordinate with the Employee Assistance Program (EAP), as well as outside providers when the SI deems necessary, to provide counseling support and referrals to individuals alleging sexual harassment and/or retaliation who request such assistance. Confidentiality regarding services provided will be maintained.



    1)   An employee must initiate the complaint process with the OSI within one year of the incident or behavior being complained of, or in the case of ongoing or continuing behavior, within one year of the most recent incident.



**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

_____

LAVERNA SIMMS,                          *


    Plaintiff,                          *


    v.                                  *    Civil Action No. 06CV02178

                                       Judge Royce C. Lamberth

DISTRICT OF COLUMBIA ET.AL.              *


    Defendants.                         *

_____*

**AFFIDAVIT OF COUNSEL JO ANN P. MYLES
IN SUPPORT OF OPPOSTION TO DISMISS AND
IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

    I Jo Ann P. Myles hereby swear and affirm under the penalty of perjury that the following statements are true and correct to the best of my knowledge and belief.

    1.    That I am over 18 years of age and competent to provide testimony in the above captioned matter. I am the attorney for Plaintiff Laverna Simms in this matter.

    2.    I have personal knowledge as to the facts and circumstances in this matter as it relates to the necessary discovery and evidence needed to fully defend Plaintiff Simms against the defendants' pending motion before this Court.

    3.    That in order to fully and completely defend defendants' pending motion to dismiss and/or in the alternative motion for summary judgment it is an absolute necessity for Simms to be able to conduct full and complete discovery, to include but not limited to serving upon the defendants interrogatories, production of documents, taking

depositions, subpoenaing documents, inspecting the workplace and interviewing potential witnesses.

4.      At a minimum, I need information/discovery concerning: (1)  prior complaints that have been made about sexual harassment in the workplace, (2) the actions taken by defendants as to sexual harassment complaints, (3) information concerning the affair and sexual activities of the Warden and other officials employed by defendants, (4) information on the defendants' supervision and control over plaintiff, (5) information concerning the defendants depriving the plaintiff of her ability to make a contract with defendants, (6) information concerning the compliance and on-compliance of the defendants of the courts two existing orders and consent agreement and (6) details of the

5.      I am requesting that the Court allow Simms to make and complete full discovery and to amend her complaint according to the discovery results otherwise Simms will be prejudiced and harmed.

I JO ANN P. MYLES HEREBY SWEAR AND AFFIRM UNDER THE PENALTY OF PERJURY THAT THE ABOVE STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

_____/s/_____
Jo Ann P. Myles

## OFFICE OF THE SPECIAL INSPECTOR
## DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS

1730 M Street, N.W.  Suite 412  Washington, DC 20036

---

**La Verna Simms**

v.

**Harcourt Masi**

**Case No.  2004-001-OSI**

---

# REPORT OF INVESTIGATION

| | |
|---|---|
| Investigator: | Janet Goldstein |
| Date: | June 21, 2004 |

# OFFICE OF THE SPECIAL INSPECTOR

## DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS

1730 M Street, N.W.  Suite 412  Washington, D.C. 20036
Phone (202) 293-8090  FAX: (202) 293-7110

**Carolyn N. Lerner, Special Inspector**
Email: clerner@hellerhuron.com

Sexual Harassment Hotline
Phone: (202) 448-2424

July 8, 2004

LaVerna Simms
P.O. Box 4085
Annapolis, MD 21403

Re: *LaVerna Simms v. Harcourt Masi*, Case No. 2004-001-OSI

Dear Ms. Simms:

This is a notice of a recommended decision finding probable cause in the sexual harassment complaint you filed against Harcourt Masi, and a recommended decision finding no probable cause in the retaliation complaint you subsequently filed. This notice is being provided to you in accordance with DCDC Program Statement 3310.4G. A copy of the investigator's Report and Recommendation is enclosed, along with the accompanying exhibits.

On December 30, 2003, you filed a complaint with DCDC alleging that Masi sexually harassed you and another DCDC employee, and on January 6, 2004 you informed the Office of the Special Inspector (OSI) that Masi had retaliated against you for having filed a complaint. The OSI investigated your complaints, and the enclosed Report of Investigation contains the investigator's findings and recommendations.

The investigator's recommendation is not a final decision. I will make a final determination after reviewing the Report and Recommendation along with any submissions that you or Mr. Masi may choose to write in response to this notice. There is no requirement that you submit a response to the Report of Investigation. However, if you do choose to prepare a response, it must be provided to me within fifteen (15) days of your receipt of the Report. After reviewing any responses that you or Mr. Masi choose to submit, I will make a final decision on probable cause.

