**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

LAVERNA SIMMS,                          )
                                        )
     Plaintiff,                      )
                                        )
     v.                              )     **Civil Action No. 06-2178 (RCL)**
                                        )
CENTER FOR CORRECTIONAL                 )
HEALTH AND POLICY STUDIES,              )
                                        )
     Defendant.                      )
---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Dr. LaVerna Simms, an African American woman, is suing her employer, the Center for Correctional Health and Policy Studies ("CCHPS"), under Title VII of the Civil Rights Act of 1964 for creating a hostile and severe work environment by allowing a non-CCHPS employee to sexually harass her. Following an internal investigation into Simms' allegations, the Office of the Special Inspector found probable cause for sexual harassment and recommended the termination of the non-employee who had allegedly caused the issues. CCHPS argues that the fact that Simms allowed more than five years to pass before filing her charge proves that her work environment wasn't hostile and severe for Title VII purposes. The case now comes before the Court on CCHPS's Motion for Summary Judgment. Having reviewed the motion, the opposition, the reply, and the applicable law at length, the Court denies the motion for the reasons that follow.

## II.    BACKGROUND

### A.    Factual History

#### 1.    Organization of CCHPS

A court-ordered receiver was tasked to provide mental health services for the District of Columbia Department of Corrections ("DOC").  Def.'s Mot. Summ. J. 1, Mar. 3, 2011, ECF NO. 101 ("Def.'s Mot.").  When the court-ordered receivership ended in 1999, two separate groups of employees began the process of bidding to win the contract to continue to provide such services at the DOC.  Def.'s Reply Mem. Summ. J. 2, Apr. 19, 2011, ECF No. 108 ("Def.'s Reply").  The two groups eventually merged to improve their chances of winning.  Def.'s Reply 3; Simms Dep. 23:9–29:2, Apr. 19, 2011, ECF No. 108-1.  On July 29, 1999, three incorporators signed the Articles of Incorporation in the presence of a District of Columbia Notary Public, thus establishing CCHPS as a non-profit corporation.  Simms Dep. 25:18–20.  When CCHPS was established, members of the two merged groups were considered board members, incorporators, or alternatively, owner/operators of the organization.  *Id.* at 23:9–29:2.

#### 2.    Simms' Employment History

In 1997, the DOC receiver hired Simms as an intake coordinator to provide medical services to DOC inmates.  Def.'s Mot. 1.  Throughout Simms' DOC employment, she worked on the third floor of the medical unit, conducting inmate evaluations either in her office or in the infirmary.  Simms Dep. 80:1–20, 21:5–22:11.  In 2001, the Health Administrator appointed her as acting Mental Health Director of CCHPS, a position she retained until she left CCHPS in 2006.  *Id.* at 37:7–38:6.  As Mental Health Director, Simms' duties included, among other things, directly supervising six employees and ensuring that the DOC's services were completed in a timely fashion.  *Id.* at 37:7–38:6.  In 2003, Simms became executive secretary of the CCHPS

board, holding either that position or that of treasurer until 2006, when other board members asked her to resign. *Id.* at 30:1–19, 128:2–11. As treasurer, Simms recorded which individuals received raises and thus knew that others received raises or bonuses at the same time that her request for a raise was denied. *Id.* at 129:14–130:9.

### 3. Harassment of Simms

Shortly after Simms started work at the DOC in 1997, a DOC correctional officer named Harcourt Masi—who didn't work on the third floor—went out of his way to introduce himself to her and ask her out on a date. *Id.* at 38:14–39:7. When Simms refused his offer, Masi lingered outside of her office door, stared at her while she worked, and commented on her appearance— telling her that she "looked good." Def.'s Mot. 2–3. CCHPS admits that Masi repeatedly asked Simms out on dates and commented about her body and "shape" on a daily basis from 1998 to April 2000. Def.'s Reply 2. Although Simms flatly refused Masi's requests, he persisted in asking her out, causing her to become quite short in her responses to him. Tr. of Simms Interview, Ex. B to Reply Opp'n Mot. re Mot Summ. J. 6:8–14, Apr. 19, 2011, ECF No. 108-2 ("Simms Interview").

In April 1999, Masi was reassigned to work in "the Bubble," a glass enclosure linking the elevator to the entrance and exit on the third floor. Tr. of Hunter Interview 4:41–5:3, Ex. 6 to Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-6 ("Hunter Tr."); Lerner Letter, Ex. E to Reply Opp'n Mot. re Mot. Summ. J., Apr. 19, 2011, ECF No. 108-2 ("Lerner Letter"). As operator of the Bubble, Masi completely controlled who entered and exited the third floor and the housing units. Simms Dep. 121:10–15. Masi developed a routine for harassing the women on the third floor: he commented on their appearance, told them he "liked their style," and asked whether they worked out. Def.'s Mot. 2–3. Masi also specifically asked Simms to "open your

lab coat, [to] let me see your body," whenever she tried to pass through the Bubble. Simms Tr. 44:8–15. When Simms refused to take Masi's bait and ignored him, he delayed her entrance to and exit from the third floor, while leaning back and staring at her until she acknowledged his presence. Tr. of Proceedings by Office of Employee Appeals 44:8–17, Ex. 1 to Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-1 ("Simms Tr."). Coryne Farmer, a CCHPS employee, described Masi's behavior, painting a picture of a man who, for appearances' sake, adopted a nonchalant pose, "lean[ing] back in his chair with his hands folded behind his head . . . appear[ing] to look off into space," when in reality his attention centered on the female in front of him. Tr. of Farmer Interview 6:12–7:8, Ex. 7 Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-7 ("Farmer Tr.").

CCHPS maintains that much of Masi's misconduct occurred at social events outside of the office. Def.'s Mot. 7–8. Simms, however, strenuously denies this and asserts that she generally only saw Masi at social events sponsored by CCHPS, such as going-away parties. Pl.'s Simms Opp'n Def.'s CCHPS Mot. Summ. J. 15, Apr. 5, 2011, ECF No. 105 ("Pl.'s Opp'n"); Simms Interview 8. At the 2002 Christmas party, for example, Masi stared at Simms while she worked at the ticket table even though she asked him to leave her alone. Simms Tr. 5–22. And while at work, Masi's behavior only escalated: he continually made inappropriate comments to Simms about her appearance, laughing off any warning that Simms would report his harassment. Simms Interview 8:29–37, 9:6–39.