Please let me know if you have any questions.

Sincerely,

Carolyn Lerner

Carolyn N. Lerner
Special Inspector

I.    **Background of Investigation**

On December 30, 2003, La Verna Simms, the Director of Outpatient Mental Health at the District of Columbia Department of Corrections ("DCDC"), informed Deputy Warden Dennis Harrison that Corporal Harcourt Masi was sexually harassing her and one of her employees, Christina Roye. (Exhibit "Ex." 1 at 12-15; Ex. 2.) [1]  On January 6, 2004, Simms notified Special Inspector Carolyn Lerner by telephone that Masi refused to perform work for her staff in retaliation for her prior report. (Ex. 1 at 19.)

During the ensuing investigation of Simms' claims by the Office of the Special Inspector (OSI), this investigator identified and interviewed five other employees in the Medical Unit at the D.C. Jail who alleged that Corporal Masi made unwanted overtures to them as well.  These individuals are Karen Harrison, Teresa Nwankwo, Gloria Robertson, Cynthia Kittrell and Coryne Farmer.  Pursuant to the mandate of the OSI to investigate and remediate all acts of sexual harassment within the DCDC,[2] this investigator included these allegations in the investigation of Respondent's behavior. [3]

II.    **The Parties to the Investigation**

La Verna Simms, Complainant, is an owner and employee of the Center for Correctional Health and Policy Studies ("CCHP"), a contractor that provides medical and mental health services to the DCDC. (Ex. 1 at 3, 5.)  Simms started working at the DCDC in 1997 as the intake coordinator for the Mental Health Department. (Id. at 4.)  She currently serves as the Outpatient Mental Health Director at the DCDC, where she supervises approximately twelve clinicians. (Id. at 5.)

Harcourt Masi, Respondent, has served as a corporal at the DCDC since 1990. (Ex. 3 at 3.)  For several years ending July 2003, Masi worked in the infirmary control bubble unit, where he controlled the entry into and exit from the 3rd floor medical unit. (Id. at 4-5.)   Thereafter, Masi served as a relief officer on the 3rd floor until January 2004. (Id. at 5, 16.)  Masi also worked overtime on the mental health post on the 3rd floor. (Id.)

---

[1] "Exhibit" (hereinafter "Ex.") refers to exhibits contained in the investigative file attached hereto.

[2] See DCDC Program Statement on Sexual Harassment, HRM, 3310.4F, December 22, 2003.

[3] Masi's unwanted overtures towards these five individuals are alleged to have occurred between 1996 and 2003. Because the investigation of these allegations was initiated by the OSI on its own accord rather than pursuant to an employee complaint, the statute of limitations provision contained in DCDC Program Statement, Section 14 (b), HRM 3310.4F, December 22, 2003 ("Program Statement") is not applicable. However, even if it were to apply, these allegations are within the statute of limitations because they represent a "case of ongoing or continuing behavior" that includes incidents occurring within one year of the commencement of the investigation. Program Statement, Section 14(b).

2

### III.    Witnesses Interviewed

Karen Harrison has worked as a podiatrist at the DCDC since 1992. (Ex. 4 at 5.) She currently works at the DCDC two days a week. (Id. at 7.)  Harrison was interviewed about unwelcome advances Masi allegedly made to her from 2000 through 2003.

Teresa Nwankwo worked as a pharmacist at the D.C. Jail beginning in 2000. (Ex. 5 at 3.)  She was interviewed about unwelcome advances Masi allegedly made to her in 2000.

Gloria Robertson has worked as a staff nurse at the DCDC since 1995. (Ex. 6 at 3.) She was interviewed about unwelcome advances Masi allegedly made to her between 1996 and 2001 or 2002.  Robertson also was a witness to Masi's alleged advances to Harrison.

Cynthia Kittrell has worked as a dental technician at the D.C. Jail for the last six years. (Ex. 7 at 3.)  She was interviewed about unwelcome advances Masi allegedly made to her between 1999 and 2003.

Coryne Farmer has worked as a medical secretary at the D.C. Jail for two years. (Ex. 8 at 3.)  She was interviewed about unwelcome advances Masi allegedly made to her in 2002.

Christina Roye has served as a mental health clinician under Simms for 1½ years. (Ex. 9 at 5-6.)  She was interviewed because Simms reported that Masi had made unwelcome advances to Roye in 2003.

Estelle Hunter has served as the Health Services Administrator at the D.C. Jail since 2000. (Ex. 10 at 4.)  She previously worked for the former receiver for medical and mental health services at the DCDC. (Id.)  She was interviewed about complaints made by Simms and Nwankwo about Masi's unwanted overtures.  Hunter also was interviewed about Masi's allegation that he told Hunter that Simms had made racists remarks about him.