Eventually, Masi's conduct turned physical. In December 2003, apparently frustrated that Simms had continually thwarted his attempts to get her attention, Masi confronted Simms in the narrow hallway. *Id.* at 12:19–27. As Simms walked toward the bathroom, Masi stood up from his chair and blocked her passageway, grabbed her arm, and according to Simms, "sexually

fondled her".[1]  *Id.*; Simms Tr. 117:7–11, 125:15–22.  Shortly after this incident, Masi again accosted Simms in the hallway—this time telling her to "come here" as he pulled her towards him, invading her "personal space."  Simms Tr. 123:20–124:9.

Simms states that she felt "emotionally drained" by Masi's conduct and feared going into the housing units because she relied on Masi for her safety.  Simms Dep. 121:4–15.  She explains that she felt "powerless," and victimized, and "stalked" by Masi.  Simms Tr. 56:15–21; Simms Dep. 121:4–14.  Dr. Andrew Gordon, Simms' family physician, listened to her complaints numerous times over the course of four years and prescribed medication to quell the anxiety that stemmed from her work environment.  *Id.* at 124:16–126:17.  Simms discussed her situation not only with Dr. Gordon, but also with her psychiatrist and peers.  *Id.* at 122:2–126:18.

### 4.  The *Bessye Neal* Litigation

Masi's harassment of Simms was not the first incident of inappropriate workplace conduct at the DOC.  When Simms joined the DOC, she was unaware of the 1995 *Bessye Neal* litigation, in which a group of female DOC officers filed a class action suit against the DOC.  *Neal v. D.C. Dep't of Corrs.*, 1995 U.S. Dist. LEXIS 11515, at *2 (D.D.C. Aug. 9, 1995); Simms Dep. 42:9–16.  The *Bessye Neal* jury found that the class members had unduly suffered from quid pro quo sexual harassment, a hostile work environment, and retaliation in the workplace.  *Neal*, 1995 U.S. Dist. LEXIS 11515, at *2.  As a result of this litigation, the plaintiffs were promoted and received backpay awards, and the court required the DOC to establish a formal structure for filing reports of sexual harassment at the jail.  *Id.* at *86–88; Simms Dep. 55:13–21, 68:10–17.

---

[1] The parties disagree as to what constituted the physical touch between Masi and Simms.  Simms contends that Masi "sexually fondled" her, whereas CCHPS admits that Masi "fondled" and "grabbed" Simms' arm on two occasions but objects to her characterization of the arm-grab as a "sexual fondle."  Def.'s Reply 3.

In response to the *Bessye Neal* litigation, the DOC developed a fifteen-page Program Statement that detailed, among other things, a description of sexual harassment that applied to "employees, contract employees and volunteers under the direction or control of the DC DOC." Program Statement 140, Ex. C to Reply Opp'n Mot. re. Mot. Summ. J., Apr. 19, 2011, ECF No. 108-2 ("Program Statement"). The *Bessye Neal* Consent Decree also created the Office of the Special Inspector ("OSI"), tasked it with investigating harassment claims, and established a specific reporting and investigative structure for filing sexual harassment claims. Def.'s Mot. 2. In addition to creating the OSI, the Consent Decree designated a female employee as the "ombudsperson" to act as a liaison between female employees and the special inspector. *See Neal*, 1995 U.S. Dist. LEXIS 11515, at *59–65. The Consent Decree also mandated the distribution of fliers with contact information and descriptions of sexual harassment throughout the jail. Simms Dep. 81:14–19. Here, however, CCHPS admits that DOC failed to effectively implement *Bessye Neal*'s training procedures, including the complaint procedure. CCHPS Reply Mem. Mot. Summ. J. 4, Apr. 19, 2011, ECF No. 108 ("Def.'s Reply Mot.").

### 5. CCHPS's Response to the Harassment

CCHPS, lacking its own sexual harassment policy, chose to follow DOC sexual harassment reporting procedures. Def.'s Reply 2. Just as the District of Columbia apparently failed to implement policies consistent with *Bessye Neal*, CCHPS also never educated its employees about a formal complaint procedure. *Id.* at 4. For example, fliers with contact information and descriptions of sexual harassment never appeared during the period relevant to this case. Simms Dep. 81:14–19. As a result of these failings, Simms only knew that CCHPS employees were expected to direct complaints of sexual harassment to the Health

Administrator.[2]  Sinclair Dep. 45:2–21, Apr. 5, 2011, ECF No. 105-5.  Indeed, Simms learned of

the *Bessye Neal* litigation "well after" CCHPS received the DOC contract in 2000.  Simms Dep.

42:17–19.  In addition, Simms was unaware of any formalized sexual harassment reporting

structure during her tenure as the executive secretary or treasurer of the board.  *Id.* at 68:19–

69:16.  Simms, who had previously complained to a non-supervisory co-worker, first told the

Health Administrator, Estelle Hunter, about Masi's conduct in 1999.[3]  Def.'s Reply 3.  Although

Hunter assured Simms that she would "take care of" Simms' issue with Masi, Hunter's

remonstration wasn't much help—Masi's behavior began anew shortly after Simms turned to

Hunter.  *Id.*  This is unsurprising: Hunter admitted that most men had "joke[d]" about Simms

because Simms was "attractive," and she therefore refused to give much credence to Simms'

complaints.  Hunter Tr. 7:7–13.  Instead, Hunter made excuses for Masi and insinuated that there

was nothing she could do because Masi was romantically involved with the DOC warden.[4]

Simms Dep. 57:8–11.  Unfortunately for Simms, Masi continually dated women who held

positions of power—including DOC warden Patricia Britton and CCHPS office manager Sharon

Dorsey—throughout the period during which he harassed Simms.  *Id.* at 56:5; Simms Interview

8:29–37.  Simms turned again to Hunter at CCHPS's 2002 Christmas party, complaining about

Masi's behavior; once again, however, Hunter's remonstration was entirely ineffective.  Def.'s

Reply 4–5.  Although Hunter assured Simms that she would not experience "more problems"

---

[2] The parties dispute whether Estelle Hunter, as Health Administrator, was required to report issues of sexual harassment to the DOC.  Notably, however, CCHPS board member Gwendolyn Sinclair—though she was not the Health Administrator—believed that the Health Administrator was required to report such issues to the DOC. Def.'s Reply 2.