Gwendolyn Sinclair is the Director of Pharmacy at the D.C. Jail. (Ex. 11 at 3.) She was interviewed about a prior complaint made to her by Nwankwo about Masi's conduct.

Donna Coakley has served as a medical clinician under Simms for the past year. (Ex. 12 at 4.)  She was interviewed about Simms' allegation that Masi retaliated against her for reporting his misconduct by failing to perform his duties for Simms' technicians in January 2004.

3

Janna McCargo served as the lead mental health clinician under Simms until she was terminated in 2003. (Ex. 13 at 2-3; Ex. 19.) She was interviewed about the unwanted advances Masi allegedly made toward Simms.

Maxine Reise has served as a corporal at the DCDC since 1982. (Ex. 14 at 4.) She has worked on the 3rd floor of the D.C. Jail in the infirmary and mental health units for the past five to six years. (Id. at 4.) Reise was interviewed about Masi's alleged unwanted overtures towards Simms and Harrison.

Hilda Short served as a corporal in the mental health unit for ten months until she retired in January 2004. (Ex. 15 at 2.) She was interviewed about Masi's interactions with personnel on the 3rd floor and the alleged efforts by Simms and others to prevent Masi from obtaining the mental health post upon Short's retirement.

Gloria Profit served as the zone sergeant on the 3rd floor of the D.C. Jail from November 2003 until April 2004. (Ex. 16 at 3.) She was interviewed about Masi's job performance and his interactions with the 3rd floor personnel.

Tyrone Jenkins is a corporal at the D.C. Jail and a colleague of Masi. (Ex. 17 at 2-3.) He was interviewed about Masi's relationship with Karen Harrison and Simms' alleged efforts to prevent Masi from assuming the mental health post.

Barry Simpson worked as a corporal in the 3rd floor control bubble in 2003. (Ex. 23.) He was interviewed about Masi's interactions with the 3rd floor personnel and Simms' preference that the mental health post be awarded to Reise.

## IV.    Issues Presented

Simms alleges that during the past six years, Masi sexually harassed her by repeatedly making unwanted overtures towards her. Masi's overtures allegedly included asking Simms out, making comments on her appearance and body, seeking Simms out at work and social events, telephoning her, photographing her and grabbing her by the arm. Simms also alleges that while Masi worked the infirmary control bubble, he continually delayed opening the exit door in order to stare at her. Finally, Simms charges that after she reported Masi's behavior in December 2003, he retaliated against her by not performing required work for one of her technicians, Donna Coakley.

As stated previously, five other individuals who worked in the third floor medical unit testified that Masi engaged in similar conduct towards them. This conduct included repeatedly asking these women out, commenting on their appearance, delaying their exit from the infirmary control bubble and, in one instance, unwanted touching.

In his defense, Masi testified that he never made sexual overtures to or asked out any of the women identified in this report. Masi alleges that Simms is biased against him

4

because he is a "foreigner," and that she brought false charges against him to insure that her friend, Corporal Reise, rather than Masi, would be assigned to the mental health post following the retirement of the post officer. Masi also denies retaliating against Simms by refusing to perform work for her clinicians.

## V.    Summary of the Evidence

### A.    Simms' Allegations and Related Testimony

#### 1.    The Testimony of La Verna Simms

La Verna Simms, a licensed professional counselor, began working for the receiver at the DCDC in 1997. (Ex. 1 at 4.) She served as the intake coordinator on the evening shift, arriving at work between 2:00 p.m. and 3:00 p.m. (Id.)  In 2001, Simms started working the day shift in her current position as Outpatient Mental Health Director. (Id. at 5.)  Simms is an employee of CCHPS, a corporation that contracts with the DCDC to operate health services within the DCDC. (Id.)  Simms also is one of twelve self-described "owner-operators" of CCHPS. [4]  (Id.)

Simms testified that she came into contact with Masi shortly after she started working at the DCDC. (Id. at 5; Ex. 18 at 3.)  Masi would come up in the evenings to the 3rd floor infirmary where Simms worked and stand outside Simms' office. (Ex. 1 at 5; Ex. 18 at 2.)  He repeatedly asked Simms on dates, telling her that "he could show [her] a good time, he liked [her] style" and "the two of them would make a good couple." (Ex. 1 at 5.)  Simms refused all his invitations. (Id.)  When Masi persisted in asking her out, Simms became more blunt in her rejections until she finally told him, "If you were the last man on earth, I would not go out with you." (Id. at 6.)