[3] Hunter began working as Health Administrator under the DOC receiver in 1996 and remained in that position after CCHPS's establishment in 1999.  Simms Dep. 38:5–39:29, 46:14.  Hunter's duties as Health Administrator included the authority to terminate and hire employees, discipline employees, and act as a liaison between CCHPS and the DOC. Sinclair Dep. 44:3–21.  Additionally, the various heads of each department within CCHPS (e.g., nursing, mental health, radiology, and pharmacy) reported to Hunter on a monthly basis.  Simms Dep. 33:14–21.

[4] Hunter resigned in 2004 amidst allegations of poor job performance.  Pl.'s Opp'n 13.  Gwendolyn Sinclair, another CCHPS supervisor, explained that Hunter's resignation resulted from—among other things—her failure to generate financial reports in a timely fashion on numerous occasions.  Sinclair Dep. 42:20–21.

with Masi, Hunter had to speak to Masi on at least one other occasion following the Christmas party because he would not stop harassing Simms. Simms Dep. 64:14–21. In short, Hunter did not follow CCHPS's complaint procedure, and the record is silent as to any formal attempt to investigate Simms' allegations. Def.'s Reply 4.

Failing to receive an effective response from Hunter, Simms turned to another supervisor, Gwendolyn Sinclair, for aid. Simms Dep. 54:11–20. Teresa Nwankwo, a pharmacist at CCHPS, also complained to Sinclair about Masi's conduct, as operator of the Bubble. Sinclair Dep. 54:1–13. Sinclair spoke to Masi and told Hunter that she had done so. *Id.* Sinclair does not know whether Hunter pursued the matter further because Masi stopped harassing Nwanko immediately after Sinclair reprimanded him. *Id.* at 58:15–59:1. Although Sinclair's reprimand stopped Masi's harassment of Nwankwo, Masi's harassment of Simms continued unabated. Simms Dep. 54:18–21.

Eventually, Simms turned to deputy warden Dennis Harrison for help. Simms Interview 14. After the first arm-grab incident, Simms went to Harrison's office to file a formal complaint against Masi. Simms Dep. 66:1–9. Harrison, however, asked for time to speak with Masi before Simms filed a complaint. *Id.* at 65:1–14. But little appears to have been accomplished by this decision. Although Harrison spoke to Masi, Masi accosted Simms in the hallway again not long after the first incident. *Id.* at 66:17–19. Simms immediately complained to Harrison after the second physical incident with Masi, and Harrison reassured her via voicemail that he had taken "care of the problem." Simms Interview 14:4–13. Nothing in the record, however, reflects that Harrison initiated a formal investigation after Simms complained to him.

Throughout this period, Simms was reluctant to file a formal complaint, unaware of the procedures that should have been in place after *Bessye Neal*. *See* Def.'s Reply Mot. 4. Fearful

of losing her job or experiencing retaliation in the workplace, Simms proceeded no further, only asking that Masi receive counseling. Simms Dep. 56:3–7, 78:4–20, 59:18–60:6. Instead of relying on procedures that should have been in place, Simms tried to take matters into her own hands: she donned her lab coat and sunglasses every time she left her office to avoid Masi's "stare-downs," which she likened to being undressed. Simms Tr. 58:3–20, 44:8–17. She also rearranged her work schedule to pass through the Bubble with co-workers because she had noticed that Masi's behavior was not as pronounced when she traveled in a group. Tr. of McCargo Interview 6:1–43, 4:25–44, 5:2–9, Ex. 6 to Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-6 ("McCargo Tr."). When Masi called Simms' office telephone line to discuss matters that did not pertain to work, Simms screened every telephone call, calling a female correctional officer instead to determine if she was truly needed. *Id.* at 7:45–8:25; *see also id.* at 7:45–8:25, 4:25–44, 5:2–9 (testimony of co-workers confirming Simms' practice of screening calls). Fellow employees also noticed that Masi looked Simms up and down, clearly "checking her out" whenever she passed. *Id.* at 5:2–9. And another DOC employee, Corporal Maxine Reise, witnessed Simms running away from Masi on at least two occasions. Tr. of Reise Interview 12:6–31, Ex. 6 Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-6 ("Reise Tr.").

Ultimately, Simms efforts were unsuccessful and Masi's harassment continued unabated. Although various employees knew of and witnessed Masi's harassment of Simms in the workplace, the record does not reflect that any supervisor took formal action against Masi. Def.'s Reply 4. When Simms told Masi that she would report his conduct, Masi did not take her threat seriously, asking "who are you going to tell?" Simms Dep. 56:19–21. Indeed, CCHPS admits that the DOC did absolutely nothing to curb Masi's behavior. Def.'s Mot. 3.

### 6.     The Investigation

One day, almost as a matter of chance, Simms mentioned to Lieutenant McCormick that she had experienced several issues with an unnamed correctional officer.  Simms Interview 14:12–18.  McCormick immediately informed her that because she had spoken to him, he had to report her complaint, regardless of whether she wanted to file a formal complaint.  *Id.* at 14:19–31.  McCormick arranged for Simms to meet with the Special Inspector, a position created by the *Bessye Neal* Consent Decree to handle allegations of sexual harassment within the DOC.  *Id.* at 15:16–22.

The Special Inspector, Carolyn Lerner, immediately appointed Janet Goldstein to investigate Simms' allegations.  *Id.* at 15:1–15.  Lerner's investigation revealed that Masi had harassed five other women on the third floor.  Lerner Letter 1.  Dr. Karen Harrison revealed that Masi asked her out every time he saw her and delayed her entrance to and exit from the Bubble, waiting until she acknowledged him.  Tr. of Harrison Interview 7:9–11, 8:5–21, 10:1–8, Ex. 7 Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-7 ("Harrison Tr.").  Masi then went further, placing his arm around Dr. Harrison's shoulder or on the small of her back every time he saw her.  *Id.* at 10:13-19.  Staff nurse Gloria Robertson repeatedly denied Masi's offers for dates and ignored his requests to see her body under her lab coat.  Tr. of Roberston Interview 5:1–23, Ex. 7 Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-7 ("Robertson Tr.").  One day in 2001 or 2002, Masi approached Robertson from behind while she sat at the nurse's station and placed his hands on her shoulders.  *Id.* at 6:26–30.  Masi also delayed opening the Bubble doors for dental assistant Cynthia Kittrell unless she acknowledged him or answered a question that was not work-related.  Tr. of Kittrell Interview 5:10–15, Ex. 7 Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-7 ("Kittrell Tr.").  While Masi never touched

Kittrell, he constantly offered her financial assistance and asked her out on dates, both of which she refused. *Id.* at 6:2–7:35. Masi's behavior in the Bubble also frustrated CCHPS secretary Coryne Farmer, causing her to file a complaint with her supervisor. Tr. of Farmer Interview 3:39–4:14, Ex. 7 Mem. Opp'n re 101 Mot. Summ. J., ECF No. 105-7 ("Farmer Tr."). Farmer explained that Masi's treatment made her "angry" because she "didn't feel like playing" games with him every time she needed to enter or exit the Bubble. *Id.* at 7:10–14. Relying on the investigation report, Lerner ultimately recommended "a probable cause finding of sexual harassment" against Masi. Lerner Letter 3.