Simms testified that Masi also commented on a "regular" basis on Simms' appearance. (Ex. 18 at 3-4.)  He told her that she had a "good shape" and "nice body" and asked her if she worked out. (Id. at 4.)

According to Simms, Masi made these overtures and comments on a daily basis for the first six to nine months following their initial meeting. (Ex. 1 at 6.)  Thereafter, Simms did not see him as frequently, although Masi continued to comment on Simms' appearance and/or ask her out whenever he saw her for the next one to two years. (Id.)  Masi stopped approaching Simms after two years when he began dating someone else in the DCDC. (Id. at 7.)

In approximately 1999, Masi was assigned to the infirmary floor control bubble, where he controlled the entry and exit of all persons to and from the 3rd floor medical unit through a large open area known as the sally/port. (Ex. 21.).  As the floor control officer, Masi controlled the opening and closing of doors leading from the medical unit into the sally/port area as well as the door leading from the sally/port to the 3rd floor exit. Masi served as the infirmary floor control officer through July 2003. (Ex.3 at 5.)

---

[4] Estelle Hunter, Gwendolyn Sinclair and Joseph Bastien also are owner-operators of CCHPS. (Ex. 35.)

Simms testified that Masi delayed her exit from the sally/port area whenever she passed through the area by herself. (Ex. 1 at 8; Ex. 18 at 4-5.) While Simms was forced to remain in the sally/port area, Masi stared at her body and made comments like "you look good" or "take that lab jacket off." (Ex. 1 at 8; Ex. 18 at 4.) Masi's behavior made Simms "very uncomfortable" and she began wearing her lab jacket and sunglasses whenever she left the 3rd floor. (Id.) Simms also tried to get her colleagues to accompany her when she exited because Masi would not delay her exit as much when she was with other people. (Id. at 5.) Simms testified that while she was annoyed by Masi's behavior, it did not bother her as much as his previous actions because he remained in the control booth and did not physically approach her as before. (Ex. 1 at 8; Ex. 18 at 5-6.)

According to Simms, in approximately 2002, Masi began dating Sharon Dorsey, who at the time was the office manager in the medical unit. (Ex. 1 at 9.) While dating Dorsey, Masi made comments to Simms that Dorsey "did not compare" to her and that he wanted to take Simms out. (Id. at 9.)  Masi made these remarks whenever he encountered Simms out of the presence of Dorsey. (Id. at 10.) Masi also photographed both Dorsey and Simms when he was with them at office social functions and made comments to Dorsey about Simms. (Id.)

Simms testified that in this same period, Masi started telephoning her from the infirmary control bubble. (Ex. 18 at 6.) Initially, he called her secretary who transferred his calls to Simms' office. (Id.) When Simms directed her secretary not to transfer the calls, Masi called her office directly and attempted to engage in social conversation. Simms hung up on him.  Simms estimated that these phone calls continued for approximately 14 months. (Id.)

At the 2002 office Christmas party, Simms testified that Masi stood next to the table where Simms was selling tickets for a few hours and refused to leave. (Id. at 7.) When Masi ignored her requests that he go away, Simms asked Hunter to speak to him. (Id.) Simms also testified that Masi frequently took photographs of her at social functions. (Id.) At some point, Simms saw Masi's album while a colleague was looking at it in the mental health hallway. It was full of pictures of Simms and made her feel "very uncomfortable." (Id.)

Simms felt that Masi was trying to cause a "split" between her and Dorsey. (Id.) She warned Masi that if he persisted in this behavior, she would notify the Health Service Administrator, Estelle Hunter. (Id.) When Masi ignored the warning, Simms told Hunter of Masi's actions. Hunter informed Simms that Masi also had made advances to a pharmacist in the medical unit but when Hunter told Dorsey about it, she did not believe her. (Id. at 10-11) Simms also talked with Gwendolyn Sinclair, the Director of Pharmacy, who confirmed that one of her pharmacists complained to her about Masi's overtures. (Id. at 11.) Sinclair said she confronted Masi who said the pharmacist was lying. (Id.)

6

Simms testified that following her conversations with Hunter and Sinclair, Masi's overtures "died down again" until Corporal Short, a friend of Masi, was assigned to the mental health post in April 2003. (Id. at 12; Ex. 15 at 2.) Masi frequently visited Short and often acted as a relief officer on the post during her days off. (Id. at 11.) Masi again began to comment to Simms at least two to three times a week that she "look[ed] so good" and she "like[d] [her] style." (Id. at 12-13.) When Simms walked by, Masi would stick his foot out. (Id. at 13.) Simms continued to tell Masi to leave her alone. (Id. at 13.) On December 22, 2003, Masi grabbed Simms' arm as she was going into the restroom. (Id. at 13.) Simms warned him not to ever put his hands on her again. (Id.; Ex. 2) One week later, Masi grabbed Simms' arm again as she was going to the restroom. (Ex. 1 at 13; Ex. 2.)