Masi's behavior did not change after OSI's formal investigation began, causing Simms to complain to Lerner again and resulting in the issuance of a "stay-away" order. Simms Dep. 83:13–84:19. After filing her official complaint, Simms learned that Masi's inappropriate conduct predated CCHPS's contract and continued without repercussion for years. *Id.* at 108:4–21. Simms explains that the fact that the DOC allowed Masi's conduct to proceed unchecked for years was "traumatic." *Id.* at 109:5–17. Having learned of Masi's repeated conduct and unchecked harassment, Simms filed a complaint with the EEOC.

### B. Procedural History

On August 24, 2005, Simms filed her EEOC Charge Information Form in the Washington, D.C. office. Charge Information Form EEOC, Ex. 13 to Mem. Opp'n re 101 Mot. Summ. J., Apr. 5, 2011, ECF No. 105-13 ("Charge Form"). Simms' filing lists seven parties as respondents, including CCHPS. *See* Charge Form. After filing her EEOC Charge of Discrimination, Simms received a Right to Sue notice regarding her claim against the DOC and the District of Columbia.[5] Regarding her other claims, however, Simms received several EEOC

---

[5] On May 17, 2007, Simms received a Right to Sue Notice regarding her claim against the D.C. DOC. *See* Notice of Right to Sue, Exhibit 2 to Def.'s Reply, April 19, 2011, ECF No. 108-2 (incorporated as Exhibit D).

notices explaining that the D.C. office was backlogged and would send her complaint to another office.  Simms Dep. 142:9–13.

On December 21, 2006, Simms filed her first complaint against the District of Columbia, the Director of the DOC, and CCHPS, alleging that she had unduly suffered from sexual harassment in the workplace.  Compl. 2, Dec. 21, 2006, ECF No. 1.  Simms' complaint sets forth five causes of actions: 1) violations of the Eighth Amendment and 42 U.S.C. §1983; 2) violations of the Fifth Amendment; 3) sexual harassment violations; 4) intentional infliction of emotional distress; and 5) negligent supervision and retention.  *Id.* at 12–14.  The government defendants soon joined the action, but CCHPS did not respond to the complaint.  The Court subsequently entered a default judgment against CCHPS.  Default Entry 1, May 18, 2007, ECF No. 10.

Several months after Simms filed her first amended complaint, the District of Columbia and the DOC moved to dismiss or for summary judgment.  Mot. Dismiss, June 4, 2007, ECF No. 14.  On July 24, 2007, Simms asked for leave to file a second amended complaint in which she alleged violations of constitutional rights and added two common law claims against both the government defendants and CCHPS.  Mot. Second Am. Compl., July 24, 2007, ECF No. 29.  Simms also added a Title VII claim against the government defendants.  *See id.*  On April 17, 2008, CCHPS moved to set aside the entry of default and submitted a verified answer to Simms' second amended complaint.  Mot. Default, Apr. 17, 2008, ECF No. 38.  The next day, the government defendants renewed their motion for summary judgment as well as their motion to dismiss.  Mot. Dismiss or Mot. Summ. J., Apr. 18, 2008, ECF No. 39.

On November 26, 2008, this Court granted the District of Columbia and DOC's motion to dismiss with respect to all claims.  Mem. Op. 8, Nov. 26, 2008, ECF No. 51.  The Court

---

Simms' other claims against six other respondents were never addressed by the EEOC.  Simms Dep. 142:9–13.
However, Simms' August 24, 2005 EEOC filing names CCHPS as a respondent in her lawsuit.  *See* Charge Form.

dismissed these claims because Simms, as an employee of CCHPS and not the DOC, did not fit the definition of an "employee" under Title VII. *Id.* The Court dismissed the Eighth Amendment claim because the Eighth Amendment does not extend to workplace sexual discrimination claims. *Id.* at 8. Simms' Fifth Amendment claim failed because municipalities are not required to provide a minimum level of security and safety in the workplace. *Id.* at 9. Finally, the Court dismissed the common law claims on jurisdictional grounds, declining to address those claims because the other claims had been dismissed under federal law. *Id.*

On September 28, 2009, CCHPS filed a motion to dismiss Simms' second amended complaint, or in the alternative, a motion for summary judgment. CCHPS argued that: 1) Simms failed to state constitutional or federal statutory violations and 2) the common law claims must be dismissed because CCHPS did not employ Masi and because Simms failed to state a claim for intentional infliction of emotional distress. Def.'s Mot. Dismiss Pl's. Second Am. Compl., or Summ. J., Sep. 28, 2009, ECF No. 61. On November 11, 2009, before the Court ruled on CCHPS's motion, Simms filed a motion to amend her complaint to add a Title VII claim against CCHPS for the first time. Third Am. Compl. 1, Nov. 11, 2009, ECF No. 75 ("Third Am. Compl."). In granting Simms' motion to amend her complaint, the Court denied CCHPS's motion to dismiss and motion for summary judgment. Mem. Op. 2, Jan. 8, 2010, ECF No. 72.

On January 19, 2010, CCHPS renewed its motion to dismiss or motion for summary judgment as to the third amended complaint. Def.'s Mot. Dismiss Pl's. Third Am. Compl., or Mot. Summ. J. 1, Jan. 19, 2010, ECF No. 74. CCHPS reiterated its original arguments, asserting that: 1) Simms did not state constitutional or federal statutory violations; 2) Simms failed to exhaust administrative remedies; and 3) Simms' common law claims must be dismissed. *Id.* at 8–13. This Court granted CCHPS's motion to dismiss regarding Simms' Fifth and Eighth

Amendment, § 1983, and common law claims for many of the same reasons that the Court

dismissed those claims against the government defendants. Mem. Op. 1, Mar. 30, 2010, ECF

No. 82. The Court denied, however, CCHPS's motion for summary judgment with regard to

Simms' Title VII claim. *See id.*

On March 11, 2011, CCHPS filed a new motion for summary judgment. Def.'s Mot. 1.[6]

In that motion, CCHPS argues that it is not liable for Masi's conduct because it was not an

established corporation; that Simms is time-barred from bringing her claim; and that she failed to

exhaust her administrative remedies. *Id.* at 6–11. Simms argues in response that CCHPS was

established in 1999; that her claim isn't time-barred; and that she has exhausted her

administrative remedies. Pl.'s Opp'n 19–36. Having fully reviewed the record and the parties'

evidence,[7] the Court now turns to the merits of defendant's motion.