During the same time frame, Donna Coakley, one of Simms' technicians, told her that Masi was annoying her co-worker, Christina Roye. Coakley said she had to "rescue" Roye every morning because Masi was always visiting Roye in her office. (Ex. 1 at 13.) Simms spoke to Roye who informed her that Masi was coming to her office daily and that he told her he wanted to take her out. Roye said it was difficult for her to work but that she did not want to make a complaint. (Id. at 14.)

On December 30, 2003, the day Masi touched her for the second time, Simms informed Deputy Warden Harrison of Masi's behavior and told him he "needed to do something with Masi." (Id. at 13.) Simms also notified her supervisor, Estelle Hunter, of the problem. (Ex. 2) The following day, Simms spoke with Lieutenant McCormick and Major Corbett about her concerns.[5] Corbett informed Simms that he was required to inform SI Carolyn Lerner of the problem. Corbett also provided Simms with the SI telephone number to call. Simms contacted Lerner on January 6, 2004 to discuss her options. (Ex. 2; Ex. 1 at 16.)

Simms testified that after she notified the DCDC officials about Masi's conduct, Masi stopped performing work for some of her clinicians. Coakley reported to Simms that when Masi was assigned to the mental health post, he did not call up or locate the inmates she needed to see. (Id. at 17.) Roye also told her that Masi was not speaking to her and did not respond when she gave him the list of inmates she needed to see. (Id.) Simms contacted Major Corbett and Lieutenant Talley and complained that they were assigning Masi to the post when he was not doing any work. Masi continued to work on the mental health post and refused to perform work for Coakley until the 3rd week of January when he was assigned elsewhere. (Id. at 18-20.)

2.    Testimony of Estelle Hunter, Maxine Reise and Janna McCargo

Health Services Administrator Estelle Hunter, Corporal Maxine Reise and mental health clinician Janna McCargo testified that Simms complained to them over the last several years about Masi's overtures to her. In addition, McCargo testified that she

---

[5] In this time frame, Simms began writing notes of significant events, a copy of which is attached as Ex. 2. (Ex. 1 at 18; Ex. 18 at 8.)

the problems she was experiencing with Masi's job performance, Reid did not indicate he was experiencing similar difficulties. (Ex. 12 at 14.) Furthermore, although Masi testified that he worked the mental health post on January 14th and 15th, there is no evidence that anyone complained about his job performance for those days. If Masi had in fact been motivated by a desire to get back at Simms for her complaint, one would expect that he would have taken more widespread action.

Third, the evidence reflects that there may be other reasons for Masi's delay in calling up Coakley's inmates. Coakley herself testified that before she learned of Simms' complaint, she thought that Masi was "personally out to get [her]" because she reported that he was asleep on the post on January 16th. (Ex. 12 at 14.) In view of the fact that Coakley appears to be the only technician who experienced serious difficulties with Masi's job performance, it is at least as likely that it was Coakley's report rather than Simms' complaint that triggered Masi's response.

Finally, this investigator cannot discount Masi's explanation that the delays in calling up inmates were attributable, at least in part, to the strained circumstances at the Jail arising from its lockdown status during the first three weeks in January. (Ex. 3 at 20.) In this regard, this investigator notes that on at least two of the days in question, Masi eventually called up Coakley's inmates. Masi testified that the inmates were not brought up earlier because there were no available escort officers. Masi said that he could not leave his post to escort the inmates because other inmates were present on the 3rd floor. (Id. at 22-23.) Although Coakley disputed Masi's contention that inmates were present, Masi testified that Coakley might not have been aware of inmates who were meeting in rooms with counselors. Under these circumstances, and for the reasons listed above, this investigator recommends that a finding of no probable cause be entered on Simms' retaliation claim.

## VIII. Recommendation

Based on the foregoing reasons, it is recommended that a probable cause finding be made that Harcourt Masi sexually harassed La Verna Simms, Karen Harrison, Teresa Nwankwo, Gloria Robertson, Cynthia Kittrell and Coryne Farmer by creating a hostile work environment. It is further recommended that a finding of no probable cause be made on the claim that Masi retaliated against Simms for reporting his sexual misconduct.