---

[6] After the Court denied CCHPS's motion to dismiss in its entirety, discovery in this matter proceeded. Memorandum & Order 13, Jan. 19, 2011, ECF No. 98 (setting discovery end-dates). Defendant, however, never filed an answer to the third amended complaint after its motion was denied, as required under Fed. R. Civ. P. 12(a)(1). Instead, several months later CCHPS moved to amend its answer to the second amended complaint, Motion to Amend/Correct Answer, Apr. 25, 2011, ECF No. 111, while plaintiff moved for entry of default for failure to answer. Motion for Entry of Order of Default, May 18, 2011, ECF No. 116. The record in this case establishes that the substantive allegations changed little between the second and third amended complaints, the grounds upon which CCHPS have defended this action have remained unchanged since initially appearing, and discovery in this matter proceeded and completed without any objection from plaintiff as to the absence of a formally-filed Answer by defendant. Under these circumstances, the Court concludes that plaintiff was not prejudiced by either the absence of a revised Answer nor defendant's late request to file such revisions, and will therefore grant defendants motion to amend its Answer while denying plaintiff's motion for entry of default. *Hunter v. U.S. Bank Nat'l Ass'n*, 698 F. Supp. 2d 94, 101 (D.D.C. 2010).

[7] In addition to the parties standard briefs, plaintiff subsequently attempted to file a surreply on the ground that defendant CCHPS's reply "added new claims, defenses, alleged facts and/or argument . . . it had not raised and/or put forward in its original motion. Motion for Leave to File a Surreply 1, May 1, 2011, ECF No. 112. Plaintiff, however, does not attempt to point the Court to *any* specific material in CCHPS's reply that goes beyond the parties dispute as framed by the motion and plaintiff's opposition. Instead, throughout her proposed surreply, plaintiff simply points to evidence already in the record in attempt to establish factual disputes which require denial of defendant's motion for summary judgment. *See generally id.* at 7–25. The standard for granting a leave to file a surreply "is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001). This standard is plainly not met by plaintiff in this case, and her motion for leave to file will therefore be denied.

## III. LEGAL STANDARD

Summary judgment should be granted when the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a)–(c).  This standard requires more than the mere existence of *some* factual dispute between the parties; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law."  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Doe v. IRS*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009) (citing *Anderson*, 477 U.S. at 248).

In seeking summary judgment, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions [of the evidence in the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once this burden has been met, the non-moving party must "go beyond the pleadings and by [her] own affidavits, or by [the evidence in the record] designate specific facts showing that there is a genuine issue for trial."  *Id*. at 324 (quotations omitted).  In doing so, the non-moving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial."  *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009); *see also Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 845 (D.C. Cir. 2001) (holding that

plaintiff must have more than "a scintilla of evidence to support [her] claims").  In other words, the non-moving party is required to point to evidence that would permit a reasonable jury to find in her favor.  *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  At the same time, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Anderson*, 477 U.S. at 255.

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's… sex." 42 U.S.C. § 2000e-2(a)(1) (2006).  Discrimination "because of…sex" also extends to sexual harassment cases, in which there are two kinds of actionable sexual harassment: quid pro quo sexual harassment and hostile work environment claims.  *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 65–66 (1986).  As is relevant here, a Title VII claim for a hostile work environment "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

## IV.  ANALYSIS

### A.  Simms Exhausted Administrative Remedies When She Filed Her Charge of Discrimination with the EEOC on August 24, 2005

CCHPS asserts that Simms' failure to procure a right to sue letter or a charge number regarding her claim precludes her from bringing that claim.  A party suing under Title VII must exhaust all administrative remedies prior to bringing a claim to court.  *Washington v. Washington Metro Area Transit Auth.*, 160 F.3d 750, 752 (D.C. Cir. 1998).  The process begins when the charging party files a formal complaint with the EEOC.  *Bowie v. Ashcroft*, 283 F. Supp. 2d 25, 33 (D.D.C. 2003).  Filing a charge of discrimination with the EEOC places the employer on notice, allowing the employer to initiate an investigation and attempt conciliation between the

charging party and the respondent without resorting to judicial intervention. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). After a party has submitted a complaint to the EEOC, the party is free to amend it "to include issues or claims like or related to those raised in the complaint" at any time prior to the conclusion of the investigation. 29 C.F.R. §1614.106(d) (2011); *see also Park*, 71 F.3d at 907. In general, the EEOC is responsible for either dismissing the complaint or issuing a right to sue letter within the allotted time frame of 180 days; if the EEOC fails to complete either of those procedures, the charging parties may bring a civil action. 42 U.S.C. § 2000(e)–5(f)(1) (2006); *see also Robinson Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 12 (D.D.C. 2008) (holding that a Title VII claimant was allowed to challenge an agency's computation of a back-pay award when the EEOC failed to act on the claimant's petition for enforcement within 180 days).

Simms invoked her administrative remedies when she filed her August 24, 2005 Charge of Discrimination against CCHPS with the EEOC. *See* Charge Form. Her EEOC Charge of Discrimination lists CCHPS among the seven defendants, specifically indicates that she suffered from sexual harassment, and includes a Title VII charge. *Id.* Simms is not raising any claims in this case that are absent from her August 24, 2005 charge form. Thus, that form was sufficient to put the EEOC on notice of all of her claims. *Id.* And though Simms did not receive a right to sue letter or a charge number from the EEOC regarding her claim against CCHPS, she received notices telling her that the D.C. office was backlogged and that they were sending her complaint to another office. Simms Dep. 142:9–13. Based on this record, the Court finds that Simms is not barred from bringing her case for failure to exhaust administrative remedies.

### B. Simms' Claim is Not Time-Barred

CCHPS next argues that Simms' claim is time-barred because she had only 180 days from the triggering event to file her complaint. The Court is not persuaded by this argument. A charge is considered filed the day the charging party actually submits the charge of discrimination to the EEOC. *Equal Emp't Opportunity Comm'n v. Commercial Office Prods. Co.*, 486 U.S. 107, 112–122 (1988); *see also Banks v. District of Columbia*, 377 F. Supp. 2d 85, 91 (D.D.C. 2005); 29 C.F.R. § 1601.13(a)(4)(ii)(A) (2011). When a charging party files a charge of discrimination in the District of Columbia, that claim is automatically cross-filed with the D.C. Office of Human Rights (DCOHR) pursuant to a worksharing agreement between the DCOHR and the EEOC. *Carter v. George Washington Univ.*, 387 F.3d 872, 879 (D.C. Cir. 2004); 29 C.F.R. §1601.13(a)(4)(ii)(A) (2011). The result of this worksharing agreement is that a claimant has 300 days—not 180 days—from the alleged incident to file a charge of discrimination with the EEOC. *Carter*, 387 F.3d at 879. When calculating the limitations period, the clock starts running when the charging party "develops a reasonable suspicion of the alleged harm." *Johnson v. Holder*, 598 F. Supp. 2d 50, 55 (D.D.C. 2009). Since Simms alleges a hostile work environment claim, however, she "only needed to plead one timely incident of discrimination to be a part of a hostile work environment claim." *Major v. Plumbers Local Union No. 5*, 370 F. Supp. 2d 118, 124–127 (D.D.C. 2005).

Simms filed her complaint on August 24, 2005; thus, to determine whether her complaint is timely, the Court must determine whether one incident of discrimination occurred within the 300 days prior to her filing. Simms alleges that the arm-grab incidents happened on two different occasions in December 2004. Simms Tr. 125:15–22. Even assuming that the last incident occurred on December 1, 2004, Simms had 300 days from that date to file a timely

charge with the EEOC— that is, September 27, 2005.  Because Simms filed her Charge of

Discrimination with the EEOC on August 24, 2005, she may pursue her claim.

### C.      CCHPS Can be Held Liable for its Supervisors' Inaction

CCHPS asserts that it is not liable for Masi's conduct for three reasons.  First, CCHPS

argues that Simms' status as an owner/operator of CCHPS renders it immune to her allegations.

Second, CCHPS argues that it could not have had notice of Masi's behavior or Simms'

complaints because the organization itself wasn't established until 2001.  Def.'s Mot. 7.  Finally,

it argues that it cannot be held liable for Masi's conduct because Simms failed to formally report

Masi's conduct.  *Id.* at 6.   As explained below, each of these arguments fails.

### 1.      Simms' Status as an Owner/Operator Does Not Affect Her "Employee" Status

Title VII defines an employer as "a person engaged in an industry affecting commerce

who has fifteen or more employees for each working day."  42 U.S.C. § 2000e–(b).  CCHPS

satisfies the requirements of an employer because it employed approximately ninety employees

who worked at the DOC on a daily basis.  Simms Dep. 81:5.  An employee under Title VII is

defined as "an individual employed by an employer." 42 U.S.C. § 2000e–(f).  Therefore, an

individual's status as an employee is of crucial importance in determining whether she can

receive protection under Title VII.

To determine whether an individual meets the requirements of an employee under Title

VII, courts utilize the eleven-factor test promulgated in *Spirides v.  Reinhardt*, 613 F.2d 826

(D.C. 1979).  The eleven factors are: 1) the kind of occupation, with reference to whether the

work usually is done under the direction of a supervisor or is done by a specialist without

supervision; 2) the skill required in the particular occupation; 3) whether the employer or the

individual in question furnishes the equipment used and the place of work; 4) the length of time

during which the individual has worked; 5) the method of payment, whether by time or by the job; 6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; 7) whether annual leave is afforded; 8) whether the work is an integral part of the business of the employer; 9) whether the worker accumulates retirement benefits; 10) whether the employer pays social security taxes; and 11) the intention of the parties. *Id.* at 832.

On balance, the evidence shows that Simms was an employee of CCHPS.  First, while Simms was a specialized employee who supervised the work of other employees, she still reported to the Health Administrator.  Second, CCHPS provided Simms with an office.  Third, Simms could be terminated at the discretion of the Health Administrator and must report all of her department's activities to the Health Administrator.  Fourth, Simms worked as an employee for longer than five years.  Finally, Simms' position as Mental Health Director—which she held until 2006—was integral to the running of CCHPS, which immediately sought to fill the vacancy when the position opened in 2001.  As CCHPS hasn't proffered any evidence to the contrary, the weight of the evidence on the record reveals that Simms was an employee of CCHPS and did not operate independently within the organization.

Simms' status as co-owner/operator or incorporator of CCCHPS does not affect her employee status.  The Supreme Court addressed the issue of whether an owner/operator qualifies as an employee under Title VII in *Clackamas Gastroenterology Assocs., P.C. v. Wells*,  538 U.S. 440 (2003).  In *Clackamas*, the Supreme Court endorsed the EEOC's six-factor test, which assesses whether a "share-holder director" is an employee or an employer for the purposes of several statutes, including Title VII.  *Id.*  The six factors that determine an individual's status as an employee are: 1) whether the organization can hire or fire the individual or set the rules and

regulations of the individual's work; 2) whether and, if so, to what extent the organization supervises the individual's work; 3) whether the individual reports to someone higher in the organization; 4) whether and, if so, to what extent the individual is able to influence the organization; 5) whether the parties intended that the individual be an employee as expressed in written agreements or contracts; and 6) whether the individual shares in the profits, losses and liabilities of the organization. *Id.* (citing Equal Emp. Oppt'y Comm'n Compliance Manual § 605:0009 (2000)). The Supreme Court also explained that a person's title—e.g., partner, director, or vice-president—does not indicate an individual's status as an employee or a proprietor. *Clackamas*, 538 U.S. at 450.

Applying the six-factor test to this case reveals that Simms was an employee of CCHPS. As an initial matter, Hunter could fire her even though they were fellow board members and Simms periodically held executive board positions. Simms Dep. 30:1–19, 128:2–11. Moreover, the record reflects that Simms, in her capacity as Mental Health Director, reported to the Health Administrator regarding the status of her department. *Id.* at 33:14–21. The Health Administrator evaluated her work on a monthly basis and had the power to discipline her if necessary. Sinclair Dep. 44:3–21; Affidavit 5:19. The fact that the board denied Simms' bonus and that other board members asked her to resign shortly after she filed her formal complaint also demonstrates that she could not influence the board. Simms Dep. 129:14–130:9. Finally, when the receiver hired Simms as an intake coordinator in 1997, she was deemed an employee of the receiver. Simms Dep. 23:10–11. Although she received the additional title of "board member" when CCHPS was established, she remained an employee of CCHPS. *Id.* at 23:9–29:2. The record is silent as to whether Simms shared in the profits, liabilities, or losses of the organization. Thus, in the absence of evidence to the contrary, the weight of the evidence suggests that Simms did not

manage CCHPS or operate independently within CCHPS and was subject to its control.  She was therefore an employee of CCHPS.

### 2.     CCHPS was Established in 1999

CCHPS asserts that several of Simms' claims attempt to impose liability on CCHPS for a time period before it existed.  Def.'s Mot. 7.  Simms argues that CCHPS existed and that fellow supervisors were aware of her complaints from the time of its incorporation in 1999.  Pl.'s Opp'n 19.  While the parties dispute CCHPS's date of establishment, CCHPS was incorporated in July 1999.  *See* Simms Dep. 25:18–20.  Pursuant to D.C. Code §29–301.32 (2004), CCHPS's "corporate existence began" upon the issuance of the certificate of incorporation.  Furthermore, once a corporation is established, it can "incur liabilities" and "be sued."  D.C. Code § 29–301.05 (2004).  Thus, the Court finds that CCHPS can be held liable for any incidents that occurred after July 1999.

In addition, CCHPS admits knowledge of Masi's inappropriate conduct with women— dating back to 1997, when Simms began working as an intake coordinator under the receivership. Def.'s Mot. 5, 12.  Thus, CCHPS tacitly concedes that it was aware of Masi's behavior before and during its formal establishment in 1999.  CCHPS simply cannot assert that it should not be held liable for Masi's behavior when it had knowledge of his long history of poor conduct towards women, which predated CCHPS's establishment as a corporation.

### 3.     CCHPS Can Be Held Liable for Its Supervisors' Inaction in Preventing a Hostile Work Environment

CCHPS argues that it cannot be held liable for the actions of a non-employee when Simms failed to file a formal complaint for years or raise the issue with fellow board members. Def.'s Mot. 6–11.  CCHPS concedes however, that an employer can be held liable for a hostile work environment created by a non-employee.   Def.'s Mot. 7; *see Henson v. City of Dundee,*

682 F.2d 897 (11th Cir. 1992); *see also Martin v. Howard Univ.*, No. 99-1175, 1999 U.S. Dist. LEXIS 19516, at \*7 (D.D.C. Dec. 15, 1999).  To prevail on a claim of a hostile work environment created by a non-employee, a plaintiff must show that the employer knew or should have known of the existence of the hostile work environment and failed to take proper remedial action.  *Martin*, 1999 U.S. Dist. LEXIS 19516, at \*7–8.  This Circuit has held that an employee can demonstrate that an employer failed to take proper remedial action by demonstrating that the employee complained to higher management with no relief.  *Bundy v. Jackson*, 641 F.2d 934, 943 (D.C. Cir. 1981).  When determining whether an employer should be held liable for sexual harassment by a non-employee, "courts consider the extent of the employer's control over the harasser and any other legal responsibility which the employer may have with respect to the conduct of the non-employees."  *Id.* at \*8–9 (citing *Otis v. Wyse*, No. 93-2349-KHV, 1994 U.S. Dist. LEXIS 15172, at \*7 (D. Kan. Aug. 24, 1994)).  An employer may avoid liability by asserting one of two affirmative defenses: 1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, or 2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

A supervisor should not assess the reasonableness of an individual's complaint; rather, the supervisor should investigate that complaint.  Indeed, "an employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking; under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer."  *Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir. 2000); *see also Lipscomb v. Winter*, 577 F. Supp. 2d 258, 277 (D.D.C. 2008) (explaining that regardless of an employee's protests, an employer maintains a duty to investigate every claim of sexual harassment).  Like the plaintiff in

*Lipscomb*, Simms indicated that she did not want to file a formal complaint and only wanted Masi to receive counseling. Simms Dep. 78:4–20. However, Simms did complain about Masi's behavior to Hunter, her direct supervisor and liaison with the DOC, at least ten times between 1999 and 2000. *Id.* at 59:18–60:6. These complaints should have triggered a formal response from CCHPS. *Bundy*, 641 F.2d at 943. Instead, Hunter refused to take the complaints seriously. Hunter Tr. 7:7–13. When Simms realized that her complaints were falling on deaf ears, she sought help from another CCHPS supervisor, Gwendolyn Sinclair. Simms Dep. 54:11–20. Although Sinclair spoke to Masi about Simms, he continued harassing her. *Id.* Nothing in the record suggests that either Hunter or Sinclair ever took the time to formally investigate or report Simms' allegations.

Simms did not ignore CCHPS's policy on sexual harassment; she followed the only policy she knew, which involved contacting her direct supervisor. *Id.* at 57:4–11. Similar to the facts in *Bundy*, in which the plaintiff complained to her direct supervisor and others, Simms also complained to Hunter and other supervisors about Masi—but no one took action regarding his behavior. 641 F.2d at 943; Simms Dep. 55:11–12. In the absence of any directive from CCHPS regarding whom to contact in the event of sexual harassment, Simms took advantage of every opportunity she could. In light of these facts, the Court finds that Simms exhausted all available avenues of relief. Moreover, CCHPS's admitted failure to implement a complaint procedure means that it has waived its right to assert an affirmative defense regarding liability. *See* Def.'s Reply 4. And as in *Bundy*, in which the plaintiff presented evidence of similarly situated victims, here the record shows that Masi also harassed Coryne Farmer and Teresa Nwankwo. 641 F. 2d at 943; Sinclair Dep. 54:1–13; Farmer Tr. 3:39–4:14. Therefore, several CCHPS supervisors, including Hunter, Sinclair, and Dorsey, were aware of Masi's behavior—yet no one

made any formal attempt to investigate Simms' complaints. Evidence of CCHPS's failure to protect Simms by employing supervisors who continually swept complaints under the rug is sufficient to render it potentially liable under Title VII, as a reasonable jury could conclude that CCHPS's actions did not rise to the response required by law.

**D.  The Issue of Whether Simms Experienced a Severe and Hostile Work Environment is a Question for the Jury**

A hostile work environment claim for sexual harassment must be "so severe or pervasive [as] to alter the conditions of [the victim's] employment and it must create an abusive working environment." *Meritor*, 477 U.S. at 67. The Supreme Court has cautioned that Title VII is not a "general civility code;" rather, the parameters of Title VII define whether the conditions in the workplace are so offensive and hostile that a reasonable person would change her conduct in response to the behavior in the workplace. *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998). To determine whether an environment is hostile or abusive, a court evaluates all of the circumstances, looking to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23; *see also George v. Leavitt*, 407 F.3d 405, 416–417 (D.C. Cir. 2005).

CCHPS advances several arguments that Simms' workplace environment was not severe enough to constitute a hostile work environment. For example, CCHPS points to evidence that Simms and Masi socialized outside of the workplace to suggest that Masi's comments could not be interpreted as affecting the "terms and conditions of her job." Def.'s Mot. 6. Simms, however, denies socializing with Masi and contends that these incidents actually occurred at work-related functions. Pl.'s Opp'n 15; Simms Interview 8. Resolution of these conflicting accounts is a matter for the jury, not this Court. *See Martin*, 1999 U.S. Dist. LEXIS 19516, at

*13–14 (explaining that a jury, not the court, must evaluate a dispute of material facts). A key factor in this case is the continuous and escalating nature of Masi's conduct toward Simms. When Masi first met Simms, he went out of his way to speak to her and persisted in asking her out every time he saw her, even though she had made it patently evident that she was not interested in his advances. Simms Interview 6:8–14. Masi's harassment continued relentlessly on a daily basis for a period of two years, during which Simms listened to a litany of comments about her appearance and body. Simms Dep. 109:5–17. Once Masi gained control of the Bubble, he wielded his control by delaying her entrance to and exit from the Bubble while asking to see her body. Simms Tr. 44:8–15. When Simms ignored his comments, Masi stared at her, undressing her with his eyes whenever she needed to pass through the Bubble. *Id.* at 44:8–15. Conduct of this kind can rise to the level of a hostile work environment. *See Dickerson v. Sectek, Inc.*, 238 F. Supp. 2d 66, 84 (D.D.C. 2002) (holding that "persistent" use of degrading words and "frequent" offensive conduct are not simply isolated incidents but rise to level of hostile work environment). And Masi's conduct was not only continuous, but began to escalate over time. A jury could readily rely upon the fact that the harassment Simms suffered grew more overt as evidence of a hostile work environment. *See Baker v. Library of Congress*, 260 F. Supp. 2d 59, 67 (D.C. Cir. 2003) (holding that sexually based comments that continually increased in frequency and severity served as evidence supporting a hostile work environment claim).

In response to this evidence, CCHPS contends that Simms did not change her behavior and thus did not suffer from a hostile work environment. The facts show otherwise. As long "as the environment would reasonably be perceived, and is perceived, as hostile or abusive," a hostile work environment claim is actionable. *Graham v. Holder*, 657 F. Supp. 2d 210, 215 (D.C. Cir. 2009) (citing *Harris v. Forklift Sys.*, 510 U.S. 17 (1993)). Here, Masi steadfastly

refused to open the Bubble doors unless he "checked out" Simms' body, causing her to cocoon herself in her lab coat to shield herself from being objectified in the workplace. McCargo Tr. 5:2–9; Simms Tr. 58:3–20, 44:8–17. Simms also rescheduled her duties at work to avoid traveling through the Bubble alone and screened every incoming telephone call from the Bubble to avoid speaking to Masi. Simms Tr. 58:3–20; 44:8–17; McCargo Tr. 4:25–44. Furthermore, it was common knowledge that Masi had a record of inappropriate behavior, and one DOC employee witnessed Simms running away from Masi on several occasions. Reise Tr. 12:6–31. A jury might easily infer from these facts that Simms was in fact experiencing, a hostile work environment. *See Graham*, 657 F. Supp. 2d at 215.

Masi's treatment of Simms eventually turned physical when he accosted Simms in the hallway, grabbing her arm and pulling her toward him. Simms Dep. 65:1–19. In *Lively v. Flexible Packing Ass'n*, 830 A.2d 874 (D.C. 2003), the court denied an employer's motion for summary judgment when a supervisor pulled a female employee into a car, to get her to sit on his lap. *Id.* at 893. While Masi's motive for pulling Simms towards him remains unclear, this case—like *Lively*—involves a female employee who was physically restrained in a confined area with no method of escape. See *id.*; Simms Dep. 65:1–19.

Finally, evidence of Simms' mental state during this period provides further proof upon which a jury could find the existence of a hostile work environment. As set forth above, Simms stopped enjoying her job and began to suffer from severe anxiety due to Masi's daily harassment. This evidence is, at minimum, reflective of the state of Simms' workplace. *See Chowdhury v. Bair*, 680 F. Supp. 2d 176, 179 (D.D.C. 2010) (explaining that a disparaged employee who sought weekly therapy sessions and took medication for depression presented sufficient evidence for a jury to assess whether he suffered from a hostile work environment). Additionally, Masi's

delay in opening the doors of the Bubble made Simms fearful of entering the housing units because she felt that she could not rely on Masi to adequately provide for her safety. Simms Dep. 121:4–15. This humiliation and victimization is yet further evidence upon which a jury might find a hostile work environment. *See Powell v. Lockhart*, 629 F. Supp. 2d 23, 60 (D.D.C. 2007) (denying an employer's motion for summary judgment because the plaintiff employee felt "belittled" as a result of public, daily verbal abuse); Simms Dep. 121:4–15; Simms Tr. 56:15–21.

On a motion for summary judgment, the task of the court is to determine whether a reasonable factfinder could reach a conclusion supporting either party in the dispute. The issue of whether Simms experienced a hostile work environment depends on a jury assessment of her environment. Taken together, the evidence of Masi's persistent conduct that eventually escalated to physical confrontation, Simms' perceptions of her safety in the workplace, and the resulting psychological effect of Masi's conduct on Simms is all evidence upon which a jury could conclude that a reasonable person in Simms' position would have felt trapped in a hostile and abusive work environment. The Court will therefore deny CCHPS's motion for summary judgment.

## V.     CONCLUSION

For the reasons set forth above, the Court finds a genuine issue of fact regarding Simms' hostile work environment claim.

A separate Order memorializing this Opinion will issue this day.

Signed by Royce C. Lamberth, Chief Judge, on July 5, 2011